**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

**Docket Number(s):** _____19-2664_____     **U.S. v. RENDON-REYES (FELIX ROJAS)**

**Motion For:** Dismissal of Appeal.

**Set forth below precise, complete statement of relief sought:**

The government requests that the appeal be dismissed.

**MOVING PARTY:** **APPELLEE**     **OPPOSING PARTY:** **APPELLANT**

☐ Plaintiff     ☐ Defendant

☐ Appellant/Petitioner     ☒ Appellee/Respondent

**MOVING PARTY:** Susan Corkery, AUSA     **OPPOSING PARTY:** Lawrence D. Gerzog, Esq.

U.S. Attorney's Office     Law Offices of Lawrence D. Gerzog

271-A Cadman Plaza East Brooklyn, N.Y. 11201     40 Fulton St, 23rd Floor, New York, NY, 10038

(718) 254-6286; Susan.Corkery@usdoj.gov     Email:LDGlawoffice@aol.com; Tel: 212-486-3003

Court-Judge/Agency appealed from: The Honorable Edward R. Korman, U.S.D.J., E.D.N.Y.

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes     ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed     ☐ Opposed     ☒ Don't Know

Does opposing counsel intend to file a response:
☐ Yes     ☒ No     ☐ Don't Know

Is oral argument on motion requested?     ☐ Yes     ☒ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?     ☐ Yes     ☒ No  If yes, enter date: _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?     ☐ Yes ☐ No

Has this relief been previously sought in this court?     ☐ Yes ☐ No

Requested return date and explanation of emergency:

**Signature of Moving Attorney:**

_____/s/_____  **Date:** 9/10/2019  Service by: ☒ CM/ECF  ☐ Other [Attach proof of service]

**Form T-1080** (rev.12-13)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

--------------------------------x

USA v. RENDON-REYES (FELIX ROJAS)

DECLARATION IN SUPPORT OF
MOTION TO DISMISS APPEAL

Docket No.  19-2664

--------------------------------x

SUSAN CORKERY hereby declares the following under 28 U.S.C. § 1746:

1.    I am an Assistant United States Attorney for the Eastern District of New York.  The United States is the appellee in the above-captioned criminal appeal.  I make this declaration in support of the appellee's motion to dismiss the appeal.

2.    Defendant-Appellant Felix Rojas has filed a notice of appeal in the United States District Court for the Eastern District of New York (Korman, J.), appealing his conviction, by a plea of guilty, of racketeering, in violation of 18 U.S.C. § 1961(1), and sex trafficking, in violation of 18 U.S.C. § 1591(a)(1).

3.    On April 18, 2017, the defendant executed a plea agreement in which he agreed not to file an appeal or otherwise challenge

2

his conviction or sentence if the term of imprisonment imposed was 300 months or less. (Exhibit 1, p. 6).

4. On April 18, 2017, during his plea allocution, the defendant was specifically advised that he could not appeal if he were sentenced to 300 months' imprisonment or less, and he indicated that he understood this waiver provision. (Exhibit 2, p. 32).

5. On January 24, 2019, Judge Korman sentenced the defendant to 300 months' incarceration. (Exhibit 3-Doc. 148, p. 47; Exhibit 4, p. 2).

WHEREFORE, it is respectfully requested that the appellee's motion to dismiss the appeal be granted.

I declare under penalty of perjury that the foregoing is true and correct.

/s/
_____
SUSAN CORKERY
Assistant U.S. Attorney

Executed on September 10, 2019
Brooklyn, New York

# EXHIBIT 1
**(Plea Agreement)**

TM:ML
F. # 2012R01664

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

FELIX ROJAS,

              Defendant.

- - - - - - - - - - - - - - - - X

PLEA AGREEMENT

15 CR 348 (S-1)(ERK)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and FELIX ROJAS (the "defendant") agree to the following:

1.      The defendant will plead guilty to Counts One and Seventeen of the above-captioned superseding indictment (the "Indictment"), charging violations of 18 U.S.C. §§ 1962(c) and 1591(a) and, at his guilty plea, admit as racketeering acts his participation in sex trafficking of Jane Doe #6 (as alleged in Racketeering Act 8(a) and Count Seventeen) and sex trafficking of Jane Doe #8 (as alleged in Racketeering Act 10(a) and Count Twenty-One). These counts carry the following statutory penalties:

Count One

      a.      Maximum term of imprisonment: life
              (18 U.S.C. § 1963(a)).

      b.      Minimum term of imprisonment: 0 years
              (18 U.S.C. § 1963(a)).

c.    Maximum supervised release term: 5 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 5 years without credit for pre-release imprisonment or time previously served on post-release supervision
(18 U.S.C. § 3583(b) and (e)).

d.    Maximum fine: greater of $250,000, or twice the gross gain or twice the gross loss
(18 U.S.C. § 3571(b)(2), (b)(5) and (e)).

e.    Restitution: mandatory in the full amount of each victim's losses as determined by the Court
(18 U.S.C. §§ 3663A and 3664).

f.    $100 special assessment
(18 U.S.C. § 3013).

g.    Other penalties: removal, as set forth below in paragraph 8; sex offender registration pursuant to the Sex Offender Registration and Notification Act, 42 U.S.C.A. § 16901 et seq., as set forth below in paragraph 11; criminal forfeiture, as set forth below in paragraphs 6 to 7.

Count Seventeen

a.    Maximum term of imprisonment: life
(18 U.S.C. § 1591(b)(1)).

b.    Minimum term of imprisonment: 15 years
(18 U.S.C. § 1591(b)(1)).

c.    Minimum supervised release term: 5 years, maximum supervised release term: life, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to life without credit for pre-release imprisonment or time previously served on post-release supervision; if the defendant commits any criminal offense under Chapter 109A, 110, or 117, or Title 18, United States Code, Sections 1201 or 1591, for which imprisonment for a term longer than 1 year can be imposed, the defendant shall be sentenced to not less than 5 years and up to the maximum term

2

of imprisonment for the offense, as set forth above in paragraph 1(a)
(18 U.S.C. § 3583(b), (e) and (k)).

d. Maximum fine: greater of $250,000, or twice the gross gain or twice the gross loss
(18 U.S.C. § 3571(b)(2), (b)(5) and (e)).

e. Restitution: mandatory in the full amount of each victim's losses as determined by the Court
(18 U.S.C. §§ 1593, 3663A and 3664).

f. $100 special assessment
(18 U.S.C. § 3013).

g. Other penalties: removal, as set forth below in paragraph 8; sex offender registration pursuant to the Sex Offender Registration and Notification Act, 42 U.S.C.A. § 16901 et seq., as set forth below in paragraph 11; criminal forfeiture, as set forth below in paragraphs 6 to 7.

The sentence imposed on each count may run consecutively.

2. The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of

3

imposing an appropriate sentence."). The Office estimates the likely adjusted offense level under the Guidelines to be 44, which is predicated on the following Guidelines calculation:

<u>Sex Trafficking of Minor Jane Doe #3</u> (Counts 1 and 2, Racketeering Act 5(a); Count 11)

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2G1.3(a)(1)) | 34 |
| Plus:   Offense Involved Commercial Sex Act (§ 2G1.3(b)(4)(A)) | +2 |
| Adjusted Offense Level | 36 |

<u>Sex Trafficking of Minor Jane Doe #5</u> (Counts 1 and 2, Racketeering Act 7(a))

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2G1.3(a)(1)) | 34 |
| Plus:   Offense Involved Commercial Sex Act (§ 2G1.3(b)(4)(A)) | +2 |
| Adjusted Offense Level | 36 |

<u>Sex Trafficking of Jane Doe #6</u> (Counts 1 and 2, Racketeering Act 8(a); Count 17)

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2G1.1(c), 2A3.1(a)(2)) | 30 |
| Plus: Offense Involved Conduct Proscribed in §§ 2241(a) & (b) (§ 2A3.1(b)(1)) | +4 |
| Plus: Serious Bodily Injury (§ 2A3.1(b)(4)(C)) | +2 |
| Plus: Victim Abducted (§ 2A3.1(b)(5) | +4 |
| Plus: Vulnerable Victim (§ 3A1.1(b)(1)) | +2 |
| Adjusted Offense Level | 42 |

<u>Sex Trafficking of Jane Doe #7</u> (Counts 1 and 2, Racketeering Act 9(a); Count 19)

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2G1.1(a)(1)) | 34 |
| Adjusted Offense Level | 34 |

<u>Sex Trafficking of Jane Doe #8</u> (Counts 1 and 2, Racketeering Act 10(a); Count 21)

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 2G1.1(a)(1)) | 34 |
| Adjusted Offense Level | 34 |

4

<u>Alien Smuggling and Transportation</u> (Counts 1 and 2, Racketeering Acts 1, 5(d), 8(c), 9(c) and 10(c); Counts 4, 13, 18, 20 and 22)

| | |
|---|---|
| Base Offense Level (§ 2L1.1(a)(3)) | 12 |
| Plus: Transporting 6 to 24 Aliens (§ 2L1.1(b)(2)(A)) | +3 |
| Adjusted Offense Level | 15 |

<u>Money Laundering Conspiracy</u> (Counts 1 and 2, Racketeering Act 13(a); Count 28)

| | |
|---|---|
| Base Offense Level (§§ 2S1.1(a)(1), 2G1.1(a)(1))) | 34 |

<u>Multiple Count Analysis</u> (§§ 3D1.1, 3D1.2, 3D1.3, 3D1.4)

Highest Adjusted Offense Level: 42

| | | Level | Units |
|---|---|---|---|
| <u>Group 1</u>: | Jane Doe #3 | 36 | 1/2 |
| <u>Group 2</u>: | Jane Doe #5 | 36 | 1/2 |
| <u>Group 3</u>: | Jane Doe #6 | 42 | 1 |
| <u>Group 4</u>: | Jane Doe #7 | 34 | 1/2 |
| <u>Group 5</u>: | Jane Doe #8 | 34 | 1/2 |
| <u>Group 6</u>: | Alien Smuggling | 15 | 0 |
| <u>Group 7</u>: | Money Laundering | 34 | 1/2 |

| | | |
|---|---|---|
| Plus: | 3 1/2 Levels (§ 3D1.4) | +4 |
| Less: | Global Reduction (§ 5K2.0) | -2 |
| Total: | | 44 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 42 and a range of 360 months to life, assuming that the defendant falls within Criminal History Category I. Furthermore, if the defendant has accepted responsibility as described above, to

5

the satisfaction of the Office, and if the defendant pleads guilty on or before March 24, 2017, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 41. This level carries a range of imprisonment of 324 - 405 months, assuming that the defendant falls within Criminal History Category I. The defendant reserves the right to contest the above guidelines estimate at the time of sentencing.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 300 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant

6

agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a

"prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note,

and will not file any claim under that law. The defendant agrees to pay the special

assessment by check payable to the Clerk of the Court at or before sentencing. The

defendant understands that he may be subject to removal as set forth in paragraph 8 below.

Nevertheless, the defendant affirms that he wants to plead guilty and to waive his right to

appeal as set forth at the beginning of this paragraph, even if the consequence is the

defendant's automatic removal from the United States.

     5.     The Office agrees that:

     a.     no further criminal charges will be brought against the defendant for (1) racketeering related to the Rendon-Reyes Trafficking Organization in or about and between December 2004 and November 2015; (2) racketeering conspiracy related to the Rendon-Reyes Trafficking Organization in or about and between December 2004 and November 2015; (3) sex trafficking conspiracy in or about and between January 2009 and June 2014; (4) alien smuggling conspiracy in or about and between December 2004 and November 2015; (5) interstate prostitution conspiracy in or about and between December 2004 and June 2014; (6) conspiracy to transport minors for prostitution in or about and between March 2006 and July 2008; (7) sex trafficking of minor Jane Doe #3 in or about and between March 2006 and October 2006; (8) transportation of a minor, Jane Doe #3, for prostitution in or about and between March 2006 and October 2006; (9) alien smuggling of Jane Doe #3 in or about and between March 2006 and July 2006; (10) sex trafficking of Jane Doe #6 in or about and between November 2007 and February 2010; (11) alien smuggling of Jane Doe #6 in or about and between December 2007 and January 2008; (12) sex trafficking of Jane Doe #7 in or about and between November 2007 and December 2008; (13) alien smuggling of Jane Doe #7 in or about and between November 2007 and January 2008; (14) sex trafficking of Jane Doe #8 on or about and between April 2009 and January 2014; (15) alien smuggling of Jane Doe #8 in or about and between April 2009 and June 2010; (16) money laundering conspiracy in or about and between May 2005 and

June 2014; and (17) distribution of proceeds of a prostitution business in or about and between May 2005 and June 2014, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the remaining counts of the Indictment and the underlying indictment with prejudice;

and, based upon information now known to the Office, it will

            b.      make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraph 5(b). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraphs 5(a)-(b).

6.      The defendant represents that he no longer owns or has any interest in any monies or properties that are subject to forfeiture as a result of his violations of 18 U.S.C. §§ 1962 and 1591, as alleged in the above-referenced indictment and the Forfeiture Allegation therein. The defendant represents that he ~~has~~ will disclose all of his assets to the United States on the financial statement ~~dated~~ within 30 days entitled "United States Department of Justice Financial Statement" (hereinafter, the "Financial Statement"), a copy of which will be attached hereto as Exhibit A. The defendant agrees that a failure to disclose assets on the Financial Statement and to inform the government in writing of any material

8

changes up until the time of sentencing constitutes a failure to cooperate with the government, and constitutes a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant. If the government discovers that the defendant owns or holds an interest in any property that the defendant had an obligation to disclose, but failed to do so before sentencing, the defendant agrees to the summary forfeiture of such property or interest.

7. Should undisclosed assets which the defendant owns or in which the defendant has an interest be discovered, the defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of said assets and agrees that said assets shall be forfeited to the United States pursuant to 18 U.S.C. §§ 1963(a) and 1594(d), and 21 U.S.C. § 853(p) as: any interest the defendant has acquired or maintained in violation of 18 U.S.C. § 1962; any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the defendant had established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962, and any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962; and/or any property constituting or derived from proceeds obtained directly or indirectly as a result of his violation, any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of 18 U.S.C. § 1591, and/or as substitute assets. The defendant agrees to execute any documents necessary to effectuate the forfeiture of said assets. In addition, the defendant knowingly and voluntarily waives his right if any, to a jury trial on the forfeiture of said assets, and waives all constitutional, legal, and equitable defense

9

to the forfeiture of said assets, including but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto Clause of the Constitution, the Eighth Amendment of the Constitution (including a claim of excessive fines), the statute of limitations, or venue. The defendant agrees that the forfeiture of said assets is not to be considered a payment of a fine, penalty, restitution loss amount, or a payment on any income taxes that may be due, and shall survive bankruptcy.

8. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses to which the defendant is pleading guilty. Indeed, because the defendant is pleading guilty to racketeering involving sex trafficking and interstate prostitution, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States.

9. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

10

10. This agreement is conditioned upon the following: (a) the defendants listed below (the "covered defendants") entering guilty pleas, pursuant to formal plea offers, on or before April 19, 2017, and (b) acceptance of those pleas by a United States District Court Judge at the time of the plea allocution. The covered defendants are:

i. Jovan Rendon-Reyes;
ii. Saul Rendon-Reyes;
iii. Guillermina Rendon-Reyes;
iv. Francisco Rendon-Reyes;
v. Jose Rendon-Garcia;
vi. Felix Rojas;
vii. Odilon Martinez-Rojas; and
viii. Severiano Martinez-Rojas.

If fewer than all of the covered defendants satisfy conditions 10(a) and 10(b), or if any of the covered defendants subsequently seeks to withdraw his guilty plea, the Office, in its sole discretion, may elect to void any or all of the covered defendants' plea agreements and proceed to trial. The Office may also elect not to recommend a reduction under the Guidelines for a global disposition. No covered defendant will have the right to withdraw his/her guilty plea in any of those circumstances.

11. The defendant has been advised, and understands, that under the Sex Offender Registration and Notification Act, a federal law, the defendant must register and keep the registration current in each of the following jurisdictions: where he resides; where he is employed; and where he is a student. The defendant understands that the requirements for registration include providing his name, residence address, and the names and addresses of any places where he is or will be an employee or a student, among other information. The defendant further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not

11

later than three business days after any change of name, residence, employment, or student status. The defendant has been advised, and understands, that failure to comply with these obligations subjects him to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

12. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement

supersedes all prior promises, agreements or conditions between the parties. To become

effective, this agreement must be signed by all signatories listed below.


Dated: Brooklyn, New York
April 18 , 2017


                                        BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York

                        By:            _____
                                        Margaret Lee
                                        Assistant United States Attorney

                                        Approved by:

                                        _____
                                        Taryn A. Merkl
                                        Supervising Assistant U.S. Attorney


I have read the entire agreement and discussed it with my attorney. I understand all of its
terms and am entering into it knowingly and voluntarily.


_____
FELIX ROJAS
Defendant

Approved by:

_____
Donna R. Newman, Esq.
Counsel to Defendant

Translated by:

_____
Carmen Espinal

13

# EXHIBIT 2

**(Plea Minutes)**

Case 19-2664, Document 21, 09/10/2019, 2651417, Page19 of 333

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,         : 15-cr-00348-ERK-6
                                  :
   - versus -                     : U.S. Courthouse
                                  : Brooklyn, New York
RENDON-REYES, et al.,             :
               Defendants         : April 18, 2017
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

A  P  P  E  A  R  A  N  C  E  S:

| | |
|---|---|
| **For the Government:** | **Bridge M. Rohde, Esq.**<br>United States Attorney |
| BY: | **Margaret Lee, Esq.**<br>**Taryn Merkl, Esq.**<br>Assistant U.S. Attorney<br>271 Cadman Plaza East<br>Brooklyn, New York  11201 |
| **For Defendants:**<br>**Felix Rojas:** | **Donna R. Newman, Esq.**<br>Law Office of<br>Donna R. Newman<br>20 Vesey Street, Suite 400<br>New York, NY 10007 |
| **Severiano Martinez-Rojas:** | **John S. Wallenstein, Esq.**<br>1100 Franklin Avenue<br>Suite 100<br>Garden City, NY 11530 |
| **Transcription Service:** | **Transcriptions Plus II, Inc.**<br>61 Beatrice Ave.<br>West Islip, New York 11795<br>laferrara44@gmail.com |

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

THE CLERK:  Criminal Cause for a Change of Plea Hearing, case number 15-cr-348, <u>United States v. Severiano Martinez-Rojas and Felix Rojas.</u>

Spanish Interpreter, Rosa Olivera, previously sworn, present.

(INTERPRETER PREVIOUSLY SWORN)

THE CLERK:  Counsel, can you please state your name for the record.

MS. MERKL:  Taryn Merkl and Maggie Lee for the United States.

Good afternoon, your Honor.

THE COURT:  Good afternoon.

MS. NEWMAN:  Donna R. Newman on behalf of Mr. Rojas.

THE COURT:  Is the mic working?

MS. NEWMAN:  Sorry.

THE COURT:  Yeah, there you go.

MS. NEWMAN:  Is that better?  Okay.

THE COURT:  Much better, thanks.

MS. NEWMAN:  Let me say that again, so that it's clear.

Donna R. Newman on behalf of Felix Rojas, who is seated next to me, your Honor.

THE COURT:  Okay.  Good afternoon.

3

Proceedings

MR. WALLENSTEIN:  And John Wallenstein for Severiano Martinez-Rojas, who is to my right, Judge.

THE COURT:  All right.  Good afternoon.

And the Spanish Interpreters -- Spanish Interpreter, sorry.

THE INTERPRETER:  There are two of us.

THE COURT:  There are two of you.  So how are we -- all right.

THE INTERPRETER:  Rosa Olivera.

THE INTERPRETER:  I'm James Santoria (ph.).

THE COURT:  All right.  Good afternoon.

THE INTERPRETER:  Good afternoon.

THE COURT:  Logistically, is this going to work?  Each of the -- everybody needs to be able to speak into a microphone, so I don't know if it -- will it be you, Ms. Newman and the -- are you alternating or how are you doing it?

THE INTERPRETER:  Yes, ma'am, we're alternating.

THE COURT:  All right.  Well, let's try it but just if you're close to a microphone, that would be helpful.

So for each defendant, I have the consent to have a plea taken before me, for each of them, I have a plea agreement that have been marked, Mr. Felix Rojas'

Transcriptions Plus II, Inc.

4

Proceedings

plea agreement as Government's Exhibit 4 and Mr. Martinez-Rojas' plea agreement as Government's Exhibit 5.

I have a copy of the indictment.  It's the superseding indictment in this case in the Eastern District, as well as a copy of the first superseding indictment which was filed in the Northern District of Georgia in a case called United States of America v. Arturo Rojas-Coyoto (ph.).

I also have from the United States, a description of the statement of the statutes and essential elements of the statutes that apply in this case.  All right.  So does everybody have a copy of those documents as you need it for your respective client?

MR. WALLENSTEIN:  Judge, do you have a copy of the Rule 20 transfer?  Did I miss that?

MS. MERKL:  She does not but I can provide a copy.

THE COURT:  Okay.  Thanks. All right.  And for Mr. Martinez-Rojas, I have this consent to transfer case for plea and sentence.  All right.  So we'll go over that in a minute.

Is there any other paper that I should have? For the government, anything else?

MS. MERKL:  No, your Honor.

THE COURT:  And for any of the defendants?

Proceedings

5

MS. NEWMAN:  No, your Honor.

MR. WALLENSTEIN:  No, your Honor.

THE COURT:  All right.  So for the government, are there any victims of the offense and if so, has the government fulfilled its obligations to notify them of today's hearing and the right to attend the hearing?

MS. MERKL:  There are victims of this case, your Honor, and yes our victim specialists have notified the victims.

THE COURT:  And do you know if they have any intent to come here today?

MS. MERKL:  It is our understanding that they do not.

THE COURT:  Okay.  Do you have any knowledge if they're going to participate in these proceedings as they go forward?

MS. MERKL:  My understanding, your Honor, is that some of the victims intend to participate at the time of sentence.

THE COURT:  Okay.

THE INTERPRETER:  The interpreter requests that the government attorney speaks up because the interpreter cannot hear.

THE COURT:  Okay.  So why don't you move the microphone closer to you.  Is the other one not working?

Transcriptions Plus II, Inc.

Proceedings

6

THE CLERK:   They both work.

THE COURT:  All right.  So you could each have your own.

MS. MERKL:  It's the government's understanding that the victims intend to participate at the time of sentence.

THE COURT:  All right.  So for each of the defendants, I am going to ask my deputy, Ms. Quinlan, to administer an oath to you.

S E V E R I A N O   M A R T I N E Z - R O J A S ,

    called as a witness, having been first duly sworn,

    was examined and testified as follows:

F E L I X   R O J A S ,

    called as a witness, having been first duly sworn,

    was examined and testified as follows:

THE COURT:  All right.  So I will explain in a little more detail as we go along but just so each of the defendants knows, much of the information that I am going to give you here today is the same for each of your respective cases and many of the questions that I am going to ask you are the same.

So at times I'll ask a question and ask each of you to answer in turn.  There will be times where the question I am asking you or the information I am giving you is specific to your respective case.  So if at any

                                                                    7
                              Proceedings

time what I am saying is confusing and you need

clarification, you can speak with your lawyer or you can

ask me directly and I'll clarify what I have said.

          All right.  So as you may know, this case has

been assigned to a district judge in this court, that's

Judge Korman.  Judge Korman is the judge who will make

the ultimate decision as to whether to accept your guilty

plea and if he does, to sentence you.

          So you have the absolute right to have the

district judge, Judge Korman, listen to your plea without

any prejudice to you.

          Do you understand?  So let's start first, Mr.

Felix Rojas.

          DEFENDANT F. ROJAS:  Yes.

          THE COURT:  And Mr. Martinez-Rojas?

          DEFENDANT MARTINEZ-ROJAS:  Yes.

          THE COURT:  All right.  As you heard me

earlier, I asked you and everyone else to use the

microphones as you're giving me the answer.  The reason

we're doing that is because we're making a recording of

today's proceeding.  A transcript of the proceeding will

be prepared by a court reporter and provided to the

district judge, Judge Korman.

          Judge Korman will review the transcript of

today's proceeding in connection with deciding whether to

8

Proceedings

accept your plea and if he does, with your sentence.  I know I asked everyone to use the microphone.  For most of you -- actually, the person we need the response on the microphone for is the translator's English translation of your answer.  So I am going to ask her to use the microphone when she is providing information to me.

All right.  So as I said, Judge Korman will read the transcript of today's proceeding and in connection with deciding whether to accept your plea and if he does, with your sentence.

So do you understand that?  First, Mr. Felix Rojas?  Do you understand?

DEFENDANT F. ROJAS:  Yes, ma'am.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  As for each of you, do you wish to give up your right to have the district judge listen to your plea and instead proceed here before me here today?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  That was from Mr. F. Rojas and then Mr. Martinez-Rojas.

In connection with your exercise of that right, I have a form here that indicates that you've consented

Proceedings

to me, a magistrate judge, to hear your plea.  So I am holding up the copy of the form for Mr. Felix Rojas.  For each of you, was this form translated for you from English to Spanish?

DEFENDANT F. ROJAS:  Yes, your Honor.

THE COURT:  All right.

DEFENDANT MARTINEZ-ROJAS:  Yes, your Honor.

THE COURT:  So I am not sure I made it clear.  Each of the defendants, you actually don't need to use the microphones when you're answering in Spanish.  It's the interpreter who needs to be able to be closer to the microphone.

All right.  So for each of you, do you understand what this form says?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And then Mr. Martinez-Rojas, do you understand?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Did you review this form with your attorney?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And are each of you in agreement with what it says on your respective forms?  So first Mr. Rojas?

Transcriptions Plus II, Inc.

10

Proceedings

DEFENDANT F. ROJAS:  Yes, yes.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So I am holding up the copy that's Mr. Felix Rojas' form and pointing to the first signature on the page.

Is that your signature, Mr. Rojas?  Can you see it?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  Ms. Newman below that, is that your signature?

MS. NEWMAN:  Yes, it is.

THE COURT:  For the government, is that Ms. Lee or Ms. Merkl, I am not sure.

MS. MERKL:  It's my signature, your Honor.

THE COURT:  All right.  And then for Mr. Martinez-Rojas, pointing to this signature here on the page, is that your signature?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And then Mr. Wallenstein, is that your signature below?

DEFENDANT MARTINEZ-ROJAS:  It is, your Honor.

THE COURT:  And then, Ms. Merkl, below that, is that your signature?

MS. MERKL:  It is.  Thank you very much, your

11

Proceedings

Honor.

THE COURT:  All right.  For each of the defendants, did you give your consent to proceed here before me today voluntarily and of your own free will? Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes, yes.

THE COURT:  All right.  So that was answer from each defendant.

And has anyone made any threats or promises to you to get you to proceed before me here today?

DEFENDANT F. ROJAS:  No.

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  All right.  Each of the defendants said no.

All right.  Additionally, for Mr. Martinez-Rojas, there's an additional form with regard to this case and this is the form that says you consent to transfer of the case, United States of America v. Severiano Martinez-Rojas for a plea and sentence.  This is the case that was in the Northern District or is in the Northern District of Georgia in the Atlanta Division.

So I am holding up my copy of the form.  Have you seen this form?

DEFENDANT MARTINEZ-ROJAS:  Yes.

12
Proceedings

THE COURT:  And was it translated for you from English to Spanish?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And do you understand this form?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And did you have a sufficient opportunity to review it with your attorney?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am going to point to the first signature.  Is that your signature?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Then Mr. Wallenstein, the third signature, is that yours?

MR. WALLENSTEIN:  It is, your Honor, and the second signature on the witness line is that of Jose Carlos Venato (ph.), who is a certified court interpreter.  He translated this document to Mr. Martinez-Rojas at MDC and he signed it at that time and we reviewed it together.

THE COURT:  Okay.  All right.  There's a signature for the Assistant United States Attorney from Georgia and then I am going to hold this up for the government.  So is that Ms. Rhode, the Acting U.S. Attorney's signature?

MS. MERKL:  It is, your Honor.

Transcriptions Plus II, Inc.

13

Proceedings

THE COURT: Okay. All right. So we're going to proceed with this case with regard to the plea and sentence here in this Court.

So for each of the defendants, as we go along today, I am going to ask you a number of questions in order to assure myself and in turn, the district judge, that your plea is in fact a valid plea.

So as I said earlier, if you don't understand any of my questions, you can ask your attorney or you can let me know directly and I will try to clarify what I have said.

So for each of the defendants, do you understand that you have the right to be represented by an attorney at trial and at every other stage of the criminal proceedings including this one?

Mr. Rojas?

DEFENDANT F. ROJAS: Yes.

THE COURT: And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: And each of you, do you understand that if you cannot afford an attorney, the Court would appoint an attorney for you?

Mr. Rojas?

DEFENDANT F. ROJAS: Yes.

THE COURT: And Mr. Martinez-Rojas?

14

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Ms. Newman, are you appointed counsel?

MS. NEWMAN:  Yes, I am.

THE COURT:  And Mr. Wallenstein, are you appointed counsel?

MR. WALLENSTEIN:  Yes, ma'am, I am.

THE COURT:  All right.  For each of the defendants, if at any time you would like to speak with your respective attorney -- so, Mr. Rojas, it's Ms. Newman or Mr. Martinez-Rojas, Mr. Wallenstein, please let me know and I will let you do so.

Do you understand?

DEFENDANT F. ROJAS:  Yes.  Yes.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am going to remind you that earlier in today's proceeding, Ms. Quinlan administered an oath to you.  And in that oath you swore to tell the truth.  So that means that if you answer any of my questions falsely, those answers may later be used against you in a separate prosecution by the U.S. government for the crimes of perjury or of making a false statement.

Do you understand that?  Mr. Rojas?

Transcriptions Plus II, Inc.

15

Proceedings

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So now we're at a stage where I'm going to ask you some background information. What I am going to do is go through the questions first with Mr. Felix Rojas and  then I am going to ask Mr. Martinez-Rojas the same questions.

So, Mr. Felix Rojas, for the record, what is your full name?

DEFENDANT F. ROJAS:  Felix Rojas.

THE COURT:  And how old are you?

DEFENDANT F. ROJAS:  47.

THE COURT:  And what's the highest level of education that you have achieved?

DEFENDANT F. ROJAS:  Secondary school.

THE COURT:  All right.  Is that high school?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And how old were you when you finished school?

DEFENDANT F. ROJAS:  Fifteen.

THE COURT:  And where did you finish school?

DEFENDANT F. ROJAS:  In San Miguel Tenancingo Tlaxcala, Mexico.

THE COURT:  Okay.  And what was the name of the

Transcriptions Plus II, Inc.

16

Proceedings

school?

DEFENDANT F. ROJAS:  Benito Juarez.

THE COURT:  All right.  And since you were fifteen, have you had any formal education?

DEFENDANT F. ROJAS:  No.

THE COURT:  All right.  Are you presently or have you recently been under the care of a doctor?

DEFENDANT F. ROJAS:  No.

THE COURT:  Are you presently or have you recently been under the care of any mental health professional such as a psychologist, psychiatrist, social worker?

DEFENDANT F. ROJAS:  No.

THE COURT:  Have you ever been hospitalized or treated for any mental illness?

DEFENDANT F. ROJAS:  None.

THE COURT:  Have you ever been hospitalized or treated for any addiction to drugs or alcohol?

DEFENDANT F. ROJAS:  No, no.

THE COURT:  In the past 24 hours, have you consumed any alcohol?

DEFENDANT F. ROJAS:  No.

THE COURT:  In the past 24 hours, have you consumed any narcotic drugs?

DEFENDANT F. ROJAS:  No.

17

Proceedings

DEFENDANT F. ROJAS:  No.

THE COURT:  In the past 24 hours, have you taken any medications?

DEFENDANT F. ROJAS:  No.

THE COURT:  Is your mind clear as you sit here today?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Do you understand these proceedings?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  I am going to now ask the same questions for Mr. Martinez Rojas.

For the record, what's your full name?

DEFENDANT MARTINEZ-ROJAS:  Severiano Martinez-Rojas.

THE COURT:  And how old are you?

DEFENDANT F. ROJAS:  52.

THE COURT:  What's the highest level of education that you've completed?

DEFENDANT MARTINEZ-ROJAS:  Elementary school.

THE COURT:  And how hold were you when you finished school?

DEFENDANT MARTINEZ-ROJAS:  Thirteen.

THE COURT:  And where did you go to school?

DEFENDANT MARTINEZ-ROJAS:  In San Miguel

18

Proceedings

Tenancingo Tlaxcala.

THE COURT:  And that's in Mexico?

DEFENDANT MARTINEZ-ROJAS:  Mexico, yes.

THE COURT:  And what was the name of the school?

DEFENDANT MARTINEZ-ROJAS:  Escuela Benito Juarez (ph.).

THE COURT:  Okay.  And since you were thirteen, have you had any formal education?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  All right.  Are you presently or have you recently been under the care of a doctor?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Are you presently or have you recently been under the care of any mental health professional, such as a psychiatrist, psychologist or social worker?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Have you ever been hospitalized or treated for a mental illness?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Have you ever been hospitalized or treated for an addiction to drugs or alcohol?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  In the past 24 hours, have you

Transcriptions Plus II, Inc.

19

Proceedings

consumed any alcohol?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  In the past 24 hours, have you consumed any narcotic drugs?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  And in the past 24 hours, have you consumed any medications?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Is your mind clear as you sit here today?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And do you understand these proceedings?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am going ask your lawyers a few questions.

So with regard to Ms. Newman, Mr. Martinez-Rojas, have you discussed this matter with your client?

MS. NEWMAN:  Yes, I have.

THE COURT:  All right.  Do you speak Spanish or have you had the assistance of an interpreter?

MS. NEWMAN:  Had the assistance of an interpreter.

THE COURT:  And have you had any difficulty communicating with your client?

Transcriptions Plus II, Inc.

20

Proceedings

MS. NEWMAN:  No.

THE COURT:  In your opinion, is Mr. Rojas capable of understanding these proceedings?

MS. NEWMAN:  Yes.

THE COURT:  And in your opinion, does he understand the rights he'll be waiving if he decides to go ahead with his guilty plea?

MS. NEWMAN:  Yes.

THE COURT:  And do you have any doubt as to his competence to plead at this time?

MS. NEWMAN:  No, I do not.

THE COURT:  Did you discussed with him the possible sentence and consequences of his guilty plea?

MS. NEWMAN:  Yes, I  have.

THE COURT:  Did you discuss with him the operation of sentencing guidelines?

MS. NEWMAN:  Yes, I have.

THE COURT:  All right.  And did you discuss with him the minimum terms of imprisonment?

MS. NEWMAN:  Yes.

THE COURT:  Okay.  All right.

And Mr. Wallenstein, with regard to your client, Mr. Martinez-Rojas, I am going to ask you the same questions.  Have you discussed this matter with your client?

21

Proceedings

MR. WALLENSTEIN:  Yes, I have.

THE COURT:  Do you speak Spanish or have you had the assistance of an interpreter?

MR. WALLENSTEIN:  I had the assistance of a certified interpreter on each occasion when we met.

THE COURT:  All right.  And have you had any difficulty communicating with your client?

MR. WALLENSTEIN:  No.

THE COURT:  In your opinion, is Mr. Martinez-Rojas capable of understanding the nature of these proceedings?

MR. WALLENSTEIN:  Absolutely.

THE COURT:  In your opinion, does he understand the rights he will be waiving if he decides to go ahead with his guilty plea?

MR. WALLENSTEIN:  He does and I have explained them to him thoroughly.

THE COURT:  And in your opinion -- well, do you have any doubt as to his competence to plead at this time?

MR. WALLENSTEIN:  No.

THE COURT:  And I am going to ask you, although I believe you touched on this answer anyway, have you explained to him the possible sentencing consequences of a guilty plea?

Transcriptions Plus II, Inc.

22

Proceedings

MR. WALLENSTEIN:  Yes, I have.

THE COURT:  Have you discussed with him the operation of the sentencing guidelines?

MR. WALLENSTEIN:  Yes, I have.

THE COURT:  Have you discussed with him the mandatory minimum sentence that the Court must impose?

MR. WALLENSTEIN:  I have.

THE COURT:  All right. Coming back to each of the defendants, I am going to ask you some other questions.

So each of you, have you had a sufficient opportunity to discuss your case with your attorney?  So for Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And have you had in each of the opportunities when you spoke with your attorney, have you had the assistance of a Spanish language interpreter?

Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Have you had any difficulty communicating with your attorneys?

23

Proceedings

DEFENDANT F. ROJAS:  No.

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Each of you, are you fully satisfied with the representation and advice given to you in this case by your attorney?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay.  And also, Mr. Martinez-Rojas, are you satisfied with the legal representation and advice given to you in your case from Georgia?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  For each of the defendants, have you received a copy of the indictment in this case?   I am just going to hold up my copy.

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  This is the thick document that describes the charges.  All right.

And additionally, for Mr. Martinez-Rojas, have you received a copy of the first superseding indictment from the case in the Northern District of Georgia?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  For each of the defendants, were the various indictments -- so for Mr. Rojas, the superseding indictment in New York and for Mr.

Transcriptions Plus II, Inc.

24

Proceedings

Martinez-Rojas, the superseding indictment in New York, as well as the superseding indictment in Georgia, been translated for you from English to Spanish?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Have you each of you consulted with your respective attorneys about the indictments?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And has each of you discussed with your attorney the particular charges to which it's proposed you're going to plead guilty?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Counsel, do either of you want me to read the indictment?

MS. NEWMAN:  No, your Honor.

MR. WALLENSTEIN:  No, Judge and just so the record is clear, I had both the New York and Georgia indictments translated into Spanish and provided Mr. Martinez-Rojas with a copy and we discussed both indictments.

THE COURT:  All right.

MS. NEWMAN:  And for the record, the indictment

Transcriptions Plus II, Inc.

25

Proceedings

-- the superseding indictment was translated in my presence word for word by a Spanish interpreter.

THE COURT:  Okay.  All right.  So for each of the defendants, do you understand the indictment in the New York case?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And then for Martinez-Rojas, do you understand the indictment in the Georgia case?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  At this point, I am going to provide you with some information about how this criminal case would move forward if you decided not to go ahead with your guilty plea and discuss some information related to your proposed plea.

So for each of you, the first and most important thing you should understand is that you do not have to plead guilty, even if you are guilty.  Under the American legal system, the government or the prosecution has the burden of proving the guilt of a defendant beyond a reasonable doubt. If the government cannot or does not meet its burden proof at trial, the jury in the trial has the duty to find the defendant not guilty even if the defendant is guilty.

26

Proceedings

Do you understand that, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  So for you, even if you are guilty, you have a choice.  It's up to you to decide what to do in your respective cases.  You can withdraw your previously entered plea of not guilty and plead guilty as I've been told you wish to do or you can choose to go to trial simply by persisting in your plea of not guilty and make the government meet its burden of proving your guilt beyond a reasonable doubt.

Do you understand that right?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So each of the defendants said yes.

So you should know that as sometimes happened in American courtrooms, including in this courthouse, that a jury at trial has returned a verdict of not guilty even though everyone in the courtroom believed the defendant to be guilty.

What the jury was saying in that instance, was not that the defendant wasn't guilty but rather that the government or the prosecution had failed to meet its

27

Proceedings

burden of proving the defendant's guilt beyond a reasonable doubt.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So for you, you have a choice.  You can say to the government, prove your case against me.  Meet your burden of proving my guilt beyond a reasonable doubt and you can exercise that right by saying not guilty when I ask how you plead.

If you continue in your plea not guilty, under the Constitution and the laws of the United States of America, you are entitled to a speedy and public trial by jury with the assistance of a lawyer on the charges contained in the indictment that have been filed with the Court.

Do you understand, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  At trial, you would be presumed innocent.  You would have not to prove your innocence at trial.  Were you to go to trial in your case, it would be the United States government's burden to overcome the presumption of innocence and prove you guilty by competent evidence and beyond a reasonable doubt.

28

Proceedings

And if the government failed to meet this burden of proof, the jury would have the obligation to find you not guilty.

Do you understand, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  If you decide to go ahead with your guilty plea, you'll be giving up your right to have the government satisfy its burden of proving you guilty beyond a reasonable doubt.  Instead, you will be admitting your guilt.

Do you understand that?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  In the course of a trial, the witnesses for the government would have to come to court and testify in your presence.  Each of your lawyers would have the right to cross-examine the witnesses for the government, to object to the evidence offered by the government and to offer witnesses and other evidence on your behalf and to subpoena or to compel witnesses to come to court and testify in your presence.

Do you understand?

Transcriptions Plus II, Inc.

29

Proceedings

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes, I do.

THE COURT:  All right.  Each of the defendants said they understood.  If you decide to go ahead with your guilty plea and you do, and I recommend that the district judge accept your plea and that's what Judge Korman does, you're giving up the rights that I've just discussed.

You're giving up your right to confront the witness who might testify against you.  You're giving up your right to offer evidence on your own behalf.  You're giving up your right to have witnesses come to court or to compel witnesses to come to court and to testify.  You're giving up your right to raise any defenses that you may have.

Do you understand, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand. Yes.

THE COURT:  Were there to be a trial in your case, you would have the right to testify on your own behalf if you choose to do so but you could not be required to testify at trial.  Under the Constitution and laws of the United States, a defendant in a criminal case

Transcriptions Plus II, Inc.

30

Proceedings

cannot be forced to take the witness stand at his trial and say anything that could be used against him to show that he is guilty of the crime or crimes with which he is charged.

So, if you decided not to testify at your trial, the judge would instruct the jury that the jurors could not hold that fact against you.  This is called your right against self-incrimination.

Do you understand it, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  I understand.

THE COURT:  All right.  If you plead guilty, I'm going to have to ask you questions about what you did in order to satisfy myself and in turn the district judge that you are, in fact, guilty of the charges to which you are pleading guilty.

As part of that process, you are going to have to answer my questions truthfully, subject to the oath that you took earlier and acknowledge your guilt.

Do you understand?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  It is not going to be enough for you simply to say that you're guilty.  You're going to have to tell me what it is that you did such that you are

31
Proceedings

in fact guilty of the charges to which you're pleading guilty.

Does each of you understand, Mr. Rojas, Mr. Martinez-Rojas then?

DEFENDANT F. ROJAS:  Yes, I do.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  If you plead guilty and I recommend that the district judge accept your plea and that's what Judge Korman does, you will be giving up your constitutional right to a trial and to all the other rights that I have just discussed.  There will not be a further trial of any kind in your case.  If Judge Korman accepts your plea, he will simply enter a judgment of guilty on the basis of that plea.

Do you understand that, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  If after you are sentenced, you or your attorney thinks the Court has not properly followed the law in sentencing you, you can usually appeal your sentence to a higher court.  But by pleading guilty however, you will not except under very limited circumstances, be able to challenge your judgment of conviction by appeal or by a collateral attack.

32

Proceedings

Do you understand?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  All right.  We're going to go over your plea agreement in a few minutes but I want to draw your attention to a limitation on your right to appeal. So this is a little bit different from what the usual right is because of your plea agreement.

So for Mr. Rojas, in Government's Exhibit 4, which is your plea agreement, in paragraph 4 on page 6, there's a provision which I am going to read which says, "The defendant agrees not to file an appeal or otherwise challenge by petition pursuant to 28 United States Code Section 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 300 months or below."

All right.  So do you understand what I just read?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Did you go over it with your attorney?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Are you in agreement with that statement?

DEFENDANT F. ROJAS:  Yes, I am in agreement.

33

Proceedings

THE COURT: All right. And do you understand that it's a limitation on your appellate rights and other rights to attack your sentence and your conviction?

DEFENDANT F. ROJAS: Yes, I understand.

THE COURT: All right. For Mr. Martinez-Rojas, you have a similar provision in your plea agreement. Your plea agreement is Government's Exhibit 5. In paragraph 4 on page 8, it provides as follows:

"The defendant agrees not to file an appeal or otherwise challenge by petition pursuant to 28 United States Code Section 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below."

Do you understand what I just read?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: Did you go over that provision with your attorney?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: Are you in agreement with it?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: Okay. So for each of the defendants, are you willing to give up your right to a trial and the other rights that I've just discussed? Mr. Rojas?

DEFENDANT F. ROJAS: Yes.

34

Proceedings

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes, yes.

THE COURT:  All right.  So just for the record, we're changing the Spanish interpreter.  So can you just state your name, so it's clear?

THE INTERPRETER:  I'm James Santoria.

THE COURT:  Okay.  All right.  So now we're going to talk about the particulars of your plea agreement.  So for Mr. Rojas again, your plea agreement is marked as Exhibit 4 and Mr. Martinez-Rojas, yours is marked as Government's Exhibit 5.

For each of you on the last page of the document, in the middle of the page it says, "I have read the entire agreement and discussed it with my attorney. I understand all of its terms and I am entering into it knowingly and voluntarily."

So first for Mr. Rojas, was your plea agreement translated for you from English to Spanish?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Okay.  Is that statement that I have just read, which I will read again for the record, "I have read the entire agreement and discussed it with my attorney.  I understand all of its terms and I am entering into it knowingly and voluntarily," is that a correct statement?

35

Proceedings

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  I am going to show you some signatures.  I'm holding up the original copy, Mr. Rojas.  I'm pointing right below the signature I just read.

Is that your signature?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And then Ms. Newman, right below that, is that your signature?

MS. NEWMAN:  Yes, it is and just for the record so it's clear, Ms. Carmen Espinal (ph.) who is appointed paralegal and Spanish speaking, did translate the plea agreement in my presence approximately two weeks ago. And I was present for that.  We answered all his questions at that time.

THE COURT:  All right.  And what was translated the same copy of the plea agreement as the one we have today?

MS. NEWMAN:  Yes, yes, yes.

THE COURT:  Okay.  All right.  And then we have both of you here, so Ms. Lee for the government, first is that your signature?

MS. LEE:  Yes, your Honor.

THE COURT:  And Ms. Merkl, her supervisor, is that your signature?

Transcriptions Plus II, Inc.

36

Proceedings

MS. MERKL:  Yes, Judge.

THE COURT:  Okay.  All right.  I am going to show you, Mr. Rojas, page 8.  I'm holding up this copy. There was a handwritten amendment to paragraph 6 to the second full sentence.  The second full sentence now reads, "The defendant represents that he will disclose all of his assets to the United States on the financial statement within thirty days entitled, "United States Department of Justice Financial Statement, hereinafter the 'financial statement'," a copy of which," it says, "is attached hereto as Exhibit A."

Do you need to change that last will be attached?

MS. MERKL:  Yes, it will be attached.

THE COURT:  All right.  Here.  I'm going to just correct it.  All right.  Can you just show that to everybody?  So can you initial that change to it now says "will be," and then just confirm on the record for the government -- I'm not sure which government attorney is initialing it, was that Ms. Lee?

MS. LEE:  Yes, your Honor.

THE COURT:  All right.

MS. LEE:  I did.

THE COURT:  All right.  So Ms. Newman, can you confirm the initials that are there now are yours and

37

Proceedings

also initial that will be change?  And then have your client initial as well and confirm on the record that he's initialed that.

MS. NEWMAN:  Yes.  Yes, your Honor, we have -- my client initialed in my presence the two changes.

THE COURT:  Okay.

MS. NEWMAN:  One that was originally made and the second change as the Court has pointed out and that we've now made on the record.

THE COURT:  And you've initialed it as well?

MS. NEWMAN:  Yes, we have.

THE COURT:  All right.  And were you able to review that change with the assistance of a Spanish-language interpreter?

MS. NEWMAN:  Yes, I was.

THE COURT:  Okay.  All right.  So, Mr. Martinez-Rojas, we're just going to go over together the initials and signing of your plea agreement which is Government's Exhibit 5.

So similarly, as I said, your agreement says, "I have read the entire agreement and discussed it with my attorney.  I understand all of its terms and I am entering into it knowingly and voluntarily."

Was this plea agreement translated for you from English to Spanish?

Transcriptions Plus II, Inc.

38

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And is that statement that I just read a correct statement?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And right below that statement is a signature.  I'm holding up my copy which is the original.  Is that your signature?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And then Mr. Wallenstein over here, is that your signature?

MR. WALLENSTEIN:  It is, your Honor and for the record not only did I discuss that with Mr. Martinez-Rojas, with the assistance of a Spanish interpreter but I had the agreement translated into Spanish and provided him with a copy written in Spanish.

THE COURT:  And then is that -- the work that you just referred to, was that done by J. Carlos Venant (ph.)?

MR. WALLENSTEIN:  Yes.

THE COURT:  Okay.  And then for the government, Ms. Lee, up at the top, is that your signature?

MS. LEE:  Yes, your Honor.

THE COURT:  And your supervisor, Ms. Merkl, is that your signature?

MS. MERKL:  Yes, Judge.

Transcriptions Plus II, Inc.

39

Proceedings

THE COURT: All right. So on page 11, paragraph 6, there was a handwritten change, Mr. Martinez-Rojas, to the plea agreement. So the relevant sentence in paragraph 6 which is the second sentence now says, "The defendant represents that he will disclose all of his assets within thirty days to the United States on the financial statement entitled, "Department of Justice Financial Statement, hereinafter the 'financial statement,' a copy of which will be attached hereto as Exhibit A."

Do you understand that sentence?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: Did you go over it with your lawyer?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: And are you in agreement with that sentence?

DEFENDANT MARTINEZ-ROJAS: Yes.

THE COURT: Here, I am going to ask Ms. Quinlan to just have the parties initial the change where the will be and confirm on the record for the government and for the defendant, that those initials are in fact the respective initials. So Mr. Wallenstein, if you could initial and just let me know that you have initialed that sentence.

Transcriptions Plus II, Inc.

40

Proceedings

So, Mr. Wallenstein, you initialed it, is that right?

MR. WALLENSTEIN:  I did, your Honor and my client is about to.

THE COURT:  Okay.

MR. WALLENSTEIN:  And, Judge, my client have both initialed all of the changes in this document.

THE COURT:  Okay.  Thanks.  Have the government, just show it then.  So Ms. Lee, you're initialing it, is that right, the change?

MS. LEE:  Yes, your Honor, I am.

THE COURT:  Okay.  All right.  We're going to go over this in a little bit more detail now.  Just for each counsel, Ms. Newman and Mr. Wallenstein, were all formal offers -- plea offers by the government conveyed to your respective client?

MS. NEWMAN:  Yes, for Mr. Rojas.

MR. WALLENSTEIN:  Yes, your Honor.  I conveyed all the offers to Mr. Martinez-Rojas and discussed them with him.

THE COURT:  Okay.  All right.  So for each of the defendants, have you read the plea agreement?  So, for Mr. Rojas, did you read the plea agreement in Spanish or it was read to you in Spanish, I think?

DEFENDANT F. ROJAS:  Yes.

41

Proceedings

THE COURT:  All right.  So let me ask -- make sure that's clear.  So, Mr. Felix Rojas, is it correct that the plea agreement was read to you in Spanish?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And then Mr. Wallenstein, you had a written copy provided to your client or it was read to him in Spanish, which one?

MR. WALLENSTEIN:  Both.

THE COURT:  Okay.  Both.  So, Mr. Martinez-Rojas, did you read a copy of your plea agreement in Spanish?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And was the plea agreement read to you in Spanish, as well?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So for each of the defendants, in reviewing the plea agreement, did you have the assistance of a Spanish-language interpreter?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And for each defendant, did you review the plea agreement with your attorney?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

Transcriptions Plus II, Inc.

42

Proceedings

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And for each of you when you were reviewing the agreement, did you have the assistance -- sorry, reviewing it with your attorney, did you have the assistance of a Spanish-language interpreter?  So, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  For each of you, do you understand all of the terms of your respective plea agreements?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes, yes.

THE COURT:  For each of the defendants, does your respective plea agreement -- so for Mr. Felix Rojas, Government's Exhibit 4, for Mr. Martinez-Rojas, Government's Exhibit 5, does it accurately represent the entire understanding or agreement that you have with the government?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

43

Proceedings

THE COURT:  All right.  For each of you, has anyone made any promise or assurance to you that's not included in the plea agreement in order to get you to agree to this plea agreement?

DEFENDANT F. ROJAS:  No.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  All right.  Has anyone threatened you in any way to persuade you to accept the plea agreement?

DEFENDANT F. ROJAS:  No.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Okay.  All right.  For defense counsel, let me just make sure.  Has each of you read and reviewed with your client the written plea agreement that is before the Court as to your respective client?

MS. NEWMAN:  Yes.

MR. WALLENSTEIN:  Yes, your Honor, I have.

THE COURT:  Okay.  And each of you had the assistance of a Spanish-language interpreter when you were discussing the plea agreement with your client, right?

MS. NEWMAN:  Yes, that's correct.

MR. WALLENSTEIN:  Yes, your Honor.

44

Proceedings

THE COURT:  All right.  And for each of you, as to your respective client's plea agreement, does it reflect your understanding of the entire agreement that your client has entered into with the government?

MS. NEWMAN:  Yes, for Mr. Rojas.

MR. WALLENSTEIN:  And for Mr. Martinez-Rojas, it does, your Honor.

THE COURT:  Okay.  For the defendants, do you understand that if you fail to fully comply with your agreement with the government, the government will be released from its obligations but you will not be released from your guilty plea.

Do you understand that?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Each of the defendants said yes.  All right.

So now I am going to explain the sentencing scheme applicable in  your case.  I'm going to first go over Mr. Felix Rojas' applicable sentencing scheme but Mr. Martinez-Rojas, I would appreciate if you would listen because some of the information is going to relate to your case as well.

So for Mr. Felix Rojas, this is what I am going to go over as outlined in your plea agreement which is

45

Proceedings

Government's Exhibit 4 which proposed is that you're going to plead guilty to Count 1 and Count 17 of the superseding indictment in the case in New York.  It charges you with violations of particular statutes.  Those are 18 United States Code Section 1962(c) and 1591(a) and as part of your guilty plea, you are going to admit to racketeering -- as racketeering acts, your participation in the sex trafficking of Jane Doe number 6, which is alleged as Racketeering Act 8(a) and Count 17 of the indictment, as well as sex trafficking of Jane Doe, which is alleged as  Racketeering Act 10(a) and Count 21.

All right.  Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  All right.  So those counts carry the following statutory penalties; a maximum term of imprisonment of life.  This is -- I'm sorry, let me start that again.

Count 1 carries a maximum term of imprisonment of life.  It carries a minimum term of imprisonment of no time in prison.  It carries a maximum supervised release term of five years.  That supervised release term would follow any term of imprisonment.

If a condition of release were violated, you may be sentenced for up to five years without credit for

Transcriptions Plus II, Inc.

46

Proceedings

pre-release imprisonment or time previously served on post-release supervision.

Do you understand that?

DEFENDANT F. ROJAS: Yes, I understand.

THE COURT: All right. Supervised release would mean that there may be many restrictions placed on your liberty. Those restrictions may include but are not limited to travel limitations, requirements that you report regularly to a probation officer, a prohibition on carrying a gun or other weapons and the like.

Do you understand that supervised release?

DEFENDANT F. ROJAS: Yes, I understand.

THE COURT: All right. Additional possible sentencing consequences for Count 1 include the maximum fine would be the greater of $250,000 or twice the gross gain or twice the gross loss.

Do you understand that?

DEFENDANT F. ROJAS: Yes, I understand.

THE COURT: Restitution is mandatory in your case. It will be in the full amount of each victim's losses as determined by the judge.

Do you understand that?

DEFENDANT F. ROJAS: Yes, I understand.

THE COURT: All right. There's a $100 special assessment that you have to be charged.

Transcriptions Plus II, Inc.

47

Proceedings

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Other sentencing consequences include removal from the United States.  This is described in paragraph 8.  So I am going to go over that.

All right.  Let me just ask, was this defendant extradited or were they in the United States?

MS. MERKL:  These two defendants were both extradited, your Honor.

THE COURT:  Okay.  All right.  So I am going to explain to you a provision that's in the plea agreement -- really just go over what's in the plea agreement, which relates to your immigration status in the United States.

What paragraph 8 explains is that pleading guilty may have consequences for any immigration status that you might have in the United States if you're not a citizen of the United States.  Under federal law, a broad range of crimes are what are called removable offenses including the ones to which it's proposed that you're going to plead guilty.

In fact, because you're going to plead guilty to racketeering involving sex trafficking and interstate prostitution, your removal from the United States is presumptively mandatory but immigration consequences are

48

Proceedings

decided in a separate proceeding.  So nobody here can tell you exactly what the immigration consequences of a guilty plea would be.

But what I would like to know is is it correct that you would like to go ahead with your guilty plea regardless of any immigration consequences that guilty plea may entail including possibly the automatic removal from the United States.

Is that correct, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Okay.  Additional possible sentencing consequences includes sex offender registration pursuant to a federal act called, Sex Offender Registration Notification Act, 42 United States Code Section 16901, et seq., meaning the sections following on.

That's described in paragraph 11 of your agreement with the government.  Do you understand paragraph 11?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Did you review it with your attorney?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  And are the statements made in paragraph 11 correct?

49

Proceedings

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Additionally, the possible sentencing consequences include criminal forfeiture. That's described in paragraph 6 and 7 of your plea agreement which is Government's Exhibit 4.

Have you read or was paragraph 6 and paragraph 7 read to you in Spanish?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Do you understand paragraph 6 and 7?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Did you have a sufficient opportunity to review paragraph 6 and 7 with your attorney?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Are you in agreement with paragraph 6 and 7?

DEFENDANT F. ROJAS:  yes.

THE COURT:  All right.  Now we're going to talk about the possible sentencing consequences of Count 17. The maximum term of imprisonment is life.  The minimum term of imprisonment is fifteen years.

Do you understand those provisions?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Do you understand that the judge

50

Proceedings

has to sentence you to a minimum term of imprisonment of fifteen years?

DEFENDANT F. ROJAS:  Yes, I understand that.

THE COURT:  All right.  Additional possible sentencing consequences include a minimum supervised release term of five years with a maximum supervised release term of life which would follow any term of imprisonment.  If a condition of release is violated, you may be sentenced for up to life without credit for pre-release imprisonment or time previously served on post-release supervision.

Do you understand that provision?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  If you commit any criminal offense under particular laws which are outlined in your plea agreement which are Chapter 109(a), 110, or 117 or Title 18 of the United States Code Section 1201 or 1591, for which imprisonment for a term longer than one year can be imposed, you shall be sentenced to not less than five years and up to the maximum term of imprisonment for the offense which was set forth in paragraph 1(a) which was life.

Do you understand that provision?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Additionally, the maximum fine is

Transcriptions Plus II, Inc.

51

Proceedings

the greater of $250,000 or twice the gross gain or twice the gross loss.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Restitution is mandatory in the full amount of each victim's losses as determined by the Court.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  You have to be charged $100 special assessment.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Similar to the previous count, penalties include removal from the United States as described in paragraph 8, sex offender registration pursuant to the Sex Offender Registration Notification Act, which is described in paragraph 11 and criminal forfeiture, which is set forth below in paragraphs 6 and 7.

So we went over earlier paragraphs 6, 7, 8, and 11.  Do you understand all of those provisions?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  Also, the agreement and the sentencing scheme provide the sentence imposed on

52

Proceedings

each count may run consecutively.  So not at the same time but one after the other.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  Okay.  So, Mr. Martinez-Rojas, I am going to go over the same parts of your plea agreement which has been marked as Government's Exhibit 5.

In your case, what's proposed is that you are going to plead guilty to Counts 1 and 19 of the New York case, which has a number 15-cr-348.  We're going to talk about it as the EDNY or Eastern District of New York indictment that charges you with violations of 18 United States Code Sections 1962(s) and 1591(a) and during your guilty plea, you're going to admit as racketeering acts, your participation in the sex trafficking of Jane Doe 1, as alleged in the Racketeering Acts 3(a), 3(b) and Count 7 and 8 of the indictment, sex trafficking of a minor, Jane Doe 3, as alleged in Racketeering Act 5(a) and Count 11, the sex trafficking of Jane Doe 6, as alleged in Act 8(a) and Count 17, sex trafficking of Jane Doe 7, as alleged in Racketeering Act 9(a) and Count 19 and sex trafficking of Jane Doe 9, as alleged in Racketeering Act 11(a) and Count 23.

Do you understand all of that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

53

Proceedings

THE COURT:  You're also going to plead guilty to Count 1 of the Georgia case.  The Georgia case is known by the number 13-cr-128 and it's referred to as the NDGA or Northern District of Georgia indictment.  It charges you with violations 18 United States Code Section 1591(a) and at your guilty plea, you're going to admit to your participation in sex trafficking of an individual identified as "MSJ" as alleged in Count 3 and sex trafficking of an individual as "SAM" as alleged in Count 5.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay. So with regard to the indictment in the Eastern District of New York or the EDNY indictment, Count 1, these are the following -- the following is the statutory -- possible statutory penalties.  All right.

So for Count 1, the maximum term of imprisonment is life.  The minimum term of imprisonment is zero years.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  The maximum supervised release term is five years.  It would follow any term of imprisonment. If a condition of supervised release were violated, you

54

Proceedings

may be sentenced for up to five years and you would not receive credit for pre-release imprisonment or time previously served on post-release supervision.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And as I said to your colleague, Mr. Rojas, if you're subject to supervised release or when you're subject to supervised release, there may be many restrictions placed on your liberty including limitations on travel, limitations on your right to carry any weapon and the requirement that you report to probation on a regular basis, as well as other possible limitations.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  The maximum fine under Count 1 is the greater of 250,000 dollars or twice the gross gain or twice the gross loss.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Restitution is mandatory in the full amount of each victim's losses as decided by the Court and you must be charged $100 special assessment.

Do you understand those provisions?

Transcriptions Plus II, Inc.

55

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Other penalties include removal from the United States as described in paragraph 8.  Did you hear what I said to Mr. Rojas about what removal means?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Do you understand it?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Did you review paragraph 8 in your plea agreement which is Government's Exhibit 5?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And it was translated for you from English to Spanish, correct?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Did you have a sufficient opportunity to review paragraph 8 with your attorney?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Are you in agreement with paragraph 8?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And is it correct that despite the serious immigration consequences, including your possible removal or automatic removal from the United States, which is in fact presumptively mandatory, that you would still like to go ahead with your guilty plea regardless

Transcriptions Plus II, Inc.

56

Proceedings

of these immigration consequences?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Other possible penalties include sex offender registration pursuant to the Sex Offender Registration Notification Act, 42 United States Code Section 16901, et seq., meaning following on, which is described in paragraph 11.

Did you read paragraph 11 in the Spanish translation of your plea agreement?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Do you understand paragraph 11?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Are you in -- well, I am sorry, did you review paragraph 11 with your attorney?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And are you in agreement with paragraph 11?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Another possible sentencing consequence is criminal forfeiture which is described in paragraph 6 and 7 of your plea agreement.

Did you read them in Spanish, paragraph 6 and 7?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Do you understand them?

Transcriptions Plus II, Inc.

57

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Are the statements in paragraph 6 and 7 correct?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And is it correct you went over paragraph 6 and 7 with your attorney?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And is it correct that you're in agreement with paragraph 6 and 7?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am going to go over possible sentencing consequences of Count 19 of the Eastern District of New York indictment.  The maximum term of imprisonment is life.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  The minimum term of imprisonment is fifteen years.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  So you understand the judge has to sentence you to at least fifteen years in jail or in prison.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

Transcriptions Plus II, Inc.

58

Proceedings

THE COURT:  All right.  Similar to the previous count, there's a minimum supervised release term.  In this count it's five years and the maximum supervised release term is life.

So I am not sure I said that clearly.  The minimum supervised release term is five years.  The maximum supervised release term is life.  It would follow any term of imprisonment.  If a condition of released were violated, you may be sentenced for up to life without credit for pre-release imprisonment or time previously served on post-release supervision.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  If you commit any offense under particular federal laws which are Chapter 109(a), 110 or 177, or Title 18 of the United States Code Sections 1201 or 1591, for which imprisonment for a term longer than one year can be imposed, you shall be sentenced to not less than five years and up to the maximum term of imprisonment for the offense which is described in paragraph 1(a) and which is life.

Do you understand those provisions?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right. Similarly, this count carries a maximum fine of the greater of $250,000 or

59

Proceedings

twice the gross gain or twice the gross loss, as well as a restitution provision in which restitution is mandatory in the full amount of each victim's loss as determined by the Court.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  You have to be charged $100 special assessment.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Other penalties include removal from the United States as set forth in paragraph 8.  I've already asked you about paragraph 8 but is it correct that you understand paragraph 8?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And is it correct that even though paragraph 8 describes that your removal from the United States is presumptively mandatory, if you go ahead with this guilty plea, that you still wish to go ahead with the plea despite those serious immigration consequences? Is that correct?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Other possible sentencing consequences include sex offender registration pursuant to the Sex Offender Registration Notification

60

Proceedings

Act, 42 United States Code Section 16901, et seq. as described in paragraph 11.

Is it correct as you said earlier that you have reviewed paragraph 11 of your plea agreement?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And is it correct that you're in agreement with what it says in paragraph 11?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And lastly, it's an additional possible sentencing consequence is criminal forfeiture which is described in paragraph 6 and 7 of your plea agreement which is Government's Exhibit 5.

Is it correct that you understand paragraphs 6 and 7?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay.  And are you in agreement with the statements in paragraphs 6 and 7?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So before we start talking about the Georgia indictment, let me just ask globally with regard to your plea agreement, Mr. Martinez-Rojas, do you understand all of the possible sentencing consequences that I've gone over, Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

Transcriptions Plus II, Inc.

61

Proceedings

THE COURT: Okay.  And did you have a sufficient opportunity to review them with your attorney?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And do you understand that Count 19 provides for a minimum term of imprisonment of fifteen years?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Now we're going to talk about Count One of the Northern District of Georgia indictment.  For that count, it provides for a maximum term of imprisonment of life.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  It also provides for a minimum term of imprisonment of fifteen years.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  It provides for a minimum supervised release term of five years, a maximum supervised release term of life.  The supervised release would follow any term of imprisonment.  If a condition of release were violated, you may be sentenced for up to life without credit for pre-release imprisonment or time previously served on post-release supervision.

And if you commit any criminal offense under

Transcriptions Plus II, Inc.

62

Proceedings

particular federal laws, which are Chapter 109(a), 110, 117, or 18 United States Code Section 1201 or 1591, for which a term longer than one year of imprisonment can be imposed, you shall be sentenced to not less than five years and up to the maximum term of imprisonment for the offense as described in paragraph 1(a) which is life.

THE COURT: Do you understand those provisions?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  The maximum fine is the greater of $250,000 or twice the gross gain or twice the gross loss.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Restitution is mandatory in the full amount of each victim's losses as determined by the Court and you have to be charged $100 special assessment.

Do you understand those provisions?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  As with the other counts, additional possible sentencing consequences include your removal from the United States as described in paragraph 8.  I've asked you this before I want to make sure you understand it in connection with the Georgia indictment.

The offenses to which you are pleading guilty mean that your removal from the United States is

Transcriptions Plus II, Inc.

63

Proceedings

presumptively mandatory.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Despite the serious immigration consequences including your presumptive removal from the United States.

Do you still want to go ahead with your guilty plea?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Other sentencing consequences include the sex offender registration pursuant to the Sex Offender Registration Notification Act which is described in paragraph 11 of your plea agreement.

Do you understand paragraph 11?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And are you in agreement with it?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And criminal forfeiture as set forth in paragraphs 6 and 7.

Do you understand paragraphs 6 and 7?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And are you in agreement with those paragraphs?

DEFENDANT MARTINEZ-ROJAS:  Yes.

64

Proceedings

THE COURT:  All right.  This plea agreement -- let me say that differently, sorry.

The sentence imposed on each count may run consecutively which means one sentence after another, not at the same time.  Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay.  All right.  Let me just make sure you understand the Northern District of Georgia indictment, Count 1, if you decide to plead guilty to that, it includes a minimum term of imprisonment of 15 years.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay.  All right.  I am going to -- All right.  Let me just take a one minute break, everybody.  If you want to -- if the marshals are okay, just stretch for a minute.  Do we have water there, Krista?

(Off the record.)

THE COURT:  -- earlier, the district judge, Judge Korman is going to be the sentencing judge.  The district judge or the sentencing judge does not have complete discretion to impose a sentence outside of the statutory minimum and maximum sentences set forth in the statute.

65

Proceedings

Each of the defendants, do you understand that, Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So each of the defendants said yes.  Right?  That was the translation?  Actually, why don't -- for the interpreter, can we just move the microphone closer to you?  Yes, thanks.

All right.  In the sentencing process, as a first step, the judge must consider what are called the advisory sentencing guidelines which have been issued by the United States Sentencing Commission to determine what's a reasonable sentence in a criminal case.

As a second step, the judge must consider whether there are factors present that would allow the sentencing judge to depart from the advisory sentencing guidelines either upwardly or downwardly.

Additionally, the judge has to review the factors that are set forth in a particular federal statute which is 18 United States Code Section 3553(a).  The judge compares those factors against all of the facts and circumstances of your particular case and it might be that the judge decides to impose a non-guideline sentence.

66
Proceedings

But the practical bottom line for you is until the date of sentencing, when the judge reviews the materials from today's proceeding, reviews a presentence report that will be prepared about you and hears from you, your lawyer and the government, you cannot know with certainty what the sentencing guidelines will be for your case or whether there will be grounds for the judge to depart from them.  Or whether the judge will impose a non-guideline sentence.

Do you understand that?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Each of you understand that.

THE COURT:  And even though I am talking about the sentencing guidelines which we're going over and how the judge has some discretion, for each of you, it's proposed that you're going to plead guilty to counts that include a minimum term of imprisonment of fifteen years.

Do you understand that?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So despite the uncertainty as to exactly what the guidelines will be when you get to your sentencing date, I am going to ask

67

Proceedings

the attorneys, first the government and then you're respective attorneys to give their best estimate as to what the sentencing guidelines are likely to say.

You should note that these estimates are based on the facts available to the lawyers at this time.  So this is their best estimate but they could be wrong.

Do you understand?  This is just their best estimate.

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Let's do Mr. Rojas first.

For the government, do you want to --

MS. MERKL:  So starting with Mr. Felix Rojas, your Honor, the government's estimate as set forth in the plea agreement is that the guidelines will be approximately 324 to 405 months, assuming that the defendant falls within criminal history category one.

I would note that that estimate is based on the global disposition of the case, which the government does anticipate is going to happen.  We have all the defendants in this case scheduled to plead by Thursday of this week.

So taking into consideration the two level reduction for a global disposition, the overall adjusted

Transcriptions Plus II, Inc.

68

Proceedings

offense level that we estimate at this time is 324 to 405 months.

THE COURT:  Okay.  So just so the record is clear, paragraph 10 asks that or requires rather that all of the defendants plead before April 19th but given everyone's schedule, including the Court's, that Thursday is actually the 20th.  Is that going to be an issue?

MS. MERKL:  No, your Honor.

THE COURT:  Okay.  All right.

So, Ms. Newman, with regard to the sentencing guidelines as they apply to your client, what's your estimate?

MS. NEWMAN:  Thank you, your Honor.  We disagree with many of the enhancements that are contained in the government's estimation and as a result, our estimation is much lower.  However, for these proceedings, so that my client is fully aware, that these could come to fruition, that the probation department and the Court could find the government's estimation correct.  Rather than go through the various groupings, we simply say that we -- I have advised my client of the government's estimations, carefully reviewed with him the guidelines, our disagreements, the arguments we would make on his behalf with respect to the various enhancements.

69

Proceedings

And so he is aware of where we are going and whether it will succeed or not and that it is up to the Court ultimately to calculate the guidelines accurately.

THE COURT:  All right.  Mr. Rojas, did you understand what the government said with regard to the estimate they have for the sentencing guidelines?

DEFENDANT F. ROJAS:  Yes.  Yes, I understood.

THE COURT:  All right.  And do you understand that your attorney is offering a different view of what the guidelines may be in your case?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  And do you understand that any disagreement as between the attorneys will not be decided until the judge, Judge Korman, makes a decision as to what the guidelines are for your case and decides what your sentence is going to be.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  All right.  And I know I keep going back to this but it's a very important point.  Despite the fact that we're talking about the guidelines, do you understand that there's a mandatory minimum sentence of 15 years?

DEFENDANT F. ROJAS:  Yes,  I understand.

THE COURT:  All right.  Let's go over Mr.

70

Proceedings

Martinez-Rojas, with regard to the sentencing guidelines. So for the government, these are outlined in his plea agreement, correct?

MS. MERKL:  Correct, your Honor.  The government's current estimate of the guidelines is set forth in pages 5, 6 and 7 of the plea agreement for Mr. Severiano Martinez-Rojas and based on the totality of the facts as we understand them right now, we estimate a total adjusted offense level of 38, which carries a range of imprisonment of 235 to 293 months, assuming that the defendant falls within criminal history category one.

As with Mr. Rojas, Mr. Martinez-Rojas' estimate is based on a two level reduction for the global disposition and as I noted previously, we do expect that to come to fruition because all of the defendants are currently scheduled to plead guilty by this Thursday.

THE COURT:  All right.  And just so the record is clear, I believe this agreement also includes the April 19th date, correct?

MS. MERKL:  Correct.

THE COURT:  All right.  And as things are scheduled now, these pleas will be completed by the 20th. Is that going to be an issue?

MS. MERKL:  No, your Honor.

THE COURT:  Okay.  All right.  Mr. Wallenstein,

Transcriptions Plus II, Inc.

71

Proceedings

your estimate with regard to the sentencing guidelines as they apply to Mr. Martinez-Rojas?

MR. WALLENSTEIN:  Well, your Honor, as Ms. Newman said, we disagree with a number of the enhancements.  However, we do recognize that the government's estimate is what it is and I certainly acknowledge that we have agreed in the plea agreement that that is the government's estimate and there is, of course, an appellate waiver which more than encompasses the government's estimate of the guidelines and my client also recognizes that there are mandatory minimum terms here.

THE COURT:  Okay.  Just to note for the record, we changed Spanish interpreters again.  Can you just state your name?

THE INTERPRETER:  Rosa Olivera.

THE COURT:  All right.  Welcome back.

All right.  So, Mr. Martinez-Rojas, did you understand what the government's attorney said with regard to the estimate they have for the sentencing guidelines?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And do you understand what your attorney said which is in sum, that he had some disagreements with the government's position.

Transcriptions Plus II, Inc.

72

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And do you understand that until the date of sentencing, when the judge has reviewed all of these materials and heard from everyone, you can't know what the sentencing guidelines will be for your case or what your sentence will be?

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  All right.  And despite that uncertainty, do you want to go ahead with your proposed guilty plea?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And as I said to your co-defendant, Mr. Rojas, is that we're talking about the discretion that the judge has with regard to the sentencing guidelines and the sentencing process two of the counts to which it's proposed that you're going to plead guilty, Count 19 of the Eastern District of New York indictment and Count 1 of the Northern District of Georgia indictment, each contains a minimum term of imprisonment of 15 years.

Do you understand that?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And it's also possible that the sentence imposed may run consecutively.

Do you understand that?

73

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So for each of the defendants, do you understand that if the government's estimates or your attorney's estimates are wrong, you will not be permitted to withdraw your plea of guilty because of those errors?  All right.  Mr. --

DEFENDANT F. ROJAS:  Yes, of course.

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  Okay.  And that's the same actually that's -- these questions now are for each of the defendants.  So, Mr. Rojas, do you also understand that even if the lawyers estimates are wrong, you would not be permitted to withdraw your plea of guilty on that basis?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  All right.  For each of the defendants, do you understand that your ultimate sentence could turn out to be different from any estimate -- any of these attorneys, the government, or your respective attorneys have given you?  All right.  Mr. Rojas, do you understand?

DEFENDANT F. ROJAS:  Yes, I understand.

THE COURT:  And Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  So it could turn out that because of other statutory sentencing factors, Judge Korman

Transcriptions Plus II, Inc.

74

Proceedings

decides to impose a sentence even higher than the one

called for by the advisory sentencing guidelines.  If

that turns out to be the case, you would not be permitted

to withdraw your guilty plea simply because no one could

tell you in advance what your sentence should be.

Do you understand that?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  All right.  So for each of you,

we've gone over your respective plea agreements in some

detail and focused and discussed some paragraphs in more

detail than others but I am going to ask you about the

entire agreement.  Does each of you fully understand your

respective plea agreement with the government?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And did each of you

have an adequate opportunity to review the plea agreement

with your attorney?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And for each of you,

those agreements were translated into Spanish, correct?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

75

Proceedings

THE COURT:  All right.  And so for each of you, do you wish to go ahead with the plea agreement that you have with the government?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  So for each of you, I am going to tell you a small point about your rights, if you have these rights in the United States at all. What's being proposed is that you're pleading guilty to a felony or felonies and if your plea is accepted and you're adjudged guilty of those felonies, that adjudication could result in the deprivation of certain civil rights.

Some of those civil rights are only available to citizens which is my understanding, that you're not citizens of the United States but I want you to understand to the extent you do have certain rights in the United States, being adjudicated guilty of a felony may result in a limitation on those rights.

Do you understand?

DEFENDANT F. ROJAS:  Yes, I understand.

DEFENDANT MARTINEZ-ROJAS:  Yes, I understand.

THE COURT:  All right.  So I have gone over many of the possible consequences to you if your plea of

76

Proceedings

guilty is accepted.

Does each of you understand the possible consequences that I have gone over?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And have you reviewed all of these possible consequences with your respective attorneys?  Mr. Rojas?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Mr. Martinez-Rojas?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  And did you have a sufficient opportunity to consult with your attorney about them?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am going to switch my questions to the government's attorneys.  It's up to you if you want to tell me about your answers to the questions as to each case or together.  So is the government -- let me ask it a little differently.

The elements of each of the claimed -- or charges to which the defendants are proposed to plead guilty are set forth in the submission that you have

Transcriptions Plus II, Inc.

77

Proceedings

statutes and essential elements.

MS. LEE:  Yes, your Honor.

THE COURT:  Okay.  And for each defendant is the government prepared to prove at trial all of the elements of each of the counts against the defendant?

MS. MERKL:  Yes, your Honor.

THE COURT:  All right.  I am going to ask you what is the evidence the government would offer at trial?  Do you want to answer that together, as least on the EDNY indictment or do you want to do it separately?

MS. LEE:  I could answer it together including the Georgia indictment.

THE COURT:  Georgia, okay.

MS. LEE:  And I just note actually for the record that while we've been sitting here, the Georgia case was officially transferred on ECF.

THE COURT:  Okay.

MS. LEE:  And it now has an EDNY docket number, and that's 17-cr-208.

And with respect to all of the charges set forth in the plea agreement, the government would prove at trial through witness testimony, including the victims that are set forth in the indictment, and border crossing records, wire transfer records, wiretap evidence, as well as other documentary evidence, that in or about and

78

Proceedings

between December 2004 and November 2015, in Queens, New York, the Rendon-Reyes trafficking organization was a criminal organization that operated in Queens, Atlant, Jefferson, Alabama, Mexico and other locations throughout the United States and that members and associates of the Rendon-Reyes trafficking organization were engaged in various forms of criminal activity, including but not limited to sex trafficking of women and minor girls, prostitution, alien smuggling, alien harboring, and money laundering.  That the enterprise trafficked women from Mexico into the United States and throughout the country, for the purpose of prostitution for their financial gain.

And then each of these defendants conducted or participated in the conduct of this organization.  With respect to Mr. Martinez-Rojas, he engaged in the sex trafficking of Jane Does 1, 3, 6, 7, 9, as well as the victim in the Georgia indictment, FBF.  Those individuals through fraud, force and coercion were brought into the United States for the purposes of prostitution, as well as the victims, MSJ, and SAM, which are also set forth in the Georgia indictment.

With respect to Mr. Felix Rojas, as Racketeering Acts and also as set forth in the counts including the substantive Count 17 that he is pleading guilty to, he through force, fraud and coercion, caused

Transcriptions Plus II, Inc.

79

Proceedings

both the Jane Does 6, and 9 to be brought from Mexico into the United States for the purpose of the prostitution.

THE COURT:  Okay.

MS. LEE:  Oh, sorry, 6 and 8.

THE COURT:  6 and 8, right.  So, 6 is in Racketeering Act 8(a), Count 17 and 8 is in Racketeering Act 10(a) and Count 21, is that correct?

MS. MERKL:  That's correct.  Thank you.

THE COURT:  All right.  So Ms. Newman, with regard to Mr. Rojas, do you agree the government would be able to prove his defense -- sorry, the government be able to prove his guilt at trial based on the evidence just described by the government?

MS. NEWMAN:  Yes, based on the evidence that was provided to us in discovery.  Yes.

THE COURT:  So that's the same as generally what the government just described?

MS. NEWMAN:  Yes.

THE COURT:  Okay.  Do you know of any reason why Mr. Rojas should not plead guilty?

MS. NEWMAN:  No, I do not.

THE COURT:  Are you aware of any viable legal defense to the charges?

MS. NEWMAN:  No, I do not.

80

Proceedings

THE COURT:  Okay.  All right.  In your opinion, is this proposed plea in your client's best interest?

MS. NEWMAN:  Yes, it is.

THE COURT:  Okay.  All right.  Mr. Wallenstein, with regard to Mr. Martinez-Rojas, do you agree the government would be able to prove his guilt at trial based on the evidence described by the government?

MR. WALLENSTEIN:  Yes, your Honor.  Based on Ms. Lee's description today and based upon the discovery that I have received and reviewed and reviewed with my client.

THE COURT:  Okay. And do you know of any reason why Mr. Martinez-Rojas should not plead guilty?

MR. WALLENSTEIN:  No, your Honor.

THE COURT:  Are you aware of any viable legal defense to the charges?

MR. WALLENSTEIN:  No, your Honor.

THE COURT:  And in your opinion, is this plea in your client's best interest?

MR. WALLENSTEIN:  Yes, it is.

THE COURT:  All right.  So for each of the defendants, as I said earlier, I am going to ask you how you plea and it's up to you to let me know if you want to plead guilty or not guilty but if you plead guilty, I am going to ask you what it is that you did such that you

Transcriptions Plus II, Inc.

Proceedings

81

are, in fact, guilty of the charges to which you're pleading guilty.

All right.  So for each of the defendants, do you need an opportunity to speak with your attorney at this time?

DEFENDANT F. ROJAS:  No.

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  All right.  So for each of the defendants, are you ready to plead?

DEFENDANT F. ROJAS:  Yes.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  We're going to start with Mr. Felix Rojas.  So with regard to Count 1 of the indictment, how do you plead, guilty or not guilty?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  No, you have to pick.  It's either guilty or not guilty, which do you pick?

DEFENDANT F. ROJAS:  Guilty.

THE COURT:  All right.  So is it correct you plead guilty to Count 1 of the indictment?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  With regard to Count 17 of the superseding indictment, how do you plead, guilty or not guilty?

DEFENDANT F. ROJAS:  Guilty.

82

Proceedings

THE COURT:  All right.  So as I said, you're going to have to tell me what it is that you did such that you are, in fact, guilty of those two counts.

DEFENDANT F. ROJAS:  Between 2008 and 2012, I was a party to a business, a family business in Mexico which brought women through the border with Mexico to the United States with the purpose of making them prostitutes -- for the purpose of prostituting them.  The business made money making off of the prostitution of the women in the United States because they paid a percentage of the monies they earned -- the money they earned in their illegal activity.

The women who worked for us worked as prostitutes in the United States, including Queens in New York.  I helped in surreptitiously bringing Jane Doe 6 and 8 through the border between the two countries for the purpose of prostituting them.

In order to convince these women to work as prostitutes in the United States, myself and other people made them false promises.  I helped to manage, to supervise prostitution in the United States and I received part of the monies that were earned through prostitution.

I knew that it was illegal to help transport the women -- to transport the alien women to the United

Transcriptions Plus II, Inc.

83

Proceedings

States and I knew that prostitution was illegal in the United States.

THE COURT:  All right.  When you said the "family business," that's the Rendon-Reyes family?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  All right.  Ms. Newman, is there anything else you would like your client to add to that allocution?

MS. NEWMAN:  No, your Honor.

THE COURT:  For the government, was that a satisfactory allocution?

MS. MERKL:  Yes, your Honor.

THE COURT:  All right.  Let me ask you a few questions, Mr. Rojas.

Are you pleading guilty to Count 1 and Count 17 of the supervised release voluntarily and of your own free will?

DEFENDANT F. ROJAS:  Yes.

THE COURT:  Has anyone threatened or forced you to plead guilty?

DEFENDANT F. ROJAS:  No.

THE COURT:  Other than the promises that are contained in the written agreement, which is marked as Court Exhibit 4 that you entered into with the government, has anyone made any other promises to you to

84

Proceedings

induce you to plead guilty?

DEFENDANT F. ROJAS: No.

THE COURT: Has anyone made any promises to you as to what your final sentence will be?

DEFENDANT F. ROJAS: No.

THE COURT: Are you pleading guilty of your own free will because you are, in fact, guilty of Count 1 and Count 17 of the superseding indictment?

DEFENDANT F. ROJAS: Yes.

THE COURT: Okay. All right. Mr. Martinez-Rojas, are you ready to plead?

DEFENDANT F. ROJAS: Yes.

THE COURT: All right. First with regard to Count 1 of the Eastern District of New York indictment, how do you plead guilty or not guilty?

DEFENDANT MARTINEZ-ROJAS: I am guilty.

THE COURT: Okay. With regard to Count 19 of the Eastern District of New York indictment, how do you plead, guilty or not guilty?

DEFENDANT MARTINEZ-ROJAS: Guilty.

THE COURT: All right. And with regard to Count 1 of the charge in the indictment from the Northern District of Georgia which was known as case number 13-cr-128 and now has an Eastern District of New York number, 17-cr-208, how do you plead, guilty or not guilty?

Transcriptions Plus II, Inc.

85

Proceedings

DEFENDANT MARTINEZ-ROJAS:  Guilty.

THE COURT:  All right.  So as I said earlier, I am going to ask you what it is that you did such that you are, in fact, guilty of Counts 1 and 19 of the Eastern District of New York indictment and Count 1 of the Northern District of Georgia indictment.

DEFENDANT MARTINEZ-ROJAS:  Between December of 2004 and November of 2015, along with other members of my family, I participated in bringing a girl and women from Mexico to the United States.

Once in the United States, Georgia, New York and other places, these girls worked as prostitutes.  My co-defendants and I benefitted from their activities because we took the money that the women earned through prostitution.

As part of the family business, the business with my family, and I participated in the prostitution of women, T-H-E J-A-N-E D-O-E 1, 3 --

THE COURT:  I'm sorry, say it one more time?

DEFENDANT MARTINEZ-ROJAS:  -- 6 and 7.

THE COURT:  Can you say those names -- hang on.  Hold on.

DEFENDANT MARTINEZ-ROJAS:  -- and 9 in New York.

THE COURT:  Sorry, say the identifying names

Transcriptions Plus II, Inc.

86

Proceedings

again?

MR. WALLENSTEIN:  It was Jane Doe and numbers, Judge.

THE COURT:  I just want the record to be clear. I couldn't understand it.

MS. MERKL:  He spelled it out, your Honor.

DEFENDANT MARTINEZ-ROJAS:  As part of the family business and I participated in the trafficking of women in Jane D-O-E, 3 -- I mean, 1, 3, 6, 7, and 9 in New York.

THE COURT:  Okay.  Thank you.  Continue.

DEFENDANT MARTINEZ-ROJAS:  In Georgia, I participated in the trafficking of M-S-G -- J, and S-M-A.

THE COURT:  S-A-M or S-M-A?

MR. WALLENSTEIN:  S-A.

DEFENDANT MARTINEZ-ROJAS:  S-M-A.

MR. WALLENSTEIN:  No.

THE COURT:  Do you want to take a look at the indictment?

DEFENDANT MARTINEZ-ROJAS:  S-A-M.

THE COURT:  Okay.  Continue.

DEFENDANT MARTINEZ-ROJAS:  I was able to do this because I made false promises in order to get them to become prostitutes.

THE COURT:  All right.  And again, the family

Transcriptions Plus II, Inc.

87

Proceedings

enterprise is the Rendon-Reyes family, is that correct?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Mr. Wallenstein, would you like your client to add anything else to the record with regard to his allocution?

MR. WALLENSTEIN:  No, your Honor, I believe that's sufficient.

THE COURT:  All right.  For the government, is that a sufficient allocution?

MS. MERKL:  Your Honor, I believe that one victim was not included and that's the subject of Count 1 of the Georgia indictment which is FBF.

THE COURT:  Hang on one second.  The plea agreement?

MS. MERKL:  Your Honor, the plea agreement states that he plans to plead guilty to Count 1 and admit his participation in the trafficking of the others who he is not pleading guilty to.

THE COURT:  Okay.

MS. MERKL:  So to the extent that we failed to include FBF specifically by her initials in that recitation does not -- that's not the end all, be all of what he is pleading guilty to.  He's supposed to be pleading guilty to Count 1 which is the trafficking of FBF.

Transcriptions Plus II, Inc.

88
Proceedings

THE COURT:  Okay.

MS. MERKL:  And she is specified on page 6 of the plea agreement by initials.

THE COURT:  The middle of the page?

MS. MERKL:  Correct.

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  Mr. Wallenstein, any issue?

MR. WALLENSTEIN:  No, your Honor.  I think it's my error when I wrote out the allocution --

THE COURT:  Okay.

MR. WALLENSTEIN:  I eliminated that accidentally.  So I have no problem with the amendment and not since my client just admitted it, we have everything we need.

THE COURT:  Okay.  Let me just confirm that. Okay.  So was one -- this is for Mr. Martinez-Rojas, was one of the women trafficked a woman noted in Count 1 of the Georgia indictment as FBF?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  And also you mentioned Jane Doe 3, was she a minor?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Okay.  All right. Anything else for the government or was that a sufficient allocution?

89

Proceedings

MS. MERKL:  That's sufficient.  Thank you, your Honor.

THE COURT:  All right.  Let me ask you a few questions, Mr. Martinez-Rojas.  Are you pleading guilty voluntarily and of your own free will to Counts 1 and 19 of the Eastern District of New York indictment and Count 1 of the Northern District of Georgia indictment?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  Has anyone threatened or forced you to plead guilty?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Other than the promises contained in the written agreement which is Government's Exhibit 5 that you have entered into with the government, has anyone made any other promises to you to induce you to plead guilty?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Has anyone made any promise to you as to what your final sentence will be?

DEFENDANT MARTINEZ-ROJAS:  No.

THE COURT:  Are you pleading guilty of your own free will because you are, in fact, guilty?

DEFENDANT MARTINEZ-ROJAS:  Yes.

THE COURT:  All right.  I am not sure if I asked this question for Mr. Rojas.  Has anyone made any

90

Proceedings

promise to you as to what your final sentence will be?

DEFENDANT F. ROJAS:  No.

THE COURT:  Okay.  So as to each of the defendants, I am going to make the recommendation.  So with regard to Mr. Felix Rojas, based on the information given to me, I find that Mr. Felix Rojas is fully competent, that he is capable of entering an informed plea.  That he is acting voluntarily, that he is aware of the nature of the charges against him, that he understands his rights, that he understands the consequences of his plea and that there's a factual basis for the plea supported by an independent basis in fact as to each of the essential elements of the offenses for Count 1 and Count 17 of the superseding indictment in the New York case.

So, I therefore recommend that the district judge, Judge Korman, accept Mr. Felix Rojas' plea of guilty to Counts 1 and Counts 17 of the indictment.

So with regard to Mr. Martinez-Rojas, based again on the information given to me, I find that Mr. Martinez-Rojas is fully competent, that he is capable of entering an informed plea.  That he is acting voluntarily, that Mr. Martinez-Rojas is aware of the nature of the charges against him, that he understands his rights, that he understands the consequences of his

91

Proceedings

guilty plea and that there's a factual basis for the plea supported by an independent basis in fact as to each of the essential elements of the offenses.

So, I therefore recommend that the district judge, Judge Korman, accept Mr. Martinez-Rojas' plea of guilty to Counts 1 and Counts 19 of the Eastern District of New York indictment, as well as to Count 1 of the Northern District of Georgia indictment.

All right.  So we don't have a sentencing date yet but as I mentioned, a presentence report will be prepared as to each defendant.  So let me ask, Ms. Newman, would you like to be part of that interview process with probation?

MS. NEWMAN:  Yes, I would thank you.

THE COURT:  All right.  We'll let probation know.

And then Mr. Wallenstein, with regard to your client would you like to be part of that process?

MR. WALLENSTEIN:  I will absolutely be there.

THE COURT:  All right.  So we'll let probation know that.

I assume your clients are going to continue in custody, is that correct?

MS. NEWMAN:  That is correct.

THE COURT:  Are there any medical issues that

92

Proceedings

need attention?

MS. NEWMAN:  Not that I know of, no.  And I've asked him each time I have met with him, so no.

THE COURT:  All right.  So for Mr. Martinez-Rojas, any medical issues?

MR. WALLENSTEIN:  No, your Honor.

THE COURT:  All right.  I'm going to return to the government, Government's Exhibits 4 and 5 which are the original plea agreements.

Anything else that we need on the record here?

MR. WALLENSTEIN:  Judge, just one thing, since I expect it will be several months until we actually get to sentencing, would you authorize us to obtain the transcript of today's proceedings?

THE COURT:  Yes.

MR. WALLENSTEIN:  I know it has to be done through e-voucher but I think we need your authorization first.

THE COURT:  We order it.  It will be on the docket, yes.

THE CLERK:  ECF.

THE COURT:  Yes.

MR. WALLENSTEIN:  I understand that but we can't get it off the docket until several months down the road.  We can order it through e-voucher initially once

93

Proceedings

it's ordered, but we need the Court's authorization.

THE COURT:  I don't usually get those requests. Do you usually make it to the magistrate judge or do you do it to the district judge?

MR. WALLENSTEIN:  I make it to anybody who has got the power to get me the transcript.

THE COURT:  Yes.

MR. WALLENSTEIN:  If you want, I'll write to Judge --

THE COURT:  No, no, you need the transcript. So we're going to order it.  Once it's available, then you can --

MR. WALLENSTEIN:  And then I think it's --

THE COURT:  -- get a copy.

MR. WALLENSTEIN:  -- not a problem.  Once the Court orders it, I think they'll automatically get us copies anyway.

THE COURT:  Okay.  We'll order it right after this.

Other issues?

MR. WALLENSTEIN:  That's it.

THE COURT:  No.  All right.  I am just going to -- for the government, we have the rest of them -- the others lined up, as you mentioned?

MS. MERKL:  Yes, on Thursday, your Honor.  I

Transcriptions Plus II, Inc.

94

Proceedings

believe we have a defendant at 1 o'clock, 2 o'clock and 3 o'clock.

THE COURT:  All right.  I would ask if you consider whether any of those could happen at the same time.  You don't need to give me an answer now but obviously no matter how hard I try, it still takes a long time to go through with the translator and the size of this case.

So if any of those folks can be done at the same time, if it can be, if you can let my deputy know, then obviously the marshals in terms of the production. If it can't we'll just, you know, go through it.

MS. MERKL:  We'll look at that, Judge, and also determine whether defense counsel's schedules permit that.

THE COURT:  Okay.

MS. MERKL:  Thank you.

THE COURT:  All right.  Thanks everyone.  Take care.

MR. WALLENSTEIN:  Thanks, Judge.

(Matter concluded)

-oOo-

95

## C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **May**, 2017.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.

# EXHIBIT 3
**(Sentencing Minutes)**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X
                                    :
UNITED STATES OF AMERICA,           :    15-CR-00348 (ERK)
                                    :
            v.                      :    225 Cadman Plaza East
                                    :    Brooklyn, New York
FELIX ROJAS,                        :
                                    :    January 3, 2019
            Defendant.              :
------------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          TARYN MERKL, ESQ. ESQ.
                             MARGARET ELIZABETH LEE, ESQ.
                             U.S. Attorney's Office
                             Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York  11201

                             BENJAMIN J. HAWK, ESQ.
                             U.S. Department of Justice
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530

For the Defendant:           DONNA R. NEWMAN, ESQ.
                             Law Office of Donna R. Newman
                             20 Vesey Street
                             Suite 400
                             New York, New York 10007

Court Transcriber:           SHARI RIEMER, CET-805
                             TypeWrite Word Processing Service
                             211 North Milton Road
                             Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

(Proceedings began at 2:45 p.m.)

THE CLERK:   United States v. Felix Rojas.

Your appearances, Counsel.

MS. MERKL:   Taryn Merkl for the United States.   I'm also here with Assistant U.S. Attorney Maggie Lee from my office and Ben Hawk, a trial attorney from the Department of Justice, Human Trafficking Prosecution Unit.   Good afternoon, Your Honor.

THE CLERK:   Probation by?

MS. SULLIVAN:   Patricia Sullivan.   Good afternoon, Your Honor.

MR. GJELAJ:   Good afternoon.   Mark Gjelaj, United States Probation.

MS. NEWMAN:   Donna R. Newman on behalf of Felix Rojas who's standing next to me.

THE CLERK:   We're on for sentencing, Judge.

MS. NEWMAN:   Your Honor, if I may.   I know the Court is well aware that I had submitted a lengthy sentencing memorandum to say the least.   I'm sorry for the length.   And a supplemental that really didn't add any additional arguments. It just said that whatever factual differences that they are really are not material and a Fatico hearing was not required and that we would rely on our statements or our proffer affidavits, whatever we had, that was contained in our sentencing memo and what was stated in the presentence report

3

and what the Government said we believe that we could argue from that and that no factual, other factual testimony was required for this sentencing.

So with that in mind, I know that we had many disagreements about the guideline calculations and I assume if I'm correct that the Court would like us to first address those.

THE COURT:  Yes, that's the normal --

MS. NEWMAN:  Yes.  Okay.

THE COURT:  First of all, the magistrate took the plea in this case.

MS. MERKL:  Correct, Your Honor.

THE COURT:  And you represented him at the time.

MS. NEWMAN:  Yes.  I will be right back.  I have to get the presentence report.  I apologize.

[Pause in proceedings.]

MS. NEWMAN:  Yes, I did, Your Honor.  I was present for the plea.

THE COURT:  Right.  And you went over it with your client, all the details of the Plea Agreement.

MS. NEWMAN:  Yes, we did.  In fact, there were various versions.  It had every single version, including the last version, translated by Carmin Espinal in my presence and read to him and then also discussed with him at length so that he would understand the consequences.

4

The Plea Agreement did have the Government's calculation of the guidelines.  We discussed the application of the guidelines, their calculations.  We discussed our possible disagreements and how we would address those and I am confident that he understood the Plea Agreement and signed it in the presence of Carmin Espinal.

THE COURT:  Okay.  I ask because I read -- gone over the plea minutes and because they involve pleas to more, more than one defendant.  I had some difficulty myself in following the colloquy and I just want to be sure he understood -- he understood the complexity of the crimes to which he was pleading guilty and the sentence that he faced.

MS. NEWMAN:  Yes.  And I might add that we --

THE COURT:  I mean it seems from reading it that he did but it's a fairly complex document.

MS. NEWMAN:  Yes.  And I would add that the plea allocution actually was typed out and translated and reviewed with him for accuracy.

THE COURT:  Is there any reason I should not accept the plea?

MS. MERKL:  No, Your Honor.  We believe based on the record that Judge Scanlon did an extremely thorough job.  We were there and I understand Your Honor's confusion with regard to the seriatim yes, yes.  It was slightly confusing but she spent a ton of time making sure that the defendants understood

5

the consequences of their decision to plead guilty and as the transcript reflects they did allocute to the essential elements in their own words.

THE COURT:  What about the Ruggiero predicates? That is the predicates of the RICO that are there and used for the calculation that he was -- that he's being responsible for even though he may not have committed the actual acts.  Is it clear that he understood that?

MS. MERKL:  We believe so, Your Honor.  The multiple count analysis was detailed in the Plea Agreement, in every version of the Plea Agreement.  His Plea Agreement was the result of substantial and lengthy negotiations between the parties.  As I'm sure Your Honor noted, not only was the Ruggerio, were the Ruggerio facts included in the Government's estimate, the Government went so far as to even offer global points in this case.  This was a lengthy negotiated plea and based on the defendant's presentation at the time of the plea allocution it is the Government's impression as it was Judge Scanlon's that he did understand the Government's guidelines estimate and that estimate was based on --

THE COURT:  No, that's clear.  There's no doubt that he understood the guideline estimates.

MS. MERKL:  That estimate was based on those Ruggiero factors.

THE COURT:  Okay.

6

MS. NEWMAN:  Yes.  I believe that he did based on my conversations with him at the MDC with a Spanish interpreter, Carmin Espinal, that he understood the Government's calculations and he understood why I disagreed with him but he also understood quite clearly that that --

THE COURT:  Why do you -- why do you disagree with the Government.

MS. NEWMAN:  Right.  He understood the Government's and understood why I would advance a disagreement but most of all he understood that the Court ultimately would decide which calculation was correct.  So he understood the Government's calculation, my calculation, and that ultimately it was up to Your Honor to decide which calculation or in the case of the Ruggiero application whether it was in fact would be included in the guideline calculation.

THE COURT:  Okay.  I adopt the recommendation of the magistrate that the plea was knowingly and voluntarily entered by the defendant with a full understanding of his rights and the consequences of the plea and there's a factual basis for the plea.  I therefore accept the plea of guilty.

MS. NEWMAN:  Okay.  Thank you, Your Honor.

THE COURT:  Mr. Rojas, have you had an opportunity to read the presentence report?

THE DEFENDANT:  Yes.

THE COURT:  I mean -- and it was read -- it was

7

read -- did you say it was translated or was read?

MS. NEWMAN:  It was read to him word by word because I was present, Your Honor.

THE COURT:  And it was -- when I say did you read it, it was read to you by an interpreter?

THE DEFENDANT:  Yes.

THE COURT:  Did you understand that it?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.

MS. NEWMAN:  Just so the record is clear why we're talking on what was discussed with an interpreter, we should add that both my sentencing memorandum and the Government's sentencing memorandum was -- were read to Mr. Rojas in Spanish so that he had a clear understanding of everybody's position with respect to sentencing.  Thank you, Your Honor.

I guess the easiest way although maybe not followed in my sentencing memorandum exactly, but I will ask the Court what it prefers.  I did first the sex trafficking of Jane Doe #6 in my memorandum and then went to 8 which follows the presentence report starting on Paragraph 64.

THE COURT:  Hang on.  Let me get it.

[Pause in proceedings.]

THE COURT:  Are we dealing with your letter or --

MS. NEWMAN:  I'm sorry, Your Honor.  My memorandum -- mine would start -- the guideline analysis starts on Page

8

22.

THE COURT:  Okay.

MS. NEWMAN:  Just for I guess --

THE COURT:  And you say this deals with --

MS. NEWMAN:  Just for an overview, what we're asking for is the mandatory minimum term of 15 years.  He pled and admitted his involvement in the enterprise that's charged in Count 1 and it was limited to his involvement in Jane Doe #6 and Jane Doe #8.  He also pled to Count 17 and that's where the mandatory minimum of 15 comes and that I believe was to Jane Doe #6.  Thank you very much.

So looking first perhaps at Jane Doe #6, which is PSR Paragraph 64 and the Government's -- just Jane Doe #6.  So that's -- would be Racketeering Act 8A and Count 17.

What we say, what the hour --

THE COURT:  I think it's easier for me if we just went to the description for the moment on these counts rather than a calculation base level.  However you want to do it.  Go ahead.

MS. NEWMAN:  Yeah.  Whatever I -- with respect to #8 -- 6, I'm so sorry.  There's just so many that I lose -- okay.  We disagree on the calculation.  We do -- based -- we do agree that it should be calculated not by a cross-reference but by starting with 2G1.1 promoting commercial sex acts or prohibiting sexual conduct, and that's guideline 2G1.1.  That

9

would be base offense level 34.  And we believe that that is the only enhancement that would apply.

The Government has claimed that there were numerous other enhancements that apply.

THE COURT:  I have difficulty following your arguments when we're talking about 2G1.1.  I have the guideline book.

MS. NEWMAN:  What would make it easier for the Court and that's the way I'll do it?

THE COURT:  Just tell me in just plain English.

MS. NEWMAN:  It is our position that the -- trust me, I understand it was difficult enough to write it and I'm familiar with the case.  So that's not -- I understand.

So Jane Doe #6 factually we state that he knew her, got to know her in Mexico.  I'm trying to find the page so that it will be a little bit easier to follow.

[Pause in proceedings.]

MS. NEWMAN:  That he met her in Mexico, that she was working in a hotel.  They connected romantically.  I'm looking for the Court's edification on Page 12 of my sentencing memo which discusses the relationship.  She gave him the telephone number.  They spoke for a few weeks and then he asked her out. She had already at that time had his son out of wedlock.  He was an infant.

It's our contention that her family life as a result

10

was stressful and not pleasant.  After the date of which she did take her son with her they went to his town, Tenancingo, and she was happy to leave her family.  That's our position, Your Honor.

And she stayed there for a while and then they agreed that they should live together and then he brought her back to her home.  He gave her money to register the child at the local registry, the municipal registry because it was very important to him based on his own illegitimacy to have the child registered in the municipal registry.  He also left her some money to meet up with him later.  Two weeks later she arrived with his son.

We admit that soon thereafter she began to work as a prostitute for Mr. Rojas in Mexico and that he made false promises to her about their future together.  She worked for about a year in Mexico and then they agreed to go to the United States.  Whether she -- we believe that whether it was said or that she understood that at the time that when she got to the United States she would be working as a prostitute. Nonetheless, there is no question, and we stated so in a plea, that she did so when she went to the United States and again false promises that they would have this life together, they would be saving money for a house, a family, and she would have a different life.

Before she left she did ask Mr. Rojas' niece, Sonia

11

Rendon-Herrera [Ph.], to care for her son and I attach an affidavit from Ms. Rendon-Herrera with respect to that.

Now, this is a document that was with the -- filed with the local registry, not recently.  Back in 2015 I believe.  I may even -- I'm sorry.  2010.  And it was given to the municipal system for the Integral Developer of Family City Council.  I guess family court more or less.  And the aim of this is because she had stopped -- Jane Doe #6 had been sending money to Ms. Herrera for the care of her son but she stopped sending money somewhere in 2010 and Ms. Herrera did not have the funds to care for the child and she was very concerned that the child should go to the rightful family. And so she submits this affidavit back in 2010.  This is well before any of this he's a target, un-target, any knowledge of any court case here in the United States.

The reason I think it's important is because why she does that is then to get the family of Jane Doe #6 to come and pick up the child in which they do.

In addition, I have submitted a report of the -- of Carmin Espinal who did the interview of Ms. Rendon-Herrera on October 11, 2018 and where we found out about this filing and she also does a -- translates what was said to her and why Ms. Herrera did file this.  And all this goes to show we're not saying that there wasn't any prostitution in the United States.  We are not saying that.  What we are simply saying is

12

there are two sides to every story but there is one side that's not disputed and that is Jane Doe #6 as a result of false promises was prostituting for Mr. Rojas.  We do not dispute that.

So our contention is is that the correct base offense level would be 34 as to Jane Doe #6.  Now, our --

THE COURT:  That's because -- that's because what, there was conduct in the United States.

MS. NEWMAN:  Excuse me?

THE COURT:  There was conduct in the United States.

MS. NEWMAN:  Yes, but they --

THE COURT:  Accepting your -- for the moment the validity of the distinction you're drawing.

MS. NEWMAN:  Yes.  What the Government then adds, and this is the dispute, is they are adding points, enhancements -- I think it's four points for abduction, not for her travel into the United States but because they contend -- and as I say people view things differently -- that when she was in Mexico when that first encounter and she's -- they got to Tenancingo where he was living after they had some telephone conversations and some dating, that that was an abduction.  And they are crediting -- therefore they're enhancing that conduct, whatever it is was, no matter how you view it, as an enhancement in this case.

It is our position that whatever conduct happened in

13

Mexico was not part of the -- was not a continuation of the conduct in the United States.  It wasn't targeted against the United States and we've cited case law as to the effect that when the conduct is not targeted to the United States then you don't enhance the conduct in the United States.

That's why we said [inaudible] was not significant. So whatever happened in Mexico, however the parties view it differently through their own perspective, nonetheless there is no question that what happened was in Mexico.  And we add that she worked there for approximately a year before they decided to go to the United States which we contend was a joint decision albeit that he did not -- was not completely honest on what their future would be, not honest at all of what their future would be.

So the enhancements of the four point reduction we say is inapplicable.  They also say that --

THE COURT:  The probation didn't give the four point enhancement for abduction.

MS. NEWMAN:  Your Honor, if I may.

THE COURT:  Yes.

MS. MERKL:  The defendant's conduct in this case did not begin with this victim, Jane Doe 6.  As alleged in the indictment he is alleged to have been involved in this activity as early as 2006 including conduct in the United States at that point with regard to Jane Doe #3.  So the

14

notion that he was not already committing crime against the United States, namely racketeering and sex trafficking conspiracy and alien smuggling conspiracy by the time that he returned to Mexico to recruit yet another victim falls flat.

He clearly went back to Mexico after he had been here previously where he was involved in a trafficking of other young women including the minor, Jane Doe 3, identified in the indictment, he went back to Mexico to recruit another victim. His family business was to recruit vulnerably young women and girls and bring them back to the United States to work.

In this instance, Your Honor, as to Jane Doe 6, the conduct was truly shocking. He recruits young women who has a minor infant, ten months old, puts her in his car, tells her that she's "fucked." Drives her to his cousin's house, leaves her there for two weeks in a cold room without sufficient food for her and her infant child and scares her into submission.

Under those circumstances, Your Honor, it is the Government's view that the abduction enhancement absolutely applies here. The defendant was already part of a large international trafficking organization that was finding these young women and girls to profit off of their backs here in the United States. It's not like whatever happened in Mexico stays in Mexico. That is not the law. That is not the law in this case. It should not -- that should not be the outcome

15

here.

The defendant abducted here clearly with the intent to bring her to the United States and he then left the child with a relative so that he could control her conduct while here.  It is that control, Your Honor, that not only caused her to continue working but makes her a vulnerable little victim.  It is impossible to comprehend what one would do if faced with the possibility that your child would be harmed.

And I would just note -- we set this forth in the Government's sentencing submission -- that it's not just Jane Doe 6's word on that.  We also have it evidenced from Jane Doe #1 who was present when a phone call was placed to Jane Doe 6 and she heard the child crying over the phone as the child was being hit by a relative in Mexico as a threat to Jane Doe 6 to earn more money.

So the notion that this abduction of Jane Doe 6 and her son is not part of the offense conduct here and it should not be accounted for in the guidelines, Your Honor, is simply not supported by the evidence.

MS. NEWMAN:  Your Honor, if I may just to -- I think that it's important to know that in fact his plea of guilty was he admitted that from about 2008 to 2012.  That was his allocution.  That was admitted.  It was gone over with the Government.  We've stated to the Government what we would be saying so that there would be no confusion and no later

16

conflict.   So he says he admitted that from 2008 to 2012 that he was a member of the Mexican family and he limited his involvement in the plea allocution to Jane Doe #6 and Jane Doe #8.

So -- and with respect to a phone call, I don't -- I mean I don't have any other corroboration but the fact that a child is heard crying for its mother.   It might have been reversed if she had -- she had the child and it was crying for its father.   So I don't know that that crying may be -- pull at the heart strings but I -- the other day my grandchild was crying for me.   Yeah.   It wasn't because anybody was harming her to say the least but it -- I don't find that completely compelling.   It just pulls at the heart strings.

All I'm saying is that his conduct is listed -- limited to 2008 to 2012.   The fact that it makes no sense -- they admit that she worked for a year and that -- in Mexico. So to say that this is targeted, if you target somebody there are other cases where -- involving sex trafficking and the Jane Does or the victims maybe they target -- they get them involved for a limited time and then bring them to the United States.   She worked for over a year in Mexico.

THE COURT:   I don't know.   I'm looking at the presentence report.   I'm looking at the presentence report in Paragraph 26 and in the middle of the paragraph in Tenancingo Felix Rojas brought her to a house.   He took away her

17

telephone.  After approximately two weeks Felix Rojas brought her back to see her parents to tell them they were in a relationship.  Felix Rojas threatened to harm her son if she tried to escape or warn her parents and then after they returned to Tenancingo Felix Rojas took her son to stay with the mother Jovan Randon-Reyes and Felix Rojas then forced her to prostitute in Guan --

MS. MERKL:  Guanajuato, Your Honor.

THE COURT:  Guanajuato, Mexico.  When Jane Doe 6 told Felix that she did not want to prostitute he reminded her that her son was with Jovan Heron Don Reyes, and then it goes on to say she had sex with eight customers and she cried all night.  So that seems to indicate something less than some sort of a voluntary act on her part.  Unless again -- I assume we're -- I don't know what's --

MS. NEWMAN:  Well, I don't -- when I say --

THE COURT:  This paints a somewhat different -- this paints a somewhat different picture than you describe.

MS. NEWMAN:  I understand.  I'm not saying that -- like I said, when somebody makes false promises to you and that you engage in prostitution I'm not saying that she readily jumped at prostitution or that she loved it.

THE COURT:  Well, this suggests that he threatened. There were threats --

MS. NEWMAN:  I am not saying that at all.

18

THE COURT: There were threats of harm to her son if she tried to escape or warn her parents.

MS. NEWMAN: But she left -- this is why I think it's belied by even our -- the Government's version because she goes back with her son to her family after the initial encounter and she goes back -- she has money, his money. He has if -- he gives her I believe it was about 500 pesos. I don't know if it's $500 but enough money let's say and she then comes -- go takes the bus and meets him. The Government's position well, she was under coercion in fear for her son. She had her son with her and I don't know whether that's clear from the PSR.

Our position -- everybody views it differently. I am not saying she was --

THE COURT: Well, it's clear that he took her son from her and removed her, the kid. This was after they returned to Tenancingo, Rojas took her son to stay with the mother of Jovan and Felix Rojas then forced her to prostitute in Guanajuato, Mexico.

MS. MERKL: Your Honor, I think that Jane Doe #6's affidavit which was sworn under oath and submitted to the Mexican authorities and we submitted it to the Court as an attachment to our December 26th letter does shed some light on this apparent argument by the defense. Jane Doe #6 does acknowledge that she was taken back home and that Felix gave

19

her 500 pesos but as she stated in her affidavit under oath she returned to where he was because I was afraid of what he would do to my son if I did not return.  And she acknowledges that she was in a vulnerable position with her son.  I don't think there's actually an inconsistency here.  I think that the question is what does it mean.

From the Government's perspective she was abducted and held against her will from the beginning and then she was placed in fear and that is why she continued to work.  That is the context of all of the content that flowed from there and asking whether or not a victim of trafficking is acting rationally in a given moment when they are in fear is frankly disrespectful to the victim.  I mean they are not necessarily action rationally because people don't act rationally when they're afraid.  There's ample psychological and scientific evidence to that and it's also just common experience.

So to pick apart the story and say she's not making sense when the defense has expressly stated that they don't want to have a Fatico hearing, Your Honor, we don't really understand.

MS. NEWMAN:  Your Honor, I think it's very clear.  I am not asking for a Fatico.  I'm saying she may have viewed it differently than we viewed it and that's human nature and particularly as I explained to the Court as to his cultural background.  So we understand and we are not trying to say

20

that the victim readily jumped into prostitution.  That's not really our position.  We're saying that she did things because she had -- they were false promise and believed that things were going to get better and this was going to earn her money. She didn't like it.  We're not saying that.  We're not saying. We're not saying that this was something she loved but the first argument which we believe that they do not present sufficient evidence for the enhancement, the four points for abduction to apply here we believe --

THE COURT:  And that's because it occurred in 2008.

MS. NEWMAN:  No, because in fact it occurred in Mexico.

THE COURT:  No, I understand that.

MS. NEWMAN:  Right.  And that's why.  We're saying it occurred in Mexico and that the decision to go to do this in the United States where there would be better earnings was not made at the moment.  The Government claims if you follow their reasoning that the minute that he took her, right, the minute that he called her, the minute that he met her in the hotel before anything he had in mind that he was going to take her sometime, somewhere at some later date to the United States.  Therefore, anything that happens in Mexico whether it be a month before, two months before she came to -- or a year which in this case it's a year, applied to the U.S. offense conduct.  And we're saying that --

21

MS. MERKL:  Your Honor, where is it in the log that that guidelines enhancements for an international crime don't apply to the international conduct?  There is no legal authority for that proposition cited in the defendant's papers.

MS. NEWMAN:  I am not because --

MS. MERKL:  It's like saying the drug trafficking outside the United States doesn't -- wasn't relevant.  The amount of quantity that was interdicted at the border doesn't count.

MS. NEWMAN:  Your Honor, we had cited in our supplemental sentencing memo case law that supports our position very clearly.  This was not an international sex trafficking ring that they're saying like the drugs is -- I don't think the comparison is justified.

What we have here is sex trafficking in Mexico in which later a decision is made to go to the United States and we agree that both things were wrong.  The problem is that the Mexican offense, and they could cite no law to that, is not targeted at the U.S. unlike drug trafficking where the drug trafficking in Columbia when they are making -- they're manufacturing it are manufacturing it with the intent that some go to the U.S., maybe some go to or Spain or wherever, that was not the intent here.

So when I mention time span I only did that because

22

they mentioned Jane Doe #3 and I'm saying that his plea and what they accepted was for 2008 to 2012.  So that doesn't work.

What I am saying is that that enhancement doesn't apply because the abduction was not in the United States.  If it was in the United States or as I said if he had abducted her to come into the United States that would be a different scenario and then the case law that they cited would support them but that's not what happened here.

I'm just going not only on our version, which I say everybody sees things differently, but on the Government's version because there's no question that what they're saying happened, the abduction happened within the first two to three weeks of their relationship which is a year before they go to the United States.  So that's my argument.

MS. MERKL:  Your Honor, I would just note and I will be quiet, I promise, that Title 18, United States Code 1591 explicitly anticipates extraterritorial jurisdiction.  The statute states whoever knowingly in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, et cetera, et cetera a person for the purposes of commercial sex shall be guilty of a crime in the United States.

Your Honor, the recruitment, enticement,

23

transportation, abduction, all of that culminated in bringing Jane Doe 6 --

THE COURT:   Her argument -- everything you say is true.

MS. MERKL:   -- to the United States and prostituting her here.

THE COURT:   But if I understand her argument it's that at the time that -- I don't think you read the word abduction by the way.

MS. MERKL:   It's not in the statute.

THE COURT:   Or kidnaping for that matter.

MS. MERKL:   Obtain though is in the statute.

THE COURT:   Yeah.  Her argument is is that this occurred earlier, sometime in 2007 and given the time lapse and what happened after that it's not fair to draw the inference since we're not having a Fatico hearing that it was done with the intent at that point to bring her to the United States.

MS. MERKL:   Your Honor, I don't think he needed to have that intent.  That is not stated in the guideline.  The Government doesn't state with the intent to abduct.  It's how did this person, how was the victim obtained for the purpose of the trafficking.  The guideline merely states that the victim was abducted.  It doesn't say and intended to bring her to the United States.  She was abducted and held against her

24

will and then brought to the United States.

THE COURT:  I know but if she was never brought to the United States the abduction wouldn't be a crime.

MS. MERKL:  I dispute that, Your Honor.  If Mr. --

THE COURT:  If she --

MS. NEWMAN:  If Mr. Rojas had been engaged in the same racketeering conduct that he was involved in in the United States and victims remained in Mexico there are -- there are strong arguments that offense -- some of that offense conduct would be considered part of the RICO.  It's a convoluted way of looking at the statute and reading it.

MS. MERKL:  Your Honor, it's not the statute that matters.  It's the guideline and the guideline does not in any way limit the extraterritorial application of that enhancement.  The argument is -- totally flies in the face of logic and how people obtain victims in these cases.  If you anticipate any type of international trafficking situation the fact that they maybe took six months or a year to gather the requisite resources and the appropriate coyotes to smuggle people across the border would wipe away somebody brought here against their will under circumstances of an reduction is totally at odds with the purpose of the guideline and the intent of the drafters.  There's no possible logic to that argument.  The fact that there's a delay in time is just luck and Ms. Newman is trying to exploit it.

25

MS. NEWMAN:  I disagree.  I think the Court understands the guidelines well.  The guidelines does not say that the abduction has to be with this offense conduct and that's what the cases say.  They have to be targeted at the United States and that's clear from the case law.  The Government is just trying to really take the statute and put it on its head.

MS. MERKL:  Your Honor, Ms. Newman's argument boils down to the idea that there's two crimes committed here when it is one continuing offense.  It wasn't a period of trafficking in Mexico and a period of trafficking in the United States.  That would -- that's what she's essentially trying to argue.  There's one crime and it's trafficking this young woman from this period of time until she finally escaped and all of the conduct that he did to her whether it's in the United States or in Mexico the Government's position is that it should count against him.  That is the offense conduct for that continuing offense whether it spanned the border or not.

MS. NEWMAN:  It has to be conduct that's targeted against the United States.  That's clear from the United States v. Azeem, A-Z-E-E-M, 946 F.2d 13 (2nd Cir. 1991) and United States v. Cruza Plaza, 45 F.3d 51 (2nd Cir. 1995), and I believe it's the latter case that really sets the standard here.

MS. MERKL:  Your Honor, with all due respect, the

26

Government's position is that these two cases are just not applicable to this enhancement under these facts.

THE COURT:   Why didn't probation provide that enhancement?

MR. GJELAJ:   Your Honor, I find myself in the [inaudible] position of being in between both the Government and the defense right now.   We agree with the Government that this is conduct clearly that should have been incorporated in the offense.   That is to say that this is a continuing offense.   The idea that it occurred in Mexico has very little meaning to us in terms of why we didn't apply it.

The reason why we didn't apply it is because it would be -- again, the Government has a very good argument that seems to me would be sort of a distinction without a difference.   This would be applied in almost every case and if it's not a kidnaping that occurred early on it certainly would be something of an abduction that -- or something that could be considered an abduction somewhere throughout this offense. The Government has even mentioned the fact that they're forcing individuals across the border and this is the sort of modus operandi that they have.

The idea that that can't somehow be characterized as an abduction -- and even once they're here the idea that they have the ability to sort of come and go I can tell you that's not the case either.   So the reason why we didn't imply it is

27

we -- apply it is because we thought it was sort of inherent within the actual guideline itself.

MS. MERKL:  Your Honor, the fact is that the Government only estimated this enhancement as to one of the ten Jane Does in this case and it's the because of the unique facts in Jane Doe 6 which is putting her in a car with her ten month old, locking the doors to the car, saying you're fucked and taking her to his cousin's house and leaving her there for two weeks and scaring her to the point where she feels that she has no other option.

There's -- we do not believe that there's a slippery slope risk here that this is going to be applied in every situation because the abduction has a specific meaning in the law.  The guidelines don't give a lot of guidance as to what abduction means.  It says its ordinary meaning which is useless but we all know what abduction means.  It means taking somebody against her will and holding them against their will in a different way than the normal sort of coercive conduct.

We would note that this is -- this is within the cross reference.  This is not part of the 2G1.3, the sex trafficking guideline.  This is in the criminal sexual abuse guideline.  That guideline comes into play.  So this is not double counting because within the criminal sexual abuse guideline it is a separate type of conduct that is not already accounted for in the criminal sexual abuse guidelines set

28

forth at 2A3.1.

MS. NEWMAN:  This makes no sense, Your Honor.  She's -- the conduct that they say, the abduction which happens within two weeks of meeting her three weeks is not clear from the Government's presentation.  She then -- this is -- the abduction is she's left in the room, right, that's what their facts are, and then allowed to go home.  It is not that she's then held and forced to prostitute which we -- whether that was an abduction, that occurred, I don't even think it means by the preponderance but I'm not arguing that.  I'm taking the Government's statement.

The point is that it happens and she leaves.  She's not forced to prostitute at that point.  So it's -- and it's not targeted against the United States which is the most important part.

THE COURT:  I'm not sure what targeted against the United States is.  It either applies or it doesn't because of the nature of the conduct and targeted -- if he -- if he abducted her it would be intent and prostituted her in Mexico and then as a purview to bringing her to the United States.  I'm not sure that -- why that doesn't violate the -- it doesn't come within the guidelines or even violate the statute.

MS. NEWMAN:  Your Honor, I think the Court was correct in its first analysis.  I'm saying it can't be the

29

kind the conduct that is this abduction to the conduct being prostitution.  Sex trafficking, right.  Because she leaves and -- so this -- whether in fact she was free to leave or what happened, there is not dispute, okay, about the fact that she then goes home with 500 pesos.

So we're not looking at her state of mind.  We don't have a psychologist report here.  And I agree that she probably -- this was a different experience for her but all I'm saying is that period of time she was then left to go back home and she did for at least two weeks with 500 pesos and then takes a bus.  So how does that involve this conduct that we're talking about for which he's pled guilty from 2008 to 2012?

THE COURT:  Is that an accurate description?

MS. MERKL:  No, Your Honor.  The affidavit from Jane Doe 6 we believe which is sworn under oath and frankly is more powerful than a psychological affidavit as a sworn statement is that she -- Felix took her to this home in Tenancingo and then took her son and her to another home in Tenancingo.  He then took her home to see her parents.  Felix told me he would do the talking and threatened to harm my son if I tried to escape or warn my parents.  He told me that the purpose of the trip was to tell my parents that we were together now and to apologize to my parents for leaving me unannounced -- leaving with me, excuse me, unannounced.

30

After staying at my parents house for approximately two hours Felix agreed to leave me there so I could spend time with my family before leaving home.  He gave me 500 Mexican pesos for my trip back to him.  I returned to where he was because I was afraid of what he would do to my son if I did not return.  So while her son was being held by sex traffickers at a home in Tenancingo Ms. Newman would have you believe that she felt free to leave the situation and that the abduction had no impact on her returning to him and ultimately being forced into prostitution.  That defies all common sense and everything everybody who has children would ever understand about how one would interact with children.

So, Your Honor, the notion that this abduction somehow terminated by the fact that she was given the opportunity to go home and say goodbye to her parents under threat just falls flat.

MS. NEWMAN:  She had her son with her.

MS. MERKL:  Your Honor, that is not what she stated under oath in the affidavit that she submitted to the Government in Mexico.

MS. NEWMAN:  That's not the way I read the affidavit.  She does not say that she left her son there.  She left her son not there but in addition that statement about who was taking care of the son is contradicted by the 2010 statement of Sonia Herrera who gives this statement to the

31

local authorities having nothing to do with this case on how she is caring for this child.

So I don't know who was caring or had -- what I have is something that was handed in to an official in 2010 with no -- I don't know what kind of immunity she got from this -- to give this affidavit and I'm not saying she was a prostitute. She was. He admitted that. It's a matter of the four point enhancement which I just think has nothing to do with this case that happens in the United States for which he's here being sentenced.

MS. MERKL: Your Honor, regardless of whether her son was with her or not with her in this moment he had already kidnaped her. He had already threatened her. He had already scared her and he had established that she knew where she and her son lived. Under those circumstances, Your Honor, we feel that the enhancement applies and that is part and parcel of this continuous course of contact that culminated in her being trafficked into the United States.

As to the Sonia Rendon-Herrera affidavit made in Mexico n 2010, Your Honor, the Government does not believe that that should be given any weight whatsoever. Ms. Sonia Rendon-Herrera wanted to get rid of the child for a trafficking victim who had escaped and she didn't want to take care of the child any more. Whatever she told the government of Mexico is irrelevant to this case.

32

MS. NEWMAN: I don't think it's irrelevant. It shows that she was caring for the son and she was being paid to care for the son and that's what it establishes and that she was -- as opposed to Jane Doe #6 saying that she made arrangements for her son to be picked up. It was actually Ms. Herrera who made the arrangements or looked for the arrangements to be made and that she according to Ms. Herrera she had -- and I believe corroborated by Jane Doe #6 had stopped calling, had stopped giving money. So this force of collection, she stopped giving money for her own son's well being. I don't know all the circumstances.

I am not here to throw disportments at her. I mean she is a victim. We admitted that. We pled to that. This is a matter of saying something that happened a year before, well before, a year before. They come to the United States before. The decision to come to the United States should get a four point enhancement that greatly increases my client's guidelines and it is actually that four point enhancement that really pushes his guidelines above the other defendants in this case because he has pled to just two, Jane Doe #6 and Jane Doe #8. We have arguments about the application of the others but as to what he pled to and what was accepted.

So the concept that this should be allowed, something that happens a year before to so enhance somebody's guideline I think definitely takes it away from what the

33

Government is saying, this continual conduct without any real support for that particularly since she worked for a year in Mexico.

MS. MERKL:  Under duress.

[Pause in proceedings.]

THE COURT:  Tell me the section of the guideline that you read from.

MS. MERKL:  Which -- I'm sorry, Your Honor.  I was reading from the statute book.

THE COURT:  You tell me the statute didn't matter.

MS. MERKL:  The guideline -- it's 283.1(b)(5), Your Honor.

[Pause in proceedings.]

THE COURT:  283.1 and --

MS. MERKL:  (b)(5).

THE COURT:  I'm sorry.  (b)(5) did you say?

MS. MERKL:  Yes, Your Honor.  And in the application notes it simply states --

THE COURT:  Let me just --

[Pause in proceedings.]

THE COURT:  In the application note -- go ahead.

MS. MERKL:  The application note is a cross reference again to commentary 1B1.1 which states abducted means a victim was forced to accompany an offender to a different location.  That's all it is.

34

MS. NEWMAN:   And the reference -- the example has to do with a bank teller.

[Pause in proceedings.]

THE COURT:   Tell me what you -- the commentary you said, the application note.

MS. MERKL:   Commentary application note 1 has a cross reference to guideline 1B1.1.

THE COURT:   One second.

MS. MERKL:   Application note 1A.

THE COURT:   So abducted has the same meaning as those given in application 1 of 1B.

MS. MERKL:   1B1.1.

MS. NEWMAN:   So reading that --

[Pause in proceedings.]

THE COURT:   So the application note, the relevant part reads abducted means that a defendant was forced to accompany an offender to a different location.   For example, a bank robber was forcing a bank teller from the bank into a getaway car would constitute an abduction.

MS. NEWMAN:   So the distinction I think is clear. The bank teller, the robbery had occurred and the bank teller now is being forced to another location.   Here, that when she goes into the car there has been no offense conduct.   That is prostitution, commercial sex trafficking.   And indeed when she gets to the other location according to Jane Doe #6 there is

35

no sex trafficking.  So she -- this concept that one happens, the abduction happens as a result of the offense conduct, that is the bank being robbed.  Here, there is no offense conduct. The offense conduct that they're talking about is the kidnaping or the abduction in Mexico that in and of itself. That is the offense conduct.

And that I suggest is not offense conduct that relates to the commercial sex trafficking.  That's --

MS. MERKL:  Your Honor, he's recruiting and obtaining an additional victim in that moment and he is taking steps to place her in fear.  There's nothing in this application though that suggests that there's any necessity for a completed offense.  If you abduct somebody to rob the bank, you demand them to give their PIN number, that's an abduction.  There's been no offense conduct as to the robbing the bank yet.  It's -- she's using the small example given in the guideline book to turn the meaning of the word abducted which is clear on its face into something totally other than what the guidelines drafters intended.

MS. NEWMAN:  Well, I don't know.  The guideline drafters intended is not clear from the commentary and I suggest that while the Government may be able to read my client's mind at the time in 2008 when this occurred -- well, 2000 -- this is before in fact the sex trafficking to the United States.  My client contends that wasn't his intent.  So

36

I can't read my client's mind and the only thing we know from the conduct, right, which is indicative, is that they're -- after she goes back to her home and then comes back on her -- and comes back by bus, she's picked up, and then there is prostitution for a year, close to a year in Mexico.

That's the conduct and therefore I still contend that the case law supports my contention that the four points in Mexico under these facts --

THE COURT:  I don't recall that the case law is precisely on point.  I mean I know that the case -- that the cases hold that for conduct that occurs outside the United States you can't use it to increase the guidelines or to -- or as relevant conduct and you can't use it for an upward adjustment but -- which makes sense but the question is was this -- was this -- was this essentially the beginning of an effort to ultimately bring her to the United States and the statute that the guideline cross references is 15.  I think that's relevant anyway.  1591.

Can you help me?  What is the punishment for 1591?

MS. MERKL:  1591 under circumstances of forced coercion, Your Honor, is a 15 year mandatory minimum.

[Pause in proceedings.]

THE COURT:  But he faces that minimum here at least.

MS. NEWMAN:  Yes, he does.

MS. MERKL:  Yes, he does, Your Honor, but the

37

Government's position is that that minimum grossly understates the severity of his conduct in light of his beating of Jane Doe 6 to the point of inducing an abortion, abducting her, placing in her fear for her life, facing her in fear for her child's life, his repeated beatings of Jane Doe 8, his involvement in this multi year family business bringing girls in and out including minors that he was aware of and had an opportunity to observe himself while they were under age.

So, Your Honor, under those circumstances the 15 years would be what applies for one single victim. In this instance, Your Honor, we feel that his conduct is far more severe and that 15 year sentence as reflected by the guidelines estimated both in our plea agreement and by the probation department.

MS. NEWMAN: Well, Your Honor, we would -- we have much disagreement with the Government on that. We have much disagreement with other applications as well, enhancements, but we do not feel that the Government is stating accurately that my client conduct and that's why the four points comes into play because it's the guidelines, Your Honor. It's not the 15 years. We believe that the 15 years more than adequately punishes Mr. Rojas for numerous reasons which the Government just has completely, completely ignored.

MS. MERKL: That is not true, Your Honor. As set forth in our papers his sentence would be grossly

38

disproportionate with similarly situated defendants including a defendant in this case who already has received 262 months for a situation involving three victims in Atlanta. He's scheduled to be sentenced later today.

Your Honor, Mr. Rojas' conduct is as that if not much worse than that defendant with regard to the severity of the violence that he inflicted and the abduction of Jane Doe 6.

THE COURT: Well, that goes to the overall sentence. That's a separate question.

MS. NEWMAN: I would like to address the violence but we'll get to that.

[Pause in proceedings.]

THE COURT: I'm not sure what to do with this. We're not having a Fatico hearing but the probation report's analysis of the facts is just different than yours.

MS. NEWMAN: Probation denounces the facts as just a reiteration of the Government's version. It doesn't bring in our version. It's not like an objective version. They've just reiterated what the Government has said. So it's just having the Government's statement twice and their -- they had said they did not give the four points. So they -- based on the very facts that they credit, right, they did not enhance it by four points either. So that also I think supports my position.

39

MS. MERKL:  Your Honor, I think that Chief Probation Officer Gjelaj just indicated that there's merit to the Government's argument in these limited circumstances and one of the probation department's concern is this is a slippery slope in their policy considerations and other issues that he identifies.  We do not think that the probation department's analysis is binding on the Court.  Clearly that's the law. And the question of what evidence is available to the Court I would again point to Jane Doe 6's sworn affidavit.  That's the sort of -- that's evidence of what happened here with regard to proving the Government's position by a preponderance, Your Honor.

There's a sworn affidavit.  It's available to the Court and otherwise there's no sworn statement to contradict anything that she has said in this affidavit, Your Honor.

MS. NEWMAN:  Well, there is a statement.

MS. MERKL:  Nothing sworn, Your Honor, that would contradict on this question.

THE COURT:  Do I have that affidavit?

MS. MERKL:  Your Honor, we submitted it as Exhibit A to our December 26th submission and if Your Honor needs a copy we can hand it up.

MS. NEWMAN:  And I would remind the Court that missing --

[Pause in proceedings.]

40

MS. NEWMAN:   In the meantime I would add that that sworn affidavit --

THE COURT:   I have it.

MS. NEWMAN:   While the Court is -- in the affidavit is missing any of the benefits she received.  What she is doing now, what's happening with her son, when did she take -- did she take custody back.  So there's things that are missing that I think -- but I don't think necessary for them -- for a Fatico.  I simply think that based on these facts the four point enhancement is legally not applicable.

THE COURT:   I read this affidavit.  I remember being confused because it said statement in support of her request for extradition but I wasn't concentrating on this particular issue when I read it.

[Pause in proceedings.]

THE COURT:   Why don't you highlight for me the differences -- the probation report seems to -- withdrawn.  I think it was prepared before -- the probation report was prepared on April 6th.  This was submitted in -- to me on December 26th and it seems to me in relevant respects it's consistent with the presentence report.

PROBATION:   Your Honor, for the record, we were provided all of those affidavits previously and we used that [inaudible].

MS. NEWMAN:   I knew what they used but it's -- I'm

41

sorry.  I understood that you had used it because it's almost word for word.  The version of the offense conduct is almost word for word from the affidavit.  So I was well aware that you had used those.

THE COURT:  So what is your position?  If you don't want any kind of a hearing --

MS. NEWMAN:  Because I --

THE COURT:  I can't rely on this affidavit, I can rely on it?

MS. NEWMAN:  I think you have -- it's not that you can't rely on the affidavit.  I think that that -- the affidavit nonetheless has some self serving aspects of it.  We don't know, for example, which I have requested the Court -- from the Government numerous times any kind of benefit, immunity agreement or immigration benefit that they receive that might shed light but that the -- my point and what I had said in my supplemental is I still contend that legally that that -- whatever happened from her perception we don't concede that that was my client's perception but it didn't matter.

Whatever conduct occurred three weeks after they met is not an abduction which would have to do with commercial sex trafficking in the United States, and that was the legal argument that I was making.  The Government wants to introduce extraneous facts and make it this continuing conduct.  They want to look into my client's head and say the minute he

42

met --

THE COURT:  Well, it's not extraneous.  We know -- we know what happened.  The question is whether this was a prelude to the ultimate act of bringing her to the United States for the purpose of prostitution.

MS. NEWMAN:  I agree.  That's why I'm saying that the way -- what I'm saying -- that's why I made the if in fact they had met and then he -- this abduction or that she went with him readily, whatever happened, okay, if it had happened within a month and then they agree to go to the United States, or if he was -- she was abducted to cross the border we would be in a different circumstance but what I'm saying is the facts as presented we don't have something related to what happened in the United States.  The Government differs.  They say obviously.  They don't know how obvious but obviously --

MS. MERKL:  Your Honor, I'll speak for the Government.  I don't mean to cut you off.  I'm prepared to respond.  So rather than characterizing my argument --

THE COURT:  Go ahead.

MS. NEWMAN:  Thank you.  It's simply that this conduct occurred in Mexico well before she went to the United States and that's the important focus we have.

THE COURT:  Well, the question -- you're right.  It happened well before she went to the United States but the question is what -- what was the purpose of it and the purpose

43

of it I think one can draw a reasonable inference particularly in light of the overall scheme and what happened in the United States was that it was done in contemplation of bringing her to the United States for the purpose of engaging in prostitution.

MS. NEWMAN:  But there's no facts to support that because of the length of time and -- there's nothing to support that assumption.  It could well be a month, not ten months into this.  My client discusses and says you know what, you're not doing that well here, let's go to the United States, and in the United States we're going to get a house and you're going to do X, Y and Z and maybe work at a restaurant, whatever, because we've admitted there were false promises and she said you know what, let's go to the United States, that seems like a good idea.

So what I'm saying is there's nothing here that supports this assumption that they're making and it's a big step because of the four points that he -- the minute he met her that's what he intended and that's my argument.  It just happened there and I think that that is -- there's nothing other than she was prostituting in Mexico.

MS. MERKL:  Your Honor, I think Your Honor's observation that in light of the entirety of the scheme reasonable inference can in fact be drawn that that was one of his purposes when he abducted her that day and the only reason

44

that I brought his involvement with the other Jane Does is because by the time he met her in 2007 and abducted her he was well aware of the family business and the family had already established operations in the United States.  There were people already here.  He had already been in the United States and at that time assisted with the trafficking of Jane Doe 3.

So this isn't like a vacuum and then he abducted her and then he decided later to go to the United States.

MS. NEWMAN:  But there's nothing -- maybe they -- if she had done well in Mexico maybe they would stay there.

MS. MERKL:  Your Honor, I --

MS. NEWMAN:  That may be so but his plea was 2008 is his involvement with Jane Doe #6.

THE COURT:  I know but that may have been the date that he pled to but there were relevant things that shed light on what he was doing before -- what happened before.  I mean this is not --

MS. NEWMAN:  I think the Court well understands. I don't want to beat a dead horse.  Understands that my position is that based on the proximity of what had happened and in fact that the prosecution did not occur as in a bank when this -- when what -- she stayed there for two weeks and then left that that abduction did not have directly to do certainly with the United States.

THE COURT:  All right.

45

MS. NEWMAN:  That's my argument.  You know it. Thank you, Your Honor, for giving me all this time.  I do appreciate it.

THE COURT:  I'm going to give the four point adjustment for the reasons that I've just stated.

MS. MERKL:  So, Your Honor, in reference to the PSR, Racketeering Act 8, Count 17 discussed in this -- starting in Paragraph 64 -- so is Your Honor's finding that four point enhancement does apply in that area of the PSR?  It would be like Paragraph 64, 65, something in that range.

THE COURT:  I'm sorry.  I don't --

MS. MERKL:  I'm just trying to ground it on the documents, Your Honor.  Page 25 of the PSR.

THE COURT:  I see.  What are you asking me?

MS. MERKL:  Just making the record clear if that was Your Honor's intention.

MS. NEWMAN:  We still have arguments, Your Honor, with respect to the other enhancements.  So you may want to change the paragraphing.

THE COURT:  Let me put it this way.  I don't want to get confused over this.  I agree with the arg -- with your position we've just -- on the issue that we just argued.

MS. MERKL:  Thank you, Your Honor.

MS. NEWMAN:  So looking -- since we're on this part of the PSR, we can go to vulnerable victim enhancement and the

46

threats of serious bodily injury.  So they -- the Government and the probation begin at 30.  They add four for threats and then they add two for vulnerable victim.  The Court has now added four to that bringing it up to 40.  We disagree with the vulnerable victim.

MS. MERKL:  Your Honor, the Government rests.

THE COURT:  We're focusing on the guidelines as we should because I have to accurately calculate them.

MS. NEWMAN:  Right.

THE COURT:  But I'm not bound by them.

MS. NEWMAN:  No.

THE COURT:  I can take into account some or -- of the arguments that you have made but I think the guidelines have to be accurate to calculate it.

MS. NEWMAN:  Right.  All I'm saying is that we have arguments about the application of vulnerable victim --

THE COURT:  Okay.

MS. NEWMAN:  -- with respect to Jane Doe #6 and with respect to all the other Jane Does.  So we have a general objection to the application of a vulnerable victim which has been applied by probation and not always with respect to the Government's calculations.

So if Your Honor would like to hear the general objection to vulnerable victim I can do that as well as its application to --

47

THE COURT:   Well, I assume you don't -- I assume where the Government is not asking for it you're not arguing with them.   So why don't you --

MS. NEWMAN:   Right.   I think the -- For #6 they do.

[Pause in proceedings.]

THE COURT:   You're talking about it in this case.

MS. NEWMAN:   Yes, I'm talking about it in this case. So vulnerable victim s per the guideline it's an adjustment under 3A1.1 just for the record and it would only be proper if the young woman involved in the prostitution was particularly vulnerable.

Now, we know that the people involved in prostitution are generally uneducated poor individuals. That's across whether it's Mexico or here in the United States.   They -- and generally they lack viable economical alternatives.   So -- and we indicated on Page 25 of our memo that in fact in the legislative history of the Victims of Trafficking and Violence Protection Act of 2000 which established 18 U.S. 1591 that Congress intended the high base offense level in 1591 which in here is level 30 as we've gone through the guidelines, takes into consideration that the victims are young and lower economic.

So the adjustment is only proper if they're unusually vulnerable and there is nothing about victim -- Jane Doe #6 that makes her unusually vulnerable.   She was working.

48

She already had an illegitimate child out of wedlock and she was having difficulty staying at home.  She didn't like to be at home.  Obviously there was some friction about her illegitimate child.  She was happy to leave with Mr. Rojas.  Maybe not to prostitute.  We never said that.  I want to be clear that we're not saying that this victim wanted to be a prostitute.  That's not going to come out of my mouth.  But there were other circumstances.

She was not uniquely vulnerable for which they -- the guidelines and Congress intended for that to be applied to a very limited class of women.  Women we should say, right?

MS. MERKL:  Your Honor, I would note that the Government was very careful in its guidelines estimates in the Plea Agreement and we applied the vulnerable victim enhancement as to each of the defendants in this case including Mr. Rojas based on the Government's evidence as to whether we could prove that that specific defendant knew or had reason to know of a unique vulnerability as to that particular victim.

THE COURT:  But she's arguing about the uniqueness.

MS. MERKL:  Correct.  In this instance the only victim as to whom the Government estimated vulnerable victim as to this defendant, Felix Rojas, is Jane Doe #6 because he abducted her with her newborn, Your Honor.  I really can't think of very many people who are more vulnerable than a

49

nursing mother who is now in fear for her child's safety. There's really very few people who are more vulnerable than that in the Government's estimation. Her job, her economic circumstances, none of that is the basis. It's the fact that she was abducted under these incredibly invidious circumstances. For this defendant the Government believes you can draw a reasonable inference saw as an opportunity to control her through this child.

MS. NEWMAN: Well, Your Honor, we submit that that's in and of itself is somewhat suspect because she came with the child to meet Mr. Rojas. She returned home --

THE COURT: Wasn't that under some rouse friend of hers?

MS. NEWMAN: Yes.

THE COURT: A friend invited her and her baby and they planned to go to a fair but when Jane Doe 6 arrived the friend was not there and Mr. Felix Rojas showed up and then it goes on.

MS. NEWMAN: Right. And we've gone through that. We dispute that but we don't think that that's a material difference. We dispute what happens thereafter but it's not material. What is whether or not -- the point of the matter is -- I think this is important -- is that the fact that she had a youngster where she returned home and thereafter when she was in the United States was giving the money and stopped

50

by her own admission paying for that child's care.  Didn't come back to Mexico to retrieve her -- retrieve him but in fact left the child in the care of Ms. Herrera.  And then for several months didn't send the money and didn't come back to Mexico to get the child, didn't send her parents.  It was Ms. Herrera who initiated the process for the child to then be retrieved.

So there's something little suspect there but that didn't make her -- what I'm saying is that they're using this as -- to enhance two points where all of the circumstances suggest that that should not be that she's particularly vulnerable and I just don't think that's what Congress meant. She was not -- the guideline is high enough when it starts at level 30.  That's what Congress said.  This is not a unique -- that makes it so unique, so outrageous that we have to add two more points to what is already we have here 30 plus four plus two plus four, and that's what the Government is just adding it on and on and on and there comes a point, Your Honor, it knows when you keep adding these enhancements like we have plenty of case law in fraud cases where they just keep adding and adding and adding that it's the enhancements that are pushing the guideline.

I suggest that as this keeps going that's what's happening here and that the guideline base offense level of 30 takes that in.

51

MS. MERKL:  Your Honor, for all of the reasons stated today and in our papers we just disagree.  This was a uniquely vulnerable victim.  She had a newborn.  She was a nursing mother.  Under a year is a newborn.  It's a nursing mother.

MS. NEWMAN:  It doesn't say she was --

MS. MERKL:  Yes, it does.  You can read it in the affidavit.  She nursed her child while she was being held in the house at the cousin's by feeding the child breast milk.

[Pause in proceedings.]

THE COURT:  I think the -- what made her otherwise particularly vulnerable is the fact that -- is the child and the threat to the child if she did not go along with what Mr. -- your client wanted her to do.  I don't see that s being a close call.

MS. NEWMAN:  I understand, Your Honor, but it's a matter of whether -- when he first initiates the contact.  That's where the vulnerable victim.  He initiates the contact with her and targets her.  That's what I understand is a vulnerable victim.  So he -- the way the Government is presenting it he targets her because she has this son and makes her a vulnerable victim as opposed to targeting generally the low economic, et cetera, et cetera women.  So my position is that's not why she was targeted because she brought the son with her.  There wasn't invited with the son

52

like bring your son and then the intent was now that you have your son I'm going to do X, Y and Z.  So that's why I don't think it's particularly vulnerable.  That's -- that was the argument I presented in my sentencing submission.

THE COURT:  Which -- what's the section of the guideline?  It's the same on we've been dealing with?

MS. MERKL:  3A1.1, Your Honor.

[Pause in proceedings.]

THE COURT:  So what is your argument, that he had to know -- at what point in time did he have to know this?

MS. NEWMAN:  In other words, he targets her as vulnerable.  That's when she becomes a vulnerable victim and my position is he didn't target her because she had a son.

MS. MERKL:  Your Honor, the evidence belies that and that is not what the guideline says.

MS. NEWMAN:  It's not very clear.

MS. MERKL:  It doesn't matter if he learned in the middle of the offense, at the beginning of the offense, towards the end of the offense.

MS. NEWMAN:  So that the -- we look at the commentary which would be application Note 2 and it explains vulnerability.

MS. MERKL:  And it has nothing to do with temporality.  It simply states it applies if the defendants knows or should have known of the victim's unusual

53

vulnerability.  It doesn't say when in the offense conduct that knowledge has to have come to the defendant's understanding.

MS. NEWMAN:  But if we read further of the commentary when it talks about vulnerable victims in fraud cases -- in other words, they're targeting and marketing, you know, fraud marketed cases because they know that the victim was handicapped, maybe was aged, or senile so that they are targeted.  That's why they're vulnerable victims.

MS. MERKL:  Your Honor, the application note does not carry the day in terms of transmogrifying the meaning, the clear meaning of this application.

The Government would note that it is also [inaudible] evidence here, that the defendant did know from the very beginning that she was -- had a small child and abducted them both and held them and the first -- the majority of his threats at the initial days focused around her son.

MS. NEWMAN:  That has to do -- it's not a vulnerable victim.  Vulnerable victims are people who are targeted according to the commentary for a specific reason that there's something about them that so unusually makes them vulnerable.

[Pause in proceedings.]

THE COURT:  So your argument is that the vulnerability has to relate to some characteristic of the defendant -- of the victim and not some factors that might

54

induce the victim to engage in --

MS. NEWMAN:  Correct, Your Honor.

THE COURT:  -- prostitution.

MS. NEWMAN:  Correct, Your Honor.  That was the argument better put by Your Honor.  Thank you.

THE COURT:  I just want to be sure I understand.

[Pause in proceedings.]

THE COURT:  But have I considered this threat to her son and the abduction discussion --

MS. MERKL:  Your Honor, I don't believe that that is double counting if that's what Your Honor is considering.  The abduction was of the victim and that's what the abduction counts for --

THE COURT:  I know but the question is whether --

MS. MERKL:  -- and the vulnerability to her.

THE COURT:  We were talking about what made the conduct an abduction to begin with.

MS. MERKL:  What made the conduct abduction to begin with was placing her in the car under the auspices of going to a fair locking the doors, telling her that she was fucked and that she belongs to him now and then taking her to another location.  What makes her vulnerable is the fact that all of that happened while she has her ten-month old with her and is a nursing mother.  Those are distinct and should be accounted for separately in the guidelines.

55

MS. NEWMAN:  I obviously disagree and for the reasons stated that this was -- she wasn't targeted because she had the son and that's what seems to suggest by the guidelines.

[Pause in proceedings.]

MS. NEWMAN:  Your Honor, I would also point out that the addendum to the PSR on Page 2 when it cites to <u>U.S. v. McCall</u> indicates that the vulnerable victim enhancement applies to those who need a greater societal protection.  They are the person who when targeted by the defendant render his conduct more criminally depraved.

MS. MERKL:  It's hard imagine more criminal depravity than abducting a nursing mother and forcing her into sex trafficking, Your Honor.  I really can't think of something more depraved.

MS. NEWMAN:  Again, but I was --

MS. MERKL:  Your Honor, I would note that probation supports the enhancement citing that case law.

MS. NEWMAN:  Again, I understand that.  My concern is the targeting and that's why I disagree with the enhancement.

[Pause in proceedings.]

THE COURT:  How do you define the word susceptible?

MS. MERKL:  Susceptible?

THE COURT:  Yes.

56

MS. MERKL:  Influence and impressionability. Receptive.

THE COURT:  Well, it says whoever -- who is otherwise particularly susceptible to the criminal conduct.

MS. MERKL:  That makes sense.

THE COURT:  I mean I think that she clearly went along and acquiesced because -- at least in part because of the child but --

MS. MERKL:  So, Your Honor, dictionary.com defines susceptible likely or liable to be influenced or harmed by a particular thing, easily influenced by feelings or emotion, sensitive.  Under those circumstances, Your Honor, the Government thinks that susceptible aptly applies to a person being manipulated by the control that somebody else is exerting over their newborn child.  Any parent with a vulnerable newborn would be understanding of how susceptible and vulnerable that makes the mother.  If the mother is being threatened if she doesn't engage in a particular course of a conduct or it's going to harm her son who is not even one year old it's hard to imagine anything that would make a young woman more vulnerable.

MS. NEWMAN:  It's the --

THE COURT:  There's no question that the threat to the child is relevant and played a role.  I don't know that it rendered her susceptible to engage in a prostitution as the

57

word is used in the context of people who are vulnerable due to age, physical or mental condition or who is otherwise particularly susceptible to the criminal conduct.

MS. MERKL:   Your Honor, people do things that are --

THE COURT:   To the criminal conduct.

MS. MERKL:   People do things to protect their children that they would not ordinarily be vulnerable to doing.  If somebody threatened somebody with harming their family member, harming a loved one or do this or I'm going to kill your wife, do this or I'm going to kill your child, do this or I'm going to kill your -- your baby that she's much more inclined to engage in that conduct than if she had been a single person working at the hotel who could [inaudible].  You got nothing over me.

MS. NEWMAN:   Your Honor, I just think the emphasis is on the -- the emphasis has to be on why she's targeted.  In the examples given all have to do where there's a basis in advance.  We are going after the people, a certain age, people who were senile or they get databases but this is different and I don't think make her a uniquely -- remember, it has to be above.

MS. MERKL:   Your Honor, if a nursing mother is not a susceptible vulnerable victim to sex trafficking or frankly any -- being forced to do any type of criminal conduct. Frankly I can't think of who would be and the vulnerable

58

victim enhancement would be rendered a nullity.

MS. MERKL:  No.  If somebody said traffic these drugs or I'm going to kill your child that would be a vulnerable -- that would be a vulnerable victim situation.

MS. NEWMAN:  I think that the purpose as stated by Congress was really very unique and limited and we don't have that circumstance here.  I think they're turning on its head adding inferences into the enhancement that just don't exist of the clear language of the guideline.

MS. MERKL:  Your Honor, the Government respectfully submits that the Court should adopt the probation department's analysis as set forth in the December 12th addendum -- sorry, the addendum dated December 7th which analyzes the case law cited by the defense and makes plain that the enhancement should apply.

MS. NEWMAN:  I respectfully disagree and --

THE COURT:  Well, the Government -- the probation's position is different from --

MS. NEWMAN:  Yeah.

THE COURT:  -- what we've been talking about.

MS. MERKL:  But probation's analysis of some of the case law, probation's distinguishing this case from a bank fraud case or a securities fraud case is relevant.  Probation specifically cites that notion that some of these cases cited by the defense do not address sex trafficking.  They're not on

59

point, Your Honor.  The question of whether or not somebody is targeted for fraud because they're elderly is totally distinct from whether or not they are in a vulnerable position to be forced into a very troubling and dangerous lifestyle because somebody is holding something over them and threatening them daily with that thing that makes them so vulnerable.

MS. NEWMAN:  And that is the usual course of events when there is sex trafficking.

MS. MERKL:  Your Honor --

MS. NEWMAN:  Whether it's the usual course with getting drugs, whatever it is these generally -- I would say 99 percent of these women do not enter into sex trafficking readily but do so because they feel the need, the coercion of somebody above them.  This has to do with targeting.  Was she targeted and there's no evidence here that she was a vulnerable victim but that's why -- that's what the guidelines are trying to punish more severely.

MS. NEWMAN:  Your Honor, that's --

MS. MERKL:  Your Honor, he abducted her with her child.

MS. NEWMAN:  But he didn't abduct her because she had a child and there's nothing in there that said that.  This wasn't a modus operandi according to you.

MS. MERKL:  Your Honor, the Government has been very judicious as we stated at the outset in looking closely at the

60

facts and trying to assess whether or not vulnerability was known and understood, right, each of the defendants in this case as to each of the Jane Does. In this instance the Government respectfully submits that Mr. Felix Rojas did in fact target Jane Doe because of her child and knew the minute that she had -- he had her and her son locked in his car he would be able to control her.

MS. NEWMAN: That's not what --

MS. MERKL: Exactly that happened.

MS. NEWMAN: That's not what the affidavit said. It doesn't say that she was targeted beforehand. He didn't say now, don't forget to bring your son when you come to the fair.

MS. MERKL: He invited her to a fair with her son and locked her in the car and immediately began threatening her by using the son as the threat.

MS. NEWMAN: That's not exactly what the facts are but moreover -- but moreover, that's not all that happened here. So we have to look at the totality here and I -- it just that this is not over and above. She was not targeted and this is a very narrow look at what the Congress wanted to be very restrictive.

MS. MERKL: There's no support for that last sentence, Congress wanted this to be restrictive. As the Court knows, probation applies the vulnerable victim enhancements liberally in those cases and there's ample case

61

law support for that as well.

MS. NEWMAN:  No.  Your Honor, they had not cited it. On the other hand, I cited what Congress did interpret it to be and the -- that's why the guideline starts at 30.  We didn't start at 14 and then add enhancements.

[Pause in proceedings.]

THE COURT:  So let's go back to the wording of -- of the commentary.  It says otherwise particularly susceptible to the criminal conduct, the criminal conduct of the defendant. I assume that's what we're talking about.

MS. MERKL:  Your Honor, I would also submit that we're talking about physical and mental condition.

THE COURT:  I'm sorry.

MS. MERKL:  I would also submit that we are talking about physical and mental condition because it is extremely taxing to be a nursing mother.  You're exhausted.  I'm not joking.

MS. NEWMAN:  I --

MS. MERKL:  I'm not joking.  It's physically exhausting.

MS. NEWMAN:  I think that's open to debate.  We will not debate it here.

MS. MERKL:  I think it's well established.

MS. NEWMAN:  I disagree.

THE COURT:  That's not the question that I asked for

62

the moment.  Was otherwise particularly susceptible to the criminal conduct of the defendant.

[Pause in proceedings.]

MS. MERKL:  Your Honor, I think susceptibility boils down to whether it was easier to control her than it would be to control a truly independent actor.

THE COURT:  Well, that in part I have to say it persuaded me that she was essentially not free to leave and that she was a victim of an abduction.  It was otherwise particularly susceptible to the criminal conduct of the defendant.

[Pause in proceedings.]

THE COURT:  Tell me again why you added two points.

MR. GJELAJ:  So we applied this provision and although not for the same reasons that the Government did, we don't disagree with the Government.  I think that that unique individualized finding for vulnerable victim equally applies.  However, we were looking at this offense and I'm not sure I'm perfectly happy with the characterization that we liberally applied but I do appreciate that fact that we do apply it and we apply it more because of the types of individuals that are typically engaged in this type of conduct and the defendant's perspectives of these types of individuals.

So we were talking about targeting although that was the standard that was once used, it no longer is.  The

63

standard is as in the commentary knows or should have known. I think there's a little question here that he knew or should have known that these individuals, these women are from impoverished uneducated -- their ages.  All of these things, the same things that defense counsel is saying are a sad fact of who gets engaged in sex trafficking is the very reason why we're applying it and why we think that they are in fact targeting these women.

MS. NEWMAN:  Your Honor, I have to respectfully disagree with probation because in fact that's why the enhancement doesn't apply liberally.  That's why they say unique because those are the typical women who do get involved and it's not to be applied to the typical victims of sex trafficking but it has to be a unique situation and that I think is abundantly clear from the guide -- from the current case law, for the case law cited and I think that -- and in the application notes.

MS. MERKL:  Your Honor, we appreciate probation's perspective and we concur that there are situations less unique than this where the guideline also applies and we intend to advocate for some of those as appropriate in various other contexts where the person was not a nursing mother but had other unique vulnerabilities or other vulnerabilities that made them more susceptible.

So I think that there's an ample basis under either

64

theory, the theory presented by the Government or the theory presented by the probation department to make a vulnerable victim finding here.

MS. NEWMAN:  Well, I again rely on the commentary of 3A1.1.  It's commentary 2.  And it says consistently unusually vulnerable.  The subsection applies to offense involving an unusually vulnerable victim and do not apply subsection B if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.  So that's where I get its incorporated in the guideline level of 30 which is uniquely high and that there's nothing -- again, it has to be unusually vulnerable.  That's just what the guideline says. So --

MR. GJELAJ:  Again, Your Honor, I'm sure we flushed this out as best we can but we do believe that they are unusually vulnerable given their ages, their economic status, their education.  They're all coming from these impoverished areas of Mexico.  The defendants clearly know where they need to go.

And, again, we've we mentioned this several times throughout this proceeding and several times within all of the documents that are before Your Honor for numerous -- a number of defendants.  This is a family business.  These individuals know where they need to go and what they need to do and so although I'm not comfortable with the term targeting I think

65

we certainly can use the term targeting when we were talking about the vulnerable victim in these particular cases.  We've applied it across the board perhaps literally.  I'm not sure but we have applied it across the board because we feel all of these women in terms of at least their vulnerable victim status are indistinguishable.

MS. NEWMAN:  We cited United States v. Sbatino, S-B-A-T-I-N-O, 943 F.2d 94 at 103.  It's a First Circuit 1991 case and adjustment for vulnerable victims under USSG Section 3A1.1 would have been proper only if the young woman employed as prostitutes by the defendants were unusually vulnerable.

That is unusually vulnerable given the kind of victim that is typically involved in a man act violation and that Congress aimed to protect.  As I gave credit to the sentencing submission of my co-counsel that went into the vulnerable victim and -- referring to Page 6 of the September 4, 2018 submission by the Federal Defenders.  I'm not sure who signed it because it changed.  It was submitted by James Darrow and Len Kamdang on behalf of Francisco Rendez Reyes and in his submission he spent quite a lengthy period of a page and a half -- two pages on the vulnerable victim enhancement and why it would not be applicable in this case.  And he's talking generally where there is -- where you're engaged with commercial sex trafficking.  And he cites to United States --

THE COURT:  I don't agree with probation because

66

that would render a whole demographic so to speak of people as vulnerable.  I don't think -- I don't think it would be -- poverty is random in -- as we know in much of Central America and I don't know that this makes them unusually vulnerable.  I think they were talking about each particular individual as opposed to a whole demographic but that -- that --

[Pause in proceedings.]

THE COURT:  I'm going to add the two points.  It seems to me that the critical paragraph, the language in Paragraph 26 is -- begins with Felix Rojas threatened to harm her son if she tried to escape or warn her parents.  After their return to Tenancingo Felix Rojas forced her to prostitute in Guan -- I don't know --

MS. NEWMAN:  Guanajuato.

THE COURT:  Mexico.  When Jane Doe 6 told Felix that she didn't want to prostitute he reminded her that her son was Jovan Randon-Reyes and her mother.  So I think she was particularly susceptible.  It's a close question and I think it was also -- it also contributed to her continued abduction.  So to a certain extent there may be an overlap but I'll take that into account when I impose a sentence.

MS. NEWMAN:  Thank you, Your Honor.  So we are now on just the Paragraph 7 --

MS. MERKL:  Your Honor -- are you moving on to Jane Doe 8?

67

MS. NEWMAN:   Yes.

MS. MERKL:   Because the Government had one final enhancement as to Jane Doe 6 that we had included in the lea Agreement as included in our estimate, and that is the estimate of an additional two points or serious bodily injury. And that estimate was based on the defendant's forcible -- forced abortion where he beat Jane Doe 6 to the point where she and her body had sort of -- a miscarriage after the beating and also burned her with a cigarette in addition to numerous other slaps and beatings but the two that we rely upon is the serious bodily injury enhancement as defined by guideline 1B1.1 are the abortion situation and the cigarette burning.

MS. NEWMAN:   Your Honor, we object as we did in a sentencing memo.   Neither of these -- I know that it sounds trivial but it's technical.   That's why we didn't believe that we needed a Fatico have to do with commercial sex trafficking. We dispute that we burnt her with a cigarette.   We did state in our version that there were instances where we fought because she was on drugs.   We -- but the burning of the cigarette according to the Government had to do with her refusal to have sex with him.

The serious bodily injury of the -- having to abort the child or miscarriage, we again dispute that.   We do agree that we were in an altercation with her in which she fought

68

back and that she did have a miscarriage but the altercation again had to do with drugs and it is not clear what actually caused the miscarriage. I note that while there is just no corroboration to her statement as to this, there is no photograph, there is no police report, there is no hospital, there is no doctor re -- there is no med -- there's nothing other than her statement and as I indicated while the -- I understand the Court's reliance but to some degree there has to be some question when the Government has failed to provide the benefits received for any such corroboration that would be independent and objective.

MS. MERKL: Your Honor, once again, the Government is left in this position of not understanding whether or not Ms. Newman is requesting a Fatico hearing. Jane Doe 6 is in the building. She is prepared to make a victim impact statement. Her affidavit is before the Court. She was required to take pills and then the defendant beat her to the point of having a spontaneous miscarriage and she has been wondering what happened to that baby for the last ten years, Your Honor.

Under those circumstances, the Government's position is that the serious bodily injury applies and the Government has met its burden of a preponderance to establish that she suffered serious bodily injury during the course of the trafficking.

69

MS. NEWMAN:  We relied on -- to define serious bodily injury -- first of all, we should just alert the Court that four points have been added that we did not dispute which was the instant offense was committed by means set forth in 18 U.S.C. 241(a).  Specifically the defendant and co-defendant used force and threats, serious bodily injury against the victim in this case.  So it is the additional two points.  Again, the enhancement on enhancement on enhancement that we're disputing.

It is not a matter of whether her perception of what caused the miscarriage.

THE COURT:  Could you go over that last argument again?

MS. NEWMAN:  I think -- the Government or myself?

THE COURT:  Yours.

MS. NEWMAN:  I'm sorry.  So what we're saying is that with respect to serious bodily injury has the meaning given to those terms --

THE COURT:  Where are you reading from?

MS. NEWMAN:  I'm reading from my own memo, Page 26.

THE COURT:  Oh.

MR. GJELAJ:  The definition, Your Honor, is on Page 19 of the manual for serious bodily injury.

MS. NEWMAN:  And that's what I --

THE COURT:  Wait, wait, wait.

70

MS. NEWMAN:   Sorry.

[Pause in proceedings.]

THE COURT:   Okay.  Now make your argument.

MS. NEWMAN:   Thank you, Your Honor.  So on to the definition it has to be serious bodily injury to mean injury requiring hospitalization, extreme physical pain or injury requiring surgery and impairment of a bodily organ.

We also note that this again as we stated, that this offense conduct -- this conduct was not in relationship to commercial sex trafficking but rather the alleged burning of the cigarette had to do with -- according to her affidavit her refusal to have sex with him, and the -- so we're saying it's outside of the enhancement.

In addition, we say that having the miscarriage, which we do not deny that there was a miscarriage, they're saying it's a result of pills.  We're saying that it is a likely result of her own use of drugs --

THE COURT:   No, there's more than --

MS. NEWMAN:   -- but it's not a factual --

THE COURT:   I think it was more than the use of pills.

MS. NEWMAN:   I think he said he beat her in the stomach or he beat her and that caused the miscarriage.

[Pause in proceedings.]

THE COURT:   She says that when I told Felix that I

71

would be able to work because of the baby Felix tried to provoke a miscarriage in me by giving me pills and beating me in the stomach to induce labor.

MS. NEWMAN:  Right.  So for the first one we said the cigarette it was outside.  Now I'm addressing that conduct and that conduct had to do with the miscarriage.  So that conduct with respect to the miscarriage we would suggest to the Court was while she had a miscarriage we don't -- we do not have any hospitalization, any medical report, any corroboration for what she is saying or even the pills, a copy of the pills or something to corroborate this.  And we have a conflicting version of this but we do admit the miscarriage.

Our version has to do with her taking of drugs but I don't believe it matters.  The fact of the matter is whether or not a miscarriage happened, we agree, and whether that equate to what this two additional point -- remember, this has to be over and above the otherwise applicable what we already agreed to the four points.  And so it's requiring hospitalization, extreme physical pain, injury requiring surgery and an impairment of a bodily organ.  I believe I've quoted that correctly from the definition of serious bodily injury.  So it has to be extreme in other words.

The Government seems to feel that that's extreme. We disagree and we also suggest and we point out that it -- we point out that there's no corroboration.

72

THE COURT:  It talks about extreme -- it talks about extreme physical pain and she said that she was in pain -- Felix tried to give me -- when I told Felix that I would not be able to work because of the baby Felix tried to provoke a miscarriage in me by giving me pills and beating me in the stomach to induce labor.  I was in pain unlike anything I've ever felt before and went into the bathroom.

MS. NEWMAN:  There's no question --

THE COURT:  And then she goes on to describe the aborted pregnancy.

MS. NEWMAN:  Right.  So we're looking at that the miscarriage is painful.  That's what she's saying, she was in pain from a miscarriage and I don't believe that that equates of -- where we're talking about the kind of pain.  Pain from a miscarriage just like extreme pain from giving birth is painful but I don't think it equates to what they're trying to happen here, and that's my argument, Your Honor.

It's a technical argument as to the definition and to point out that we don't have any corroboration which could be corroboration, the normal course of events which the guideline seems to anticipate and that's the argument in a nutshell.

MS. MERKL:  Your Honor, I believe the defense argument ignores this cause of the miscarriage.  The defendant was concerned about keeping his prostitute as a viable victim

73

who could serve his clients and beat her stomach so that she would have a miscarriage and I think it's just common sense that that's going to cause extreme physical pain.  She passed out from the pain and to this day does not know what happened to the fetus.

MS. NEWMAN:  Look, the -- I think you mischaracterized my argument because I didn't say that that would not fall -- unlike the refusal to have sex.  What I am saying, however, that miscarriages are painful and that's what she saying was the pain but it's not the extraordinary pain.  It's mother's nature pain.  It's our body's pain.

[Pause in proceedings.]

THE COURT:  What's the guideline, specific guideline this definition applies to?

MS. MERKL:  Your Honor, 2A3.1(4) is the guideline that makes reference to the serious bodily injury enhancement. And it is distinct from the coercive forcible conduct that lands us in this guideline scheme.  So there's no --

THE COURT:  Say that -- 2A what?

MS. MERKL:  2A3.1(4) states in (B) if the victim sustains serious bodily injury increase two levels.  And then the guidelines notes take you to the cross-referencing guideline 1B1.1.

[Pause in proceedings.]

THE COURT:  I actually think that this is the lease

74

difficult for me, so I'm going to -- I agree that this enhancement applies.  A lot of -- some of the arguments, you're in a box here because you don't want t -- you can't ask for a Fatico hearing because it'll upset the whole global plea.  And I understand --

MS. NEWMAN:  Thank you for understanding, Your Honor.

THE COURT:  -- I understand your position.  You're making arguments that i would normally say we'll have a hearing.

MS. NEWMAN:  I appreciate it.  I appreciate the Court's understanding the conundrum that we are faced in this case and that -- but nonetheless, I do really believe that a lot of it is legal argument and the basis of it.

THE COURT:  No, you're right.  But what you were just arguing seems to me to be a query of -- I mean I don't see it as -- if I accept her affidavit, I don't see it as a close case on that particular enhancement.

MS. NEWMAN:  Okay.  So just that we're clear, I think we should just sum up so it's for Jane Doe 6.  We would start at 30.  We add 4 for serious bodily injury, use of force, and threats of serious of bodily injury.  Then we added 2 for vulnerable victim.  We added 4 for abduction and then 2 for serious bodily injury.  So that gets us level 42?

MS. MERKL:  Level 42, Your Honor.

75

MS. NEWMAN:  Level 42 before anything else happens. All right.  Okay.  I just wanted to be clear so that the record was clear.  So that brings us to Jane Doe #8.  And there is some good news and that is while probation disagrees, the Government and the defense agree that the guideline level for Jane Doe #8 is 34.  I just want to confirm that on the record with the Government?

MS. MERKL:  That's correct, Your Honor.

MS. NEWMAN:  So if we look at probation has a completely different analysis and they are at level 36, we would ask the Court to agree with the Government and the defense that the level should be 34.

THE COURT:  Okay.  Where does that leave us?

MS. NEWMAN:  Well, that leaves us to the next argument.  So it would be the adjusted offense level which is level 75, but the other paragraphs in the PSR would be wrong because they have a different -- completely different analysis.

MS. MERKL:  Are you talking about Paragraph 75?

MS. NEWMAN:  Yeah, I was just because it was the adjusted offense level where -- but the other paragraphs would be --

MS. MERKL:  So, Your Honor, just to be completely clear for the record, the Government made note of this in our sentencing submission, I think that probation took a slightly

76

different approach than we took. The Government applied the cross-reference to the criminal sexual abuse guideline, and that guideline resulted in a higher offense level than the normal trafficking guideline, if you will. We only went to the reference at 2A3.1, and those guidelines were higher than they would ordinarily be under 2G1.1 in the case of the adults and 2G1.3 in the case of the minor victims.

So probation may technically be correct that the guideline should be 2A3.1 which results in a level 34. Or we could technically be fine that it's also based on 2G1.1 at a level 34. So it's a distinction without a difference in terms of the total analysis, but I just wanted to make plain for the record what the origin of that disagreement was if Your Honor felt it necessary to make a ruling on it for the purposes of, you know, a correct calculation of the guidelines.

MS. NEWMAN: I just would add that the difference in the calculation arises from the victim-related adjustment. Probation added the two points for Jane Doe #8 as vulnerable victim, and the Government has agreed with the defense --

THE COURT: Right.

MS. NEWMAN: -- that as to that, it would not apply.

THE COURT: And I've agreed with you and the Government. So where does that leave us?

MS. MERKL: So for Jane Doe 8, that leaves us as striking the victim-related adjustment in Paragraph 72 and it

77

leaves us at a total adjusted offense level in Paragraph 75 of a 34.

MS. NEWMAN:  That's correct as far as the defense is concerned.  So now, if we're ready, we can go to Jane Doe #3. And there are general objections to Jane Doe #3, 5, and 7 and specific objections as to each.  Generally, on 3, 5, and 7, our objection is that they -- Mr. Rojas was not convicted with sex trafficking of Jane Does 3, 5, and 7.  And the --

THE COURT:  These are the Ruggiero counts?

MS. NEWMAN:  Right.  So we're looking -- and I understand Ruggiero, so I was getting to that.  But in fact, under Ruggiero, there has to be a direct involvement for the racketeering acts which this would be for Jane Doe 3, 5, and 7 to apply.  And if we look at the facts with respect to Jane Doe 3, 5, and 7, his involvement had to do with the crossing of the -- transportation of these Jane Does from Mexico into the United States.

So let me just get to my factual predicate here. For this, I relied a great deal on the PSR which relied on we know the affidavits of the various Jane Does.  So with respect to Jane Doe #3 which is RA-5A, I'm looking at my sentencing memo on Page 17.

And as stated in the PSR, his involvement with Jane Doe #3 is he lent Jose Rendon-Garcia a sum of money and understood that Jose Rendon-Garcia needed the money to

78

purchase transportation or some of the money, I don't know if it encompassed all of the money for the transportation -- of himself, Rendon-Garcia, and his girlfriend who was then Jane Doe #3 to the United States.  So he doesn't -- the only involvement with the crossing had to do with lending money.

And then when they arrived in the United States, he provided them with his recollection, which is irrelevant, was one-night stay.  I believe probation's may have been a few nights, but it was very, very short.  He was not involved in prostituting Jane Doe #3, and I rely on the PSR at Paragraph 15.

When we look at Jane Doe --

MS. MERKL:  Paragraph what?

MS. NEWMAN:  Nineteen.  Did I say 15?

MS. MERKL:  You said 15, yeah.

MS. NEWMAN:  I'm sorry.  Correction, it's Paragraph 19 of the PSR.  If we look to his involvement with Jane Doe #5 which is racketeering act 7A, at some unknown date, he met with Jovan Rendon-Reyes and I look to --

UNIDENTIFIED SPEAKER:  Guanajuato.

MS. NEWMAN:  Thank you.  Guanajuato, Mexico.  And sometime afterwards he also met them in Pueblo, Mexico.  He picked them up and gave them a lift home, and for that, I rely on the presentence report at Paragraph 24.  Again, I would say that doesn't rise to his involvement in prostituting Jane Doe

79

#5.

Jane Doe #7, which is racketeering act 9A, was Severiano Martinez-Rojas' girlfriend, and as far as Mr. Rojas knew was that she and he wanted to give -- he being Severiano wanted to live together in the United States.  And Mr. Rojas and another individual assisted her in reaching the Mexican-United States border at which point the coyote smuggled her across the border.  But he was not involved in prostituting Jane Doe #7.

So relying on the PSR's recitation of the facts which rely on the affidavit, it is not, which Ruggiero requires a preponderance of the evidence that they -- that Mr. Rojas directly participated in the commercial sex trafficking of Jane Doe 3, 5, and 7.  He would and is included in the analysis of the conspiracy for alien smuggling.  That would be applicable to him, and we have included it in the conspiracy, the alien smuggling conspiracy.

MS. MERKL:  Your Honor, the statute at issue here is not the man [Ph.] act.  It is not a prostitution statute.  It is trafficking.  The action verbs in Section 1591 of Title 18 of the United States Code are "entice, harbor, obtain, maintain, transport, recruit."  And the defendant did those things as to these girls.  He transported them across the border.  He harbored them in his home in Georgia.  He provided funding to Jose Rendon-Garcia to bring Jane Doe 3 across the

80

border.  And there is actually a wire transfer showing him sending almost $1,000 to an individual near the border in Nogales, Arizona, that corroborates that Jane Doe's account that he funded that trafficking.

Your Honor, he was integrally involved in the family business of bringing these girls across the border so that they could be prostituted in the United States.  He doesn't have to have told them to go to work.  He doesn't have to have driven them to their dates.  All he needs to do to facilitate that family business are the actions that he in fact took as to these three Jane Does and, of course, the actions he took as to the other Jane Does as well.

But he does not have to be directly involved in the prostitution conduct to be guilty of sex trafficking and to have had a substantial role in the trafficking of those women.  He personally smuggled Jane Doe 5 across the border, Your Honor, with Jane Doe 6 when she was a minor.

MS. NEWMAN:  Okay.  Well, Your Honor, we disagree on our analysis of Ruggiero and how it applies.  There is also alien smuggling charged in this case, and that certainly fits within this.  But he did not -- just smuggling them across is not direct involvement in their prostituting in the United States.

So even if you look at relevant conduct because this is not guilty of -- contrary to the Government's assertion, he

81

did not plead guilty to these crimes.  So what we're talking about is relevant conduct and which area of its interpretation on how they could be when you calculate the guidelines how they are calculated separately.

So when we look at relevant conduct, particularly the more recent version of the guidelines from two years ago, they changed it and really made it clear that it has to be a more narrow interpretation of relevant conduct, this action that he did, would not constitute relevant conduct of sex trafficking in the United States.

So that's what we found.  We did not plead to it and this is the Government wants a back door in through a very broad reading of Ruggiero which is not applicable here.

MR. MERKL:  There's no back door.  Our inclusion of the predicate acts in the pleading made plain.  The Government has understood this conduct to be relevant conduct for guidelines sentencing purposes in the beginning of this case. And the defendant was charged with these crimes.  The Government feels confident that he committed sufficient acts to support these crimes, that the relevant actions [indiscernible] Section 291 to have been found guilty if this case comes to trial.  There's no back door here.  The suggestion that that's what's going on here is outrageous.

MR. NEWMAN:  Well, Your Honor, with all due respect to the Government, the Government believes that just simply

82

because they say it is so, it is so.  So because they included it when we purposely, intentionally left a provision within the Plea Agreement for us to dispute the guidelines because we never agreed to them, which is a little bit unusual in this district, because we felt they did not have a basis to do so. We believe we are right.

MR. MERKL:  The additional victims in this case, Your Honor, did file actually sufficient affidavits and we can, of course, provide them to the Court if necessary.

MR. NEWMAN:  And we believe that that --

MR. MERKL:  And Ms. Newman, of course, had them in discovery as well.

MS. MERKL:  Yes.  And that's why I believe the PS -- why I relied on the PSR because those affidavits and what was written in the PSR which the Government has not disputed is incorrect.

It clearly limits Mr. Rojas's conduct to transportation and that's it.  That's trafficking.

MR. MERKL:  That's definition of trafficking in the statute.

MR. NEWMAN:  Well, it's not -- trafficking for the purpose of commercial sets and that -- his purpose was to get them from point A to point B and he assisted in the alien smuggling of these.  He gave a loan they want.  They are insisting that that loan can result in his being held

83

responsible for all of the acts that the other defendants did when Ruggiero clearly is not the intent. And certainly relevant conduct says it has to be limited, so it is contrary -- their position is contrary to Ruggiero and contrary to the relevant conduct.

THE COURT: So your argument is essentially that he was just lending them money to cross the border and it -- for no purpose other than -- other than what?

MR. NEWMAN: He didn't get anything else. There is no indication that there is anything else that he did in connection with that other than lend them money. They had no other purpose. He wasn't gaining anything. That's not what the affidavit said and that's not what the PSR, which I relied on said.

MR. MERKL: Your Honor, to be very clear, the argument about lending money only relates to Jane Doe #3 as to whom the defendant lent almost $1,000 by wiring it directly to an individual in Nogales, Arizona, right along the border. The Government believes that a strong corroboration with the notion that this defendant paid the traffickers to smuggle Jane Doe #3 across the border and then he harbored her in his home. The notion that this was done as an altruistic purpose as opposed to being part of a larger conspiracy where his family was engaged in a routine pattern of bringing in girls, minors and young women to this country to work in the sex

84

industry flies in the face of all the evidence in this case.

There's clearly part and parcel of the conspiratorial agreement to bring these girls here for the purpose of engaging in commercial sex.  That's Jane Doe #3. Jane Doe #5, the defendant was in Mexico and he personally smuggled Jane Doe #5 and Jane Doe #6 together across the border while Jane Doe #5 was still a minor.  He -- this not -- just kind of sits with the transportation of Jane Doe #5 for bringing her here.  He trafficked her personally across the border to bring her to the United States to work in prostitution.

As to Jane Doe #7, the PSR makes plain at paragraph 27 again that he first met her in Mexico, took her to a house, and then he made arrangements to bring her across the border by bringing her up to the border.

All of these things are not happening in a vacuum, Your Honor.  They're happening within a larger construct of this family business of recruiting young women and girls.  All of the brothers help each other.  This is how the enterprise works.  This is what made the enterprise a threat for 15 years alleged in this indictment, Your Honor, is because of this close cooperation and the assistance and mutual plans that all of these defendants help each other with in order to target and victimize this many victims.  He couldn't have done it alone.

85

MR. NEWMAN:   But by contrary, nobody helped Mr. Rojas with victim No. 6 and Jane Doe #8.   So he did that --

MR. MERKL:   That's incorrect, Your Honor.

MR. NEWMAN:   Wait.

MR. MERKL:   It's in the PSR.

MR. NEWMAN:   He --

MR. MERKL:   The Montrando [Ph.] Ranch was involved in both of those.

MR. NEWMAN:   But he was the one who transported with them.   He was the one.   This is -- this is looking at it with such a broad stroke when it's clear what happened here and I am relying on the PSR, which they don't argue.   But they are -- they keep bringing up the money.

We admit that we --

THE COURT:   You're relying on the PSR's description of what happened.

MR. NEWMAN:   -- gave the money.

THE COURT:   Is that it?

MR. NEWMAN:   Yes, the description that what he did -- that's what -- which con -- from their affidavit with Jane Doe #3, Jane Doe #5, Jane Doe #7, the affidavits.   So what we're saying is they are making a big deal about the money and we admit this is -- so they're saying, oh, but we have corroboration.   No need.   We admit it.   We're forthright.

86

We come front -- yes, we gave that money to help when done. But we -- it's not that we in any way assisted.  The use of harboring, it's a characterization.

MR. MERKL:  It's the statute, Your Honor.

MR. NEWMAN:  Well, it -- excuse me.  But the conduct.  Mr. Rojas's name is not in the statute and your interpretation of his allowing them to stay the night and calling it harboring when there is no -- nothing in the affidavit suggest that it was harboring.  In fact, as I recall the affidavit, it's that --

THE COURT:  Where is that?  Where is the affidavit?

MR. NEWMAN:  -- he was --

THE COURT:  Where's the affidavit?

MR. NEWMAN:  I think that's 5 is the one I'm referring to, which is the affidavit.  5.  Jane Doe #5, maybe I should say, in which -- let me look at the PSR because that's [indiscernible].

THE COURT:  I just had it.

MR. MERKL:  Jane Doe #3 is --

THE COURT:  I had it up here.

MR. MERKL:  Almost stayed at his house.  Your Honor, just to be completely clear, I don't know which definition of harboring Ms. Newman is relying upon, but case law interpretation of harboring for purposes of sex trafficking is not --

87

THE COURT:  I'm sorry.  I was starting to pull [ph.].  I didn't hear the --

MR. MERKL:  I'm not sure which definition of harboring Ms. Newman is relying upon for her argument.  The case law interpreting harboring in the context of 1591 makes plain that it's providing shelter.  It doesn't need anything magical.  I'm not sure where the dispute is.

MR. NEWMAN:  Well, I guess if somebody stays over my home and I invite them, I'm harboring them.  My definition --

THE COURT:  It has an element of criminality.

MR. NEWMAN:  That's right.

THE COURT:  The word.

MR. NEWMAN:  That's --

MR. MERKL:  What I was talking about.

THE COURT:  Yeah.  So where are we?

MR. NEWMAN:  Right.  So Jane Doe #3.  I was arguing that he allowed them to stay and I wouldn't -- I wouldn't equate that to harboring.  And that he did not actively participate in her sex trafficking or commercial sex trafficking, prostituting in the United States.

And then with respect to Jane Doe #5 --

THE COURT:  Well, how did he help them?  For what purpose were they coming to the United States?  Why was -- what was his purpose in assisting them to come into the United States?

88

MR. NEWMAN:   Your Honor, I'm not sure that he had to have a purpose.   He was asked to lend money.

THE COURT:   Well, it's not a question that he had to have a purpose.   The question is what -- did he have a purpose.

MR. NEWMAN:   Well, he lent -- his purpose was to lend the money.   This individual was going.   According to relevant conduct there has to be more.   There has to be more than that is present here.

So let me just go back to my case law.   So guideline 1B.3, the relevant conduct, by the way, specifically differentiates between conspiratorial liability for conviction purposes from conduct which can be considered for sentencing purposes.   And the Government is arguing conviction purposes. They even said we could prove it at trial.   The scope of conduct for which a defendant had to be held accountable under the sentencing guideline is significantly narrower than the conduct embraced by the law of conspiracy.   And that was from Rigo [Ph.].

THE COURT:   Where are you reading from?

MR. NEWMAN:   Yeah.   I'm reading from my sentencing memo, Page 28, in which I cite the commentary to 1B1.3, commentary note 1.   United States v. Rigo --

THE COURT:   Hold on one second.   Commentary to what?

MR. NEWMAN:   Page 28, the second full paragraph.

89

THE COURT:  No, no, the commentary you --

MR. NEWMAN:  Oh, the commentary note 1.

THE COURT:  Well, I don't know.  Commentary to what?

MR. NEWMAN:  To 1B1.3, relevant conduct.

MR. MERKL:  Your Honor, I would just like to read you next --

THE COURT:  Well, I'm sorry.

MR. MERKL:  -- the defendant's guilty plea allocution.

THE COURT:  I'm sorry.  I want to read the commentary.  1B, you say?

MR. NEWMAN:  I'm looking at 1B -- it should be -- it's the cite.  1B1.3.  I'm sorry, I forgot a one in my typing.  And I was quoting from United States v. Rigo, 2017 W.L. 213064 at 3, 13-CR-89, the Seventh District, January 17, 2017.  And that was a quote from United States v. Perrone, 936 F.2d 1403, 1406 (2nd Cir. 1991).

THE COURT:  First look -- let me look at what you're actually --

MR. NEWMAN:  Sure.

THE COURT:  -- quoting.  So I'm looking at Section 1B1.3.

MR. NEWMAN:  Yes, let me find --

THE CLERK:  I can't hear you.

THE COURT:  And where -- where?  What specific

90

provision of the commentary.

MR. NEWMAN:  I'm sorry.  Application Note 1, sentencing accountability and criminal liability.

[Pause in the proceedings.]

THE COURT:  Okay.

MR. NEWMAN:  So it's our position that he did not -- was not involved in directly prostituting Jane Doe 3, 5 and 7. The factual recitation contained in the PSR supports our contention that his involvement was limited to the alien traffic -- transportation conspiracy and that therefore it should not be counted separately.  There shouldn't be a separate analysis under the guidelines.

MR. MERKL:  Your Honor, guideline 1B1.3, subsection (a)(1)(B) makes clear that in the context of jointly undertaking criminal activity the defendant is responsible for his acts and all acts of others that were taken within the scope of the jointly undertaken criminal activity in furtherance of that criminal activity and that conduct that was reasonably foreseeable in connection with the criminal activity.

And with that backdrop, Your Honor, I would like to read you the first paragraph of the defendant's guilty plea allocution.  On Page 82 of the guilty plea allocution May 5, 2017 -- May 30, excuse me, 2017, the defendant stated under oath "Between 2008 and 2012 I was a party to a business, a

91

family business in Mexico which brought women through the border with Mexico to the United States for the purpose of making them prostitutes for the purpose of prostituting them."

He did everything he did in this case against that backdrop, his involvement in that family business. Whether he personally directed somebody to prostitute is irrelevant. He knew that was part of the jointly undertaking criminal activity and that the purpose for bringing these women and girls here was to make them be prostitutes and to pay the money that they had earned back to the family.

MS. NEWMAN: And on this same note on 1B1.3 on No. 3, jointly undertaking criminal activity, subdivision (b), scope, one, two, third paragraph "A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of the conduct -- knows of that conduct."

So they give an example of a drug conspiracy that's ongoing.

THE COURT: I'm sorry. Where were you reading from?

MR. MERKL: I'm sorry?

THE COURT: Where --

MR. MERKL: I'm reading from 1B1.3(B), scope.

MR. MERKL: In the application notes, Your Honor.

MR. NEWMAN: And it says under scope in the third

92

paragraph I -- what I was just quoting from "relevant conduct does not include conduct prior to the defendants joining the conspiracy."

Jane Doe #3 concerns activity in 2006, in 20 -- Mr. Rojas joined the conspiracy in 2008.

MR. MERKL:  Your Honor, as Your Honor previously noted, the time limitations set forth in his guilty plea allocution is of no moment as to whether or not he was involved in the activity before that time frame.  Your Honor already made an observation as to that fact earlier in this proceeding.

MR. NEWMAN:  Well --

MR. MERKL:  Relevant conduct can be without -- be outside the time frame of the allocution.  The law is clear on that.

MR. NEWMAN:  Well, the law is -- well, I must disagree and I know the law on that and it said very clearly, it's not prior to his joining the conspiracy and --

THE COURT:  Let me --

MR. NEWMAN:  -- that's all I'm saying.

THE COURT:  Let me just read this.

MR. NEWMAN:  Sure.  Sorry.

[Pause in the proceedings.]

THE COURT:  Okay.  Now, I understand the point. Ms. Merkl, what is your response?

93

MR. MERKL:  Pardon?

THE COURT:  What is your response on this defendant's relevant conduct does not include?

MR. MERKL:  The notion that this is outside the scope of his involvement in the conspiracy is belied by the evidence.  He was --

THE COURT:  Well, he -- this -- she's relying on the third paragraph under B in the commentary.

MR. MERKL:  Understood, Your Honor, but this isn't -- this relates to liability for the conduct of others prior to his involvement.  He was involved with Jane Doe 5, Jane Doe 3.  This is -- we're not saying he's responsible for victims who were transported prior to the day that he mailed -- he sent money to Nogales to transport Jane Doe 3. That's what this is talking about.  This is talking about holding accountable a newbie to the drug conspiracy with the prior 100 kilos.

We're not doing that.  We're holding him responsible for the girls he was personally involved in transporting, trafficking and harboring.

MR. NEWMAN:  Well, I'll just reply on his allocution that was agreed to by the Government, 208.

MR. MERKL:  Your Honor, we don't agree to allocutions.  That's just erroneous.  If the defendant showed it to us as a courtesy that is nice but it's not our words to

94

provide to the Court.

THE COURT:   But that's neither here nor there.   What were you going to say?

MR. NEWMAN:   I'm sorry, Your Honor.   This -- we're talking about somebody who lent money for transportation. What or where or how or what they were going to do in the United States -- while the Government may make assumptions the problem with -- well, the issue with relevant conduct is what was his involvement and was it prior to his joining this enterprise.

They're saying you can't accept his statement under oath, and then on the other hand they're saying please accept his statement under oath.   They can't have it both ways.

THE COURT:   And what is his statement under oath that you're referring --

MR. NEWMAN:   What I'm referring to is that he admitted his involvement with this family from 2008 to 2012.

THE COURT:   And your response again?

MR. MERKL:   His conduct in the conspiracy predates his allocution.   The fact that he allocuted to a specific date range because it pertained to the Jane Does he was specifically allocuting to is of no moment.   He was in the United States in 2005 or 2006, whatever is in the PSR at Paragraph 19, when he sent the money to the border so -- to facilitate the transportation of Jane Doe #3.

95

As of that moment at the latest he became a member of this conspiracy, Your Honor. That's not sitting in the apartment watching drugs go in and out. He's taking an active role in the family business, the family business he described in his guilty plea allocution. This is not a situation where we are holding him accountable for activity that occurred before his involvement. This paragraph is talking about conduct undertaken by others prior to somebody getting involved. The date of -- the specific dates of his allocution is not -- does not terminate his involvement.

MR. NEWMAN: Well, Your Honor, I just disagree --

THE COURT: You mean it doesn't commence it.

MR. MERKL: I'm sorry?

THE COURT: You mean it doesn't commence it.

MR. MERKL: It doesn't commence it or terminate it, right.

MR. NEWMAN: But this is not within his jointly undertaken criminal activity back in 2006. That's the problem that they have. And it's -- it's -- wasn't -- we don't know what he reasonably foresees because he wasn't involved in any of the prostituting activities relating to Jane Doe #3, and that's clear from the PSR.

MR. MERKL: Your Honor, that's not clear from the PSR. He let her stay over at the apartment while they're making arrangements to transport her to her prostitution

96

location.  Everybody knew that they were engaged in prostitution activity.  That was the family business.  This isn't like he was in a silo alone living in an apartment by himself and these people descended upon him.

The context of his conduct makes clear that he understood the family business as early as the time that he provided funding to support the transportation of Jane Doe #3 and that he -- this activity was jointly undertaken.  The probation department's inclusion of this Ruggiero counts is correct as is the Government's inclusion of it in the Plea Agreement, Your Honor.

MR. NEWMAN:  Your Honor, they are just twirling relevant conduct and the limitations placed on it on its head because otherwise we have conspiratorial liability the same, and that's what they are -- what relevant conducts can't be the same.

THE COURT:  Well, but the language you're relying on itself says the defendant's relevant conduct does not include the conduct of members of the conspiracy prior to the defendant joining the conspiracy.

MR. NEWMAN:  Right.  And I'm saying --

THE COURT:  And you're saying that he didn't join it because -- until 2008 because that's what he allocuted to and the Government is arguing that, in fact, he did.  That's basically --

97

MR. NEWMAN:   I understand but we also --

THE COURT:   -- and that these were acts in furtherance of that activity.

MR. NEWMAN:   They are acts in furtherance of the alien -- they are relevant conduct to the alien trafficking conspiracy.  We agree on that.  They are not within the scope of his activity and his involvement because he did not promote any of the prostituting and that's what the PSR makes clear.

THE COURT:   Well --

MR. NEWMAN:   And it says sentencing accountability, criminal liability, which I quoted, cannot be the same as -- whether the defendant is criminally liable for an offense as a principal, accomplice or conspirator:  It's not the same and I am quoting 1B1.3, commentary application note 1.

So while they want this Rojas' simple act, we really have to look at it in the context he's lending somebody money and --

THE COURT:   But this --

MR. NEWMAN:   And it's not even clear, by the way, but he's lending money.  We don't -- we agree.

THE COURT:   Well, but presumably --

MR. MERKL:   Your Honor, I just want to make clear something.  This is not conspiratorial liability that we're arguing.  We are arguing that the defendant is personally responsible for the trafficking.  He is charged with

98

substantive trafficking.  He committed acts that are substantive trafficking offenses.  Ms. Newman is twisting these concepts and commingling the notions that conspiracy and relevant conduct in ways that defy the law.  He is charged substantively with each and every one of these victims because he did something to transport them, to harbor them, and help his organization to maintain them so that they could get to the United States safely to be exploited for sex.

That was what was going on.  He knew it.  Everybody knew it.  He's charged in the indictment starting as early as 2006, Your Honor, with being in a transportation to transport minors for the purpose of sex.

MR. NEWMAN:  Your Honor --

MR. MERKL:  And we acknowledge he did not plea to that but if this were to have to go to a Fatico we are confident we could prove that by a preponderance of the evidence.

MR. NEWMAN:  That's the problem, Your Honor. Simple.  They are arguing that because he was charged with a substantive act now.  Remember they were initially arguing Ruggiero --

MS. MERKL:  No.  No.

MS. NEWMAN:  -- which is not substantive.  That's what they're arguing.  That's what the PSR says.  Now they changed and said, no, you can look at relevant conduct under

99

the substantive act.  So we're not arguing Ruggiero anymore. Now we're arguing direct substantive act.

The fact that he was charged, okay, we're back to, well, now we're in relevant conduct territory.  That's why I put both things down in my sentencing memo, and it is clear that under that, then we're not talking about conspiratorial, right.  We're talking about what he did directly.  He did not prosecute -- prostitute these women directly.  And so whether or not he was charged is not really relevant.  What is relevant is what was the conduct and how does it apply to either relevant conduct or Ruggiero.

And I'm saying under both analysis, he did not commit -- under relevant conduct even by a preponderance is not -- he does not equate to having those counted separately.

MS. MERKL:  Your Honor, just to completely clear, we are not changing our position in any way.  My comment about the conspiracy was a direct response to Ms. Newman's reliance upon the third paragraph within the application note entitled scope which is talking about the limitations of conspiratorial liability.  We're not relying on conspiratorial liability.

Ruggiero predicates are just kind of common parlance around the courthouse with the inclusion of uncharged conduct that the Government can prove by a preponderance that doesn't that constitute relevant conduct.  This constitutes substantive relevant conduct under (a)(1)(B).  You don't have

100

to -- it's not a question of conspiratorial principles.  This is not Pinkerton liability.  This is his conduct.

THE COURT:  So you have if the case went to trial and you had charged him with this offense, this conduct, what would you have alleged?

MS. MERKL:  With Jane Doe 3, the evidence would have been that he sent money to facilitate the trafficking of that girl, an underage girl, across the border and that he, thus, transported her across the border within the meaning of 1591, and then upon her arrival had her stay at his house which is harboring, again, within the meaning of 1591.

MS. NEWMAN:  And we would say he didn't transport her and nobody said he transported her.  He lent money.  So let's be clear on being accurate.

MS. MERKL:  No.  That's what facilitated the transportation, Your Honor.  And I said that.  He did not personally transport her.  He sent the monies to have the coyote transport her.  That's transportation within the meaning of the law.  He doesn't have to personally do it.

MS. NEWMAN:  And that's why the conspiracy, the alien conspiracy does apply.

MS. MERKL:  He's guilty of both clearly.

THE COURT:  Well, it could be both.

MS. NEWMAN:  I just disagree that that could be considered relevant conduct when his involvement did not

101

include direct involvement in the prostituting of these individuals in the United States.

MS. MERKL: That is an argument with the way 1591 is structured, but the law is clear that that conduct is sufficient under 1591 to make him guilty of trafficking if the purpose of his conduct in providing the transportation and harboring was to help facilitate commercial sex, as he clearly acknowledged in his guilty plea allocution and as all of the evidence in this case suggests.

There is not one scintilla of evidence in this case, Your Honor, that anybody in this organization who was female was employed in anything except for prostitution.

MS. NEWMAN: But that's not the issue.

MS. MERKL: Yes, it is because it goes directly to his knowledge as to what this family business was about.

MS. NEWMAN: That is -- it says clearly that doesn't matter. It doesn't matter if you knew. It was before he was involved in this commercial sex trafficking. That's what's clear. And so I give money, you may do what you want. He's not directly involved in their prostituting, and that's why it's important that we make the distinction.

And I'm making a deal about it because relevant conduct makes a deal about it. They don't want -- the Commission had narrowed it, made it clear. I don't know that they narrowed it. I just think that they made it clearer

102

about two years ago.

[Pause in proceedings.]

THE COURT:  I'm going to ask the probation officer to repeat what he just told me so there are no secrets.

MR. GJELAJ:  Yes, Your Honor.  So it's a three-prong analysis under 1B1.3.  And the first is the scope or the purpose.  So, again, depending on what Your Honor believes, if in fact his intention, his purpose is to bring this victim into the country for purposes of sex trafficking, then we have his scope.  And he's entered the jointly undertaking criminal activity, which is what we're looking at for purposes of 1B1.3.

Once we have that established, then it's whether the acts of his co-defendants are in furtherance of the enterprise.  And the enterprise is important here too because this allows for even greater latitude in terms of time frame and things of that sort.  In fact, the actual count of conviction is a RICO charge which charges as early as December 2004.  And, again, it's the violation of law is the criminal enterprise.  It's, again, some of these things we perhaps use in thinking, well, this is additional criminal conduct and this is additional criminal conduct but, again, focusing in on the count of conviction.

And then the last thing is whether the acts of his co-defendants are reasonably foreseeable to him.  And again,

103

if Your Honor finds that all three are those satisfied, there's nothing to do with pre-dating.  In essence, he enters the conspiracy at minimum or enters the jointly undertaking activity at minimum if Your Honor believes that he transported this victim for purposes of prostitution.  He's entered the jointly undertaking criminal activity and should be held accountable for everything that follows, again, if Your Honor also agrees that in furtherance -- that the acts of his co-defendants are in furtherance of the jointly undertaking criminal activity or in this instance the enterprise and likewise whether they were reasonably foreseeable to him.

The one provision that defense counsel is citing, that's a bright line rule we have in conspiracies and jointly undertaking criminal activity.  That's really more just a timing issue, not to hold someone accountable for conduct that predates their involvement in the criminal activity.  The distinction here is, and this is why we've held him accountable under Ruggiero, is we've said as soon as -- at minimum, as soon as he transports the victim, he's entered -- for purposes of relevant conduct, he's entered into the jointly undertaking criminal activity.  That's the scope of his involvement begins there.

MS. NEWMAN:  So just to be clear, under the probation's analysis, which you know I disagree with but I just want to be clear, you're looking at it as the Ruggiero?

104

THE COURT:  Yes.

MS. NEWMAN:  Okay.  It's a conspiracy as opposed to substantive.  You're looking at the Ruggiero?

MR. GJELAJ:  No, no, no.

MS. MERKL:  No.  No.

MR. GJELAJ:  In fact, this is all -- these are all guideline calculations.  These are all guideline analysis and estimates.  So at the end of the day, it's jointly -- what drives whether we apply for purposes of sentencing -- and I know the judge just asked Ms. Merkl about the idea of a conspiracy and what she would be able to prove at a trial. For purposes of sentencing, this is the analysis.  It's this three-prong analysis, when it is that he enters into the jointly undertaking criminal activity and then what he can be held accountable for going forward.

MS. NEWMAN:  Because what you're focusing on, and I just wanted the record clear --

MR. GJELAJ:  Sure.

MS. NEWMAN:  -- is the conspiracy, not substantive acts.  That's -- you know, whether in fact -- you know, for example, Jane Doe #6 --

MR. GJELAJ:  Yes.

MS. NEWMAN:  -- would be part of, you know, the racketeering and the substantive act.

MR. GJELAJ:  Yes.

105

MS. NEWMAN:  -- to distinguish it because it was a direct.  That's all I'm trying to distinguish.

MR. GJELAJ:  And yeah.  And I wouldn't -- again, I wouldn't use necessarily the RICO conspiracy, although that's certainly an analysis in terms under Ruggiero.  But for purposes of holding him accountable for purposes of sentencing, it's the relevant conduct provisions that I'm citing here and why it is that we ultimately included it.

MS. NEWMAN:  But it's not the -- this is the difference, right?

MS. MERKL:  Ruggiero is not limited to conspiratorial liability.  The concepts are being mixed here. Ruggiero is clearly applicable when counts -- acquitted conduct in predicate acts can be considered at the time of sentencing.  It has nothing to do with conspiratorial liability.  Ms. Newman keeps saying we're relying on Ruggiero, it's conspiracy.  That's not the law.

MS. NEWMAN:  It's -- what is the law is that it has to do with the racketeering acts.  That's all I'm making the distinction that it's under the enterprise and under the racketeering acts.  That's the distinction I was trying to draw.  And as I understand probation's analysis, that's what it was based on.

MS. MERKL:  The inclusion because he pled guilty to the RICO, sure.

106

MR. GJELAJ:  That's correct.

MS. NEWMAN:  That's what I understood.

MR. GJELAJ:  That's fair.  Again, the analysis is under the guidelines, but yes, you're correct in terms of him having pled guilty to the RICO and these coming in as predicate acts.

MS. NEWMAN:  Okay.  Thank you.

MS. MERKL:  But it's the Government's view that it will be relevant conduct under the substantive counts and the RICO.  That's why all of the counts and predicate acts are listed in our Plea Agreement.  It's all relevant conducts, Your Honor.

MS. NEWMAN:  And it would be -- we would disagree.  If the Court -- we have alternate arguments.  If the Court were to find that it is relevant conduct or Ruggiero, we would still have arguments as to the guideline analysis and what enhancement would be included and what enhancements would not be included.

[Pause in proceedings.]

THE COURT:  So, tell me, Ms. Merkl, if he hadn't plead guilty to a RICO and he just pled guilty to substantive counts --

MS. MERKL:  Uh-huh.

THE COURT:  -- what would your argument be, that this is relevant conduct with respect to the substantive acts?

107

Is that what you're saying?

MS. MERKL: Yes, Your Honor. In every sex trafficking case I have done in this courthouse, this is the first RICO, every Jane Doe has been included as to every victim. Every Jane Doe has been included as to every defendant for whom that defendant was responsible under probation department's analysis and under our estimates.

THE COURT: And that what's not under -- that's where -- assuming there was not a RICO prosecution.

MS. MERKL: That's what I'm saying. This is the first RICO the Eastern District has done in a Mexican sex trafficking case. And in all of the prior Mexican sex trafficking cases that I have personally prosecuted or supervised, the Jane Doe -- if it's jointly undertaking criminal activity and similar in nature to the conduct here where there's mutual assistance, use of common resources such as apartments, assisting each other in getting the girls across the border, et cetera, every Jane Doe as to whom a defendant was involved was included as relevant conduct both in my estimate and in the probation department's calculation.

MS. NEWMAN: And to that, I would say in this case as to the substantive, it's absolutely wrong. It is wrong legally. Now whether anybody else has caught that, I don't know. And I always say United States v. Booker. We all thought that the guidelines were not advisory, so.

108

But in any event, I will get to that argument if the Court wants now or I can wait for the ruling on whether or not it would be included under relevant conduct or under Ruggiero, you know, which I call the racketeering count.

MS. MERKL:  Your Honor, part of the reason for the Government's estimate as being inclusive of every victim as to whom a defendant is engaged is because the multiple count analysis in these cases makes clear that victims of this type of crime cannot be grouped.  And the defendant has to be held responsible for the full scope of their relevant conduct.

MS. NEWMAN:  That --

MS. MERKL:  And that is what every single judge in this courthouse has done, including Judge Matsumoto, Judge Block, I can't even remember them all, Judge Mauskopf.  I have multiple cases, Your Honor, where this exact issue was present and in every single instance, probation department's PSR has included a multiple-count analysis for all the victims regardless of whether the defendant pled to that particular victim if the defendant was involved in the trafficking of that person.

MS. NEWMAN:  Your Honor, I just -- it doesn't make sense.  We might as well just complete the indictment.

THE COURT:  I can't hear you.

MS. NEWMAN:  I understand Ruggiero, a different analysis.  I understand Ruggiero, and I understand all that.

109

But I'm not interested in what other -- I don't know the specific facts.  I don't know the case, so I can't really comment on that.

But it is -- there is one thing that is clear.  This was as to the substantive for these Jane Does 3, 5, and 7, the guidelines that the Government proposed and as probation cannot legally stand.

MS. MERKL:  Your Honor?

MS. NEWMAN:  They just -- and I will begin by looking to 2G1.1 which is promoting commercial sex act or promote --

MS. MERKL:  Are we talking about the guideline level now?

MS. NEWMAN:  Yes.

MS. MERKL:  Okay.  I think we should get a decision on whether or not this is relevant conduct before we talk about the actual level that applies, Your Honor.

MS. NEWMAN:  Well --

MS. MERKL:  I don't mean to be disrespectful, but it's very confusing if we're switching topics.

MS. NEWMAN:  Well, the only reason was --

THE COURT:  Can I ask you why you used RICO in this case?

MS. MERKL:  Because some of the conduct predated the change in the statute of limitations, Your Honor.  And some of

110

the conduct that related back to 2004 could not be reached outside of the RICO.  In addition, there were venue issues as to certain of the predicates.  Some of the girls were primarily trafficked in Georgia.  So, you know, to have the national venue reached and to go back in time, RICO accurately captured the full scope of this enterprise's activities where a sort of plain vanilla sex trafficking conspiracy could not have done.

And that's also important to note that there was no trafficking conspiracy statute until 2009.  That's when Congress passed that law.  So in order to reach, you know, all of the defendant's conduct across the country, RICO was the most appropriate vehicle given the nature of this enterprise.

But, and Your Honor, before we move on to the question of which guideline may apply in these Ruggiero counts, I'd just like to note the Guideline 2G1.1(d), the sex trafficking guideline, specifically provides that if the offense involved more than one victim, multiple counts analysis shall be applied as if the promoting of a commercial sex act or prohibited conduct with respect to each victim had been contained in a separate count of conviction.

The multiple count analysis in these cases, under the guidelines, is required to include each victim, whether it's a RICO, whether it's a sex trafficking conspiracy under 1594, or whether it is a 15 -- one count of 1591.  That is the

111

consistent approach probation has taken, and that is the law.

MS. NEWMAN:  Well, that is not.  We're talking about multiple counts.  It's a totally different guideline analysis because you only get to multiple counts if it's to be counted.  Otherwise, we don't discuss multiple counts.  And I have not argued that the multiple count that they should be grouped.  So the argument is argument against I don't know who and it's non-existent what -- the multiple count has nothing to do with the issues that we've raised in our -- with respect to whether or not he could be charged -- not charged -- that the guideline analysis should be a separate for each -- for 3, 5, and 7, Jane Doe 3, 5, and 7.

That was the only issue so far raised with respect to Jane Doe 3, 5, and 7.

MS. MERKL:  Your Honor, Ms. Newman is entirely missing my point.  My point is that the guidelines expressly tell us that the defendant is to be held responsible for each victim separately.  The Application Note 5 to Guideline 2G1.1 includes specific instruction that there needs to be a multiple count analysis even for victims who aren't even cited in the indictment because this crime is terrible and the defendants need to be held responsible for the full scope of their conduct.

MS. NEWMAN:  But that --

THE COURT:  Could you go back?

112

MS. NEWMAN:  Okay.  Sorry, Your Honor.

THE COURT:  I just wanted to go -- I wanted to go back to one thing you said about why you used RICO.  And you said trafficking wasn't prohibited until or illegal until 2009?

MS. MERKL:  No.  The sex trafficking conspiracy statute was passed in 2009, Your Honor.  The Trafficking Victims Protection Act 1591 was first passed in 2000.  That's why in the indictment, the sex trafficking conspiracy begins in 2009 as opposed to earlier.

THE COURT:  Section we were on when we -- what was the commentary with purpose?

MS. MERKL:  Scope?

THE COURT:  Yeah.

MS. MERKL:  Scope was 1B1.3.

MS. NEWMAN:  1B1.3 and it's Commentary Application Note B.

THE COURT:  Well, let's start off, and I'll ask Mark to go over this again.  But I believe that he -- that the conduct in those -- in 3, 5, and -- is it 3. 5, and 6?

MS. MERKL:  7, Your Honor.

MS. NEWMAN:  3, 5, 7.

THE COURT:  3, 5, and 7, that that was undertaken for the purpose they were -- it was undertaken for the purpose of allowing them to come into the United States for the

113

purpose of engaging in prostitution.  Now what's the second?

MR. GJELAJ:  Whether their acts were in furtherance of the jointly undertaking criminal activity.  So any acts that they've done, are they in furtherance of the jointly undertaking criminal activity.

THE COURT:  Yes.  I make that finding as well. What's the third?

MR. GJELAJ:  And then the last is whether those acts were reasonably foreseeable.

THE COURT:  Yes.  I make those -- that as well.  I make that finding as well.  So where are we now?

MS. NEWMAN:  Okay.  So we are still on 3, 5, and 7. And it would be dealing with the guideline analysis of probation and the Government and which we disagree basically that all the enhancements that are applied which he didn't do, right, we all agree to the limitation of what he did, should not be applied to him to increase his guideline level.  And I start with Guideline 2G1.1.

THE COURT:  Are we dealing with a particular paragraph in the indictment?

MS. NEWMAN:  Yes, I'm going to the paragraph now in the PSR.

[Pause in proceedings.]

MS. NEWMAN:  Okay.  So we are looking at Paragraph 76, but probation does a different -- actually, they do 2G1.3.

114

MS. MERKL:  The minor.

MS. NEWMAN:  Yeah.  Because it's a minor.  But the same analysis I was going to say applies.  So if you look at Paragraph 76, they say the most appropriate guideline is 2G1.3.  And they get -- they go that the -- they then do a cross-reference to 2G1.3(c) and 2A3.1 Criminal Sexual Abuse, and they get to an offense level of 30.

MS. MERKL:  Thirty-four.

MS. NEWMAN:  On Page 76 they start at 30.  76.

MS. MERKL:  They get to an offense level of 34, though.

MS. NEWMAN:  Oh, right.  But I'm saying just the base offense on Paragraph 76.  Let me just get the Government's analysis.

[Pause in proceedings.]

MS. NEWMAN:  I believe it's a little different.

MS. MERKL:  Your Honor, our analysis did not apply the cross-reference because under the Government's estimate, we get the same result as the probation department's estimate.  So under 2G1.3, it specifically tells you not to do the cross-reference if it's the same guideline.

So the Government's analysis of both of the minor victims, Jane Doe 3 and 5, is that the applicable base offense level is a 34 as if the defendant were convicted of 1591(b)(1), which is what he's charged with, and then a two-

115

level adjustment under 2G1.3(b)(4)(A) for the offense involving a commercial sex act.

MS. NEWMAN:  Yes.

MS. MERKL:  In contrast to the probation department, we did not apply a victim-related vulnerable victim adjustment as to either of these two because of our view that the defendant had limited involvement with these particular girls and had no reason to know of any specific vulnerabilities they may have had.

MS. NEWMAN:  So with that, I have argument.  To begin with, if you look at 2G1.3 and you look at (a) base offense level, it says 34 if the defendant was convicted --

THE COURT:  Could you tell me what 2 -- what is it again?

MS. MERKL:  It's Page 206 in that book, Your Honor.

THE COURT:  Okay.

MS. NEWMAN:  He was not convicted under 18 U.S.C. Section 1591(b)(1).  Then it says if not base offense 30, if the defendant was convicted under 18 U.S.C. Section 1591(b)(2).  Three says 28 if convicted under 18 U.S.C. Section 2422(b) or Section 2423(a); or, four, 24 otherwise convicted.  Did not happen again.  And so, the base offense level should be 24.

It doesn't say or relevant conduct makes it -- or relevant conduct equates under a preponderance.  It clearly

116

says convicted because that would mean that it was beyond a reasonable doubt or he pled guilty to that.  That didn't happen with respect to either Jane Doe 3, 5, or 7.  Therefore, the base offense level is 24.  And for that reason, this -- the Government's analysis is incorrect.  And we would propose that the probation's analysis is incorrect.

MS. MERKL:  Your Honor, the guideline is admittedly odd in that the, you know, level is driven by the phrase "convicted" as opposed to describing the offense conduct.  That being said, the Government is of the view that the conduct underlying those statutes is the relevant way to analyze the relevant conduct applicability of this guideline to those counts.

Under that analysis, the Government's view is that 15 -- if we end up at a level 24, Your Honor, we go to the cross-reference, in which case we go back to 2A3.1 and we arrive at the same result.  So it really makes no difference whether or not he is convicted under this statute or we go to the cross-reference.  The Government's view is that it's the conduct of conviction that matters with regard to the relevant conduct analysis.  The probation department applied the cross-reference, which would also arrive at a level 34.  Either way it's a level 34.

MS. NEWMAN:  And we disagree.  So we've now dealt with the Government's analysis.  And we would suggest that the

117

-- sorry, I'm looking at the wrong one.

THE COURT:  I need to take a five-minute break, so. I'll be back in a few minutes.

(Off the record at 6:13 p.m.)

(On the record at 6:22 p.m.)

THE COURT:  All right.  Conviction means conviction. So where does that leave us?

MS. MERKL:  In that event --

THE COURT:  I think there's no way around the clear language.

MS. MERKL:  In that event, Your Honor, the Government would concede that we made a mistake that the probation department's analysis of the cross-reference would then apply because the cross-reference analysis results in a higher guideline than the level 24 as to all of them, so.

MS. NEWMAN:  It is our position that the cross-reference doesn't apply to Mr. Rojas.  I understand why it applied, for example, in Victim #6 and Victim #8.  But the cross-reference -- let me get to 2G1.3 because we're not all on the same page on the cross-reference here.

And that would be, if I understand it, on 2G1.3 Commentary Application 5 of (c).  I'm just looking for --

THE COURT:  What page of the guideline book?

MS. NEWMAN:  Okay.  So we were looking at 2G1.3.  We said the conviction --

118

THE COURT:  Yes.

MS. NEWMAN:  -- wouldn't apply.

THE COURT:  Yes, you're right.

MS. NEWMAN:  And the Government said, well, in that case, they agree with probation that we go to the cross-reference that was indicated -- let me just ask probation to assist.  So they're talking about the cross-reference --

MS. MERKL:  It's on Page 207 of the red book, Your Honor.

THE COURT:  Yeah, I'm on 207.  Just tell me which --

MS. NEWMAN:  And Application of (c)(3).  Okay.  Well, I guess we really should look at first 2G1.3(c), not -- before we get to the commentary: "If the event's involving, causing, transporting, permitting, offering, or seeking by notice or advertisement a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction."  But I believe --

MS. MERKL:  No, no.  It's 3.

MS. NEWMAN:  Agreed.

MS. MERKL:  It's (c)(3).

MR. GJELAJ:  It's 3, (c)(3): "If the offense involved the conduct described."

MS. NEWMAN:  I'm sorry.  I didn't turn the page.  I'm sorry.  Thank you.  Thank you, probation.  "Involve conduct described in 18 U.S.C. 2241 or 2242, apply 2A3.1."

119

Okay.  And just for -- to be efficient, the comments that I am making under 2G3.1 that apply to Jane Doe #3 would apply to Jane Doe 5 and 7 even though they would be under 2G --

MS. MERKL:  Only 7 is under 2G1.1, Your Honor.

MS. NEWMAN:  Right, 2G1.1 which has a similar cross-reference.

THE COURT:  I'm lost.

MS. NEWMAN:  And so --

MS. MERKL:  What?

THE COURT:  I'm lost.

MS. NEWMAN:  Okay.  Sorry.

MS. MERKL:  So, Your Honor?

MS. NEWMAN:  I'm trying to make it efficient.  Let me make it clearer.  I'm sorry.  So if we look under 2G1.3.

THE COURT:  I'm looking at 2G1.3.

MS. NEWMAN:  Right, 3.  And that deals with a cross-reference.

THE COURT:  Right.

MS. NEWMAN:  And that's how probation gets to 2A3.1. Let's just deal with --

THE COURT:  Okay.

MS. NEWMAN:  -- Jane Doe #3.  And then we'll go to the others which will be quicker, but we'll go to the others.

THE COURT:  Just wait one second.

MS. NEWMAN:  And --

120

THE COURT:  Wait one second.

MS. NEWMAN:  Sure.

[Pause in proceedings.]

THE COURT:  Okay.

MS. MERKL:  Yeah, I am.  It says: "If the offense" -- let me just make clear.  Probation --

MS. SULLIVAN:  We are here.

MS. NEWMAN:  Okay.  Sorry I looked right past you. I apologize.  I didn't mean to.  Okay.  I'm looking at the (3) and it says that "If the conduct involved described in 18 U.S.C. 2241 or 2242 applied 2A3.1" -- okay -- "if the resulting offense level is greater than that determined above."  So I'm saying that determined above would be level 24 and, therefore, the Government claims and probation says you go to Section 2A3.1.

My objection is provided the conduct described in 18 U.S.C. 2241 or 2242 apply.  I'm saying as to Mr. Rojas and his involvement in the offense, neither 2241 or 2242 apply.  And, therefore, we would be under 2G1.3 with a base offense level of 24.

MS. MERKL:  Your Honor, going back to the relevant conduct principles that we just went over, it is the Government's agreement now with probation that the offense conduct as to each of the relevant three Jane Does 3, 5, and 7 were in fact subjected to being placed in fear of bodily

121

injury and threatened in order to cause their participation in the underlying sex trafficking here and that conduct was reasonably foreseeable to this defendant because he likewise engaged in similar conduct as did all of the trafficking members of his family.

Under those circumstances, Your Honor, under the relevant conduct principles we just went over as part of this jointly undertaking criminal activity, the cross-reference advocated by probation in the PSR should apply.

MS. NEWMAN:  And I would say as advocated by probation and described by probation that all three of the principles that the Court found would involve him in having a separate calculation for criminal sex trafficking would not equate to his reasonably foreseeable to what they did because we're talking with respect to Jane Doe #3 2006.  And the Government's argument is that after all, he engaged in similar conduct but in 2008.

MS. MERKL:  That's not the Government's argument, Your Honor.  The Government's argument is that this was the family business.

THE COURT:  Go slow.

MS. MERKL:  And this is the methods that they used to cause them to comply and that was reasonably foreseeable to him when he began his involvement with his family organization.

122

MS. NEWMAN:  But that's not --

MS. MERKL:  It has nothing to do with 2008.

MS. NEWMAN:  It's not what is before the Court with respect to what we relied on from the PSR and the limited involvement.  And the Court found that his involvement with giving money was something that was in furtherance of this.  But this under the principles of relevant conduct, does that mean that he is responsible for all the actions of the other defendants in this case.

So with respect to the enhancements that we find on Paragraph 77, Paragraph 78, and the vulnerable victim, Paragraph 79, we would disagree.  And since the Court found that it would be separate guideline analysis, that the guideline can be no higher than base offense level 30.

MS. MERKL:  Your Honor, the Government --

MS. NEWMAN:  I'm sorry, the base -- I withdraw, base offense level 24 because 30 involves the cross-reference.

MS. MERKL:  Your Honor, the Government would just note as helpfully pointed out by the probation department, that in the cross-reference language specifically, 2G1.3(c)(3), it states if the offense involved this type of conduct.  It doesn't say that the defendant has to personally have done it.  And that language is distinguishable from many other guidelines enhancements that say the defendant.  For example, under 2G1.3(b)(1), it says, "If the defendant was a

123

parent or relative," 2G1.3(a) "If the defendant was convicted."

Here, if the offense involved that activity, which it did as set out in the PSR, the cross-reference applies as to that Jane Doe.

[Pause in proceedings.]

THE COURT:   So if it's the offense of which he was convicted.

MS. NEWMAN:   Uh-huh.

MS. MERKL:   No, Your Honor.   That's not what it says.   If the offense involved conduct described, then it goes to the cross-reference.

MS. NEWMAN:   Where are you looking?   I'm sorry.

MS. MERKL:   2G1.3(c)(3).

[Pause in proceedings.]

MR. GJELAJ:   The offense is specifically defined, Your Honor, in the guidelines also.

THE COURT:   Where is it defined?

MR. GJELAJ:   It's in -- on Page 19 is 1B1.1.   And it's in the Commentary (i).

MS. NEWMAN:   1.1(i)?   I'm sorry.   I didn't hear you?

MR. GJELAJ:   1B1.1(i).

MS. NEWMAN:   Thank you.

MR. GJELAJ:   Well, the commentary is the (i).

[Pause in proceedings.]

124

THE COURT:  Okay.

MS. NEWMAN:  Your Honor, I submit that the reading of 1B1.1 definition of offense means the offense of conviction and/or relevant conduct.  It does not say "or."  So I submit that when they talk about the offense of conviction, they mean all relevant conduct to the offense of conviction and not separate relevant conduct.  This is not an offense of conviction.

MS. MERKL:  The RICO is an offense of conviction, Your Honor.  These are predicate acts within the RICO.  I don't follow Ms. Newman's argument at all.

MS. NEWMAN:  Your Honor, what I'm saying these are, they're not an offense of conviction.  The conviction with RICO, the court found that he -- the commercial sex trafficking under Ruggiero.  But Ruggiero's life was limited and so is relevant conduct.  He didn't participate in the prostituting of these women.  He didn't threaten them.

MS. MERKL:  Nobody is saying he did, Your Honor.

MS. NEWMAN:  That's correct.

MS. MERKL:  But he knew that his co-conspirators were very likely to, and it was reasonably foreseeable to him.

MS. NEWMAN:  In 2006?

MS. MERKL:  Yes.

MS. NEWMAN:  Well, that we don't have from the PSR.

MS. MERKL:  I disagree with you.  The inferences

125

that can be drawn from the PSR, Your Honor, are that the defendant was actively involved in trafficking young women and girls across the border so his cousins and brothers could exploit them, that is clear, using the same methods that he used, Your Honor, and the same types of violence and threats.

[Pause in proceedings.]

MS. NEWMAN:  And I should point out the error in the probation.  It says the -- Paragraph 77 of the PSR specifically the defendant and his co-defendants used force and threats, talking about Jane Doe #3.  That's simply inaccurate.

MS. MERKL:  That's not what it says, Your Honor.  It says against the victims in this case to ensure their continued prostitution, which is exactly correct and is what he did and is why the conduct was reasonably foreseeable to him.

MS. NEWMAN:  Well, but that's later.  What I'm saying is the fact that it could be generally against victims, it has to apply to Jane Doe #3, not generally.

MS. MERKL:  Your Honor, we just respectfully disagree.  That's where the relevant conduct principles kick in, and that's where the probation department is correct that the cross-reference applies.

MS. NEWMAN:  Not unless he used it against that victim.

126

[Pause in proceedings.]

THE COURT:   I don't understand your argument.

MS. NEWMAN:   Okay.   I'm sorry, Your Honor.   Let me be clear --

THE COURT:   I want to just try and follow it.   I don't think I agree with it, but I just want to be sure I understand.

MS. NEWMAN:   Yeah, sure.   All I'm saying -- I think it's very simple, Your Honor.   When we're looking at relevant conduct because under 1B1.3 that it does limit what he's held responsible for, so while he could be held responsible for the acts that he did, you know, giving money, for example, for the commercial sex trafficking as the Court found, that doesn't mean he's responsible for all the acts that the defendant who was directly responsible in prostituting Jane Doe #3.   That's my argument.

And if he's not directly -- if he did not -- was not involved in threatening her in any way and wasn't involved in prostituting her in any way, then the enhancements that are applied by probation should not be applied.   And if -- so, therefore, we shouldn't do the cross-reference.   The first thing is you shouldn't do the cross-reference.   The second thing is if you do the cross-reference, the enhancement shouldn't apply.   And it's for the similar reasons.

THE COURT:   So tell me, even though the trafficking

127

which was, you know, paying them money, giving them money to -- for the purpose of crossing into the United States committing prostitution --

MS. NEWMAN:   Right.

THE COURT:   -- even though that was relevant conduct.

MS. NEWMAN:   Right.   That's what the Court found, right.

THE COURT:   Right.   Then what follows?   That I should read the instant offense was committed by means set forth, specifically the defendant and his co-defendants used threats and that is not the same as finding that trafficking was relevant conduct.

MS. NEWMAN:   Right.   Because the way I understood the Court's finding was the act of giving the money was aiding this, but that didn't mean the act of giving them money, his involvement, was also aiding the threats or the other activity that they involved.   So he shouldn't be responsible for all the enhancements that the other defendants who were directly involved with Jane Doe #3 prostituting in the United States. That's what I'm drawing the limitation.

And that's why I think because he didn't do the threats, he didn't -- his conduct wasn't that, his offense conduct was limited, that, therefore, the enhancement shouldn't apply.   And in the same breath, therefore, the

128

cross-reference shouldn't apply because you would have to find the threats to find the cross-reference.

THE COURT:  Well, we go back to what Ms. Merkl said the offense is RICO.

MS. MERKL:  Uh-huh.

THE COURT:  And that offense involved -- is involved conduct described in 2241 and 2242 or 2242.

MS. NEWMAN:  Well, but not his conduct.  It did involve RICO, and he admitted to two.  And in relevant conduct, you said that 3, 5, and 7 would be applicable under -- if it's RICO be Ruggiero.  But it doesn't mean he's responsible for everything they did because he gave money.  It means he's responsible generally for aiding and abetting, the way I understood the Court's finding, the commercial sex trafficking.

MS. MERKL:  Your Honor, it's analogous to a loan sharking, you know, conspiracy where one defendant knows that the other defendant is going to go do a collection.  It's reasonable foreseeable that a leg might get broken or that violent threats would be made.  It's the same exact thing here.  The defendant was in this organization.  He knew what it was about.  It's relevant conduct that his co-conspirators committed the same acts that he committed.

What we're talking about here, Your Honor, is an adjustment of a half a point to a point in the ultimate

129

multiple counts analysis, just to keep this in perspective.

MS. NEWMAN:  Well, we're also talking about -- right, but you're talking -- ultimately, my argument applies to the other three -- the other two.  So it's not.  It's three points.

MS. MERKL:  No, it's not, Your Honor, because they're all at a level 34 or 36, and the highest that Your Honor has found so far is a 42.  So each of these additional multiple count adjustments would be worth a half a point.  We certainly respect and support if the Court needs to find the correct guidelines regardless of the outcome, but I just want to keep our eye on the ball here as to impact of the differences between the parties here.

MS. NEWMAN:  It's only a defendant.

MS. MERKL:  I'm not saying that.  I'm just --

MS. NEWMAN:  Well, that's what you're saying, so --

MS. MERKL:  No, it's not, Donna, and you know it.

MS. NEWMAN:  No, because if it's -- I disagree that he should be held responsible in 2006 for something that he pled to in 2008 in joining.  I understand the Court, so I'm not arguing.  I'm not going back and arguing anything.  But nonetheless, there is some analysis here that just this very broad sweeping without an eye as to what the guidelines and the intent of the guidelines are.

THE COURT:  But offense is defined as the offense of

130

conviction which is RICO and all relevant conduct unless a different meaning is specified.

MS. NEWMAN:  Right.  I understand that, but it's not his relevant conduct and that's where relevant conduct distinguishes it.  I understand that it would be, but it's not his relevant conduct.

MS. MERKL:  Your Honor, we spent a long time going over what relevant conduct means here.  The Government is not going to repeat those arguments and go back over 1B1.3.  But it is very, very clear from the context of this case that his co-defendant and co-conspirators jointly undertaking criminal activity were likely to have involved the types of threats and force that he himself used.

THE COURT:  And this --

MS. NEWMAN:  That he subsequently used.

THE COURT:  But he was aware that they were doing it at the time.

MS. NEWMAN:  But that's the problem, Your Honor. That's what's missing.

THE COURT:  And before.

MS. NEWMAN:  Right.  Well, that's missing here. That's all I'm saying.  The only thing we have is his -- I understand that what the indictment says, but we have a -- he said under oath.  So what we have here is a before.  I understand what the Court found, but we don't have from the

131

factual recitation in the PSR where he was so involved in this conspiracy, this enterprise that everything that they did was reasonably foreseeable to him in 2006. That's really what I'm trying to --

UNIDENTIFIED SPEAKER: I'm sorry.

[Pause in proceedings.]

THE COURT: Okay. Where were we?

MS. MERKL: I'm sorry.

UNIDENTIFIED SPEAKER: We'll go, Judge.

MS. NEWMAN: That was my argument. I think the Court understands it. I just think that, you know, in the end, you can imagine what I'm going to be arguing in mitigation here.

THE COURT: I don't understand your argument. Say it again.

MS. NEWMAN: Okay.

UNIDENTIFIED SPEAKER: Judge, they can't hear you from --

MS. SULLIVAN: Okay. I did. What I'm trying to say is I understand about relevant conduct. I understand the Court's finding, but it still has to be relevant conduct as to the defendant, what was his relevant conduct. And I think that's what 1B1.3 tries to distinguish when they narrowed it with a conspiratorial, what is he responsible for in relevant conduct.

132

They didn't limit it.  They tried to clarified it. But he did not do threats.  That's what I'm saying.  I know that the others did, and what we're looking at is something that happened in 2006.  So when the Government keeps saying it was reasonably foreseeable, certainly they would have a stronger argument subsequent.  But I think in 2006 they didn't have that because of what the PSR does and that limitation of the facts as to what he did and his communication with his co-defendants.

I mean it's just, you know, we've all been involved in cases.  This is a lot more going on between the co-defendants and proof of that.  So that's why I'm arguing this way.  I don't think it's an unreasonable argument.  I don't think it's a meritless argument.  I just think that they're just piling it on without a basis in the facts.  That's what I"m saying because there still has to be a preponderance.

THE COURT:  So what didn't happen that he was not aware of in 2006 --

MS. NEWMAN:  Well, there's no evidence that he was aware.

THE COURT:  -- that was foreseeable to him at that point?

MS. NEWMAN:  Right.  Well, that's the other thing. What we know is that he gave money and that's all.

THE COURT:  I know, but we've been through that.

133

MS. NEWMAN:  But that's all we know.  So whether it was foreseeable, the Court has found that it was reasonable that he knew that this was -- they were being transported for commercial sex.

THE COURT:  Right.

MS. NEWMAN:  Okay.  We got that.  So now what is reasonably foreseeable to him?  If you say it always has to do with threats, I would say that the guideline itself, level 30, takes that into accord.  That's what level 30 does.  That's why it's so high.  If not, what the Court is saying is always if there is commercial sex trafficking --

THE COURT:  There's always threats, is that --

MS. NEWMAN:  I mean I don't have to be --

THE COURT:  Is that what -- I mean I understand what it says.

MS. NEWMAN:  Right.  Yeah.  I can imagine.  You know, it would be unrealistic.

MS. MERKL:  To make sure of the cross-reference, Your Honor.  Because we're out of the commercial sex trafficking guideline and in the, you know, criminal sexual abuse guideline, the commercial sex enhancement does come back into the picture because there's plenty of opportunity for criminal sexual abuse.  It doesn't involve the exchange of money.

MS. NEWMAN:  So the cross-reference, what I'm saying

134

it always has to be 34.  And that's --

MS. MERKL:  For sex trafficking, that's correct.

MS. NEWMAN:  Right.  And that is not what I believe --

THE COURT:  I think her argument is is that even though commercial sex trafficking was foreseeable to him, it doesn't mean that it happened in every case and that, therefore, it's not clear that that aspect of it was foreseeable to him in 2006.  That's --

MS. MERKL:  As to Jane Doe 3.

MS. NEWMAN:  Yeah.  That's what I'm saying.

THE COURT:  Yeah.

MS. MERKL:  No, I understand the argument.

THE COURT:  That's what I understand her argument.

MS. MERKL:  Yeah.  I just think that it's belied by the facts.  He was already in the U.S. assisting his family in setting up their basis of operation to transport women and girls.  The notion that it was not foreseeable to him given the culture of Tenancingo which is amply laid out in Ms. Newman's filing is just ludicrous on its face, Your Honor. The context in which all of this happened is highly relevant whether it's reasonably foreseeable to the defendant that his co-conspirators would engage in the same sorts of threats and forcible conduct that he ultimately engaged in personally.

The notion it's a complete surprise to him that his

135

defendant brothers and cousins were engaged in forcible or threatening sex trafficking conduct is completely belied by her mitigation arguments which entirely rely on the notion that he was brought up in this violent sex trafficking culture of Tenancingo, Mexico.

MS. NEWMAN:  But that's --

MS. MERKL:  That's the context from which this defendant comes.  Maybe there's a mitigation argument to be made there, but it is highly relevant to whether or not it was foreseeable to him that this conduct was going to happen when these girls and women were brought across the border.

MS. NEWMAN:  But he -- what you're saying it's not. It's more than reasonably foreseeable.

MS. MERKL:  That is what the guideline says.

MS. NEWMAN:  Okay.

MS. MERKL:  2B1.3.

MS. NEWMAN:  Yeah.  And we're back --

MS. MERKL:  We've been back there.

MS. NEWMAN:  -- into --

THE COURT:  So that -- your foreseeability argument as to threats is based on what the culture was in Mexico.

MS. MERKL:  Your Honor, I'm just saying in the defendant's own submission, she takes great length to explain the violent sex trafficking culture of the town that this family is from.

136

MS. NEWMAN: On the contrary. It doesn't talk about violence, but it does talk about the culture in which it was accepted. It does not talk about violence.

MS. MERKL: The evidence in the case also makes clear, Your Honor, that the nature of this organization was to bring women and girls here under threats and with force. And the notion that this was reasonably foreseeable to the defendant that one of his co-defendants and brothers and cousins would have engaged in this conduct as to the girls he helped facilitate is very clear in our view based on the context.

I would also note that this argument appears to only be applicable to Jane Doe 3 because that's the earliest in time. So, you know, I suspect we'll get to the additional Jane Does in a minute, but I just want to cabin what we're dealing with here.

MS. NEWMAN: I guess it's a matter of finding whether it's base offense level 30 plus 4 because it would have to be 34 if the Court finds it's always involved in that. Or it's level 24 under -- without the cross-reference under 2G1.3 to put it -- summarize the issue.

MS. MERKL: Although, Your Honor, as probation points out, 2A1.3 does have a specific upward adjustment for the victim having been age of 14 to 15 when she was prostituted by the organization.

137

THE COURT:  Yeah, that's true.

MS. MERKL:  And the defendant harbored her in his home in Georgia.  He saw her when she was 15.

MS. NEWMAN:  And that doesn't mean that he knew her age.

MS. MERKL:  Reasonable opportunity to observe these underage victims is clearly the lie, Your Honor.  The Second Circuit held in the Robinson case that it is strict liability when it comes to minors.

THE COURT:  Remember we're talking about the age. It deals with --

MS. MERKL:  Okay.

THE COURT:  -- 78 and not 77.

MS. MERKL:  Correct.  So I'm just saying Ms. Newman's summary of the situation where we're talking about a level 34 or a level 24 is not quite right.

THE COURT:  Okay.

[Pause in proceedings.]

THE COURT:  The foreseeability in 2006 was that he had been in the United States before then?

MS. MERKL:  Yes.  And that he was assisting his family in setting up the family business to bring the women and girls over the border.

MS. NEWMAN:  And the -- I don't believe that we have that in the PSR, but I could be wrong.

138

MS. MERKL:  He clearly was here because he was in Georgia sending money to facilitate the transportation of the girls.

MS. NEWMAN:  That doesn't mean the rest of it.

MS. MERKL:  No, it's foreseeability.  It's a question of the reasonable inference to be drawn.

THE COURT:  Yeah.  But you're looking at it with, you know, with blinders on.  So what's included in the base level?

MS. NEWMAN:  If you go to -- depends if you use 2G1.3 or you use the cross-reference.

THE COURT:  No, no.  As it's been calculated here.

MS. NEWMAN:  Okay.  Probation calculates it with the cross-reference.  They use base offense level 30.

THE COURT:  I know, but what is that?  What conduct does that encompass?

MS. NEWMAN:  That encompasses the concept that the cross-reference is appropriate, that threats were used, and that it would be applied -- let me just -- I don't want to misstate something.

MR. GJELAJ:  Your Honor, if the cross-reference is used, it'll bring you over to 2A3.1.  It gives you two base offense levels there, the first being if there was a conviction for 2241 which we do not have here or 30 otherwise.  And that's what we use, the 30 otherwise.  That's what

139

establishes the base offense level.  As long as you satisfy the cross-reference --

THE COURT:  But is -- are threats and the use of threats of force and the threats of serious bodily injury, are they encompassed within that?

MS. MERKL:  Yes, Your Honor.

MR. GJELAJ:  Yes.

MS. MERKL:  That's what drives the cross-reference.

MS. NEWMAN:  Right.  That would be under 2241 or 2242, 18 U.S.C., I'm sorry, which is under criminal sexual abuse or attempt to commit criminal sexual abuse.

THE COURT:  I agree with the -- I would agree with 77, and 78 we've been over already.

MS. NEWMAN:  So, I'm sorry.  So 78, you believe that the enhancement for him should be two levels because the victim was age 14 to 15 and there's -- I just say that there's no evidence in the PSR that he knew that.  Just looking at somebody, I would respectfully say go to the junior high. You'll never be able to tell your age.  I just say just the Government's proof is that she by looking at her because he was -- visually saw her.

MS. MERKL:  Your Honor, I don't think that's sufficient.

THE COURT:  Does he have -- by the way, does he have -- where does the intent -- where does the knowledge that he

140

has to know come from?

MS. MERKL: There is no basis in law. That's what I was going to say.

THE COURT: That's what I was about to say.

MS. MERKL: Yeah.

MS. NEWMAN: Right. But it has to be -- I'm just going on relevant conduct. This is another enhancement, and it's not reasonably foreseeable.

MS. MERKL: No, it doesn't say that. It just -- this enhancement applies if the victim is that age.

THE COURT: Yeah, I agree.

MS. MERKL: There's nothing in the guideline about the defendant's knowledge of that.

THE COURT: I agree.

MS. MERKL: And the Second Circuit made clear in the Robinson case that strict liability attaches in the context of sex trafficking with minors.

MS. NEWMAN: The next enhancement on 79 is vulnerable victim. Again, we object to that.

MS. MERKL: And that one, Your Honor, we actually agree.

THE COURT: Okay.

MS. NEWMAN: Two we agree.

THE COURT: Okay. So we'll take that out?

MS. MERKL: Yes.

141

MS. NEWMAN:   Correct.   So Paragraph 82 would be adjusted offense level 36.   So that leaves --

MR. GJELAJ:   If I could, this just may short-circuit a few things.   The Ruggiero conduct Racketeering Act 7A from Paragraphs 83 through 88, that's all wrong.   It should be exactly the same as Paragraph 76 through 82 with the exception of the vulnerable victim.   And I'm not sure if we're going to make an argument on vulnerable victim with respect to this particular victim, but, again, this one requires a conviction under 1591 which we do not have.   We have a conviction under RICO, and this is one of the Ruggiero Act.

So it would be the conduct itself, though, is similar to Jane Doe 3.   So Jane Doe 5 and Jane Doe 3, at least for purposes of enhancements and guideline application, are indistinguishable in -- should be at least in the presentence report.

MS. NEWMAN:   Again, my objection to -- so it would be 30 -- you're saying 30 and 34.

MR. GJELAJ:   30 -- again, if she is a minor, which I believe she is, it would be 30, 34, 36.

MS. NEWMAN:   I don't think she was a minor.

MS. MERKL:   She was a minor.   Jane Doe 5 was a minor, Your Honor.   But I believe -- I'm trying to determine whether she was 16.

MS. NEWMAN:   Your Honor, once again, there is --

142

it's still relevant conduct to him, so we have to have some knowledge.  It's just my objection.

THE COURT:  Okay.  Could you tell us -- let's put down how this is being corrected because we have -- Paula has to --

MR. GJELAJ:  Yeah.

THE COURT:  -- has to do a --

MR. GJELAJ:  So Paragraph 83 should be similar to Paragraph 76 in that it's a conviction under 1961.

THE COURT:  So it should be 30?

MR. GJELAJ:  Yes.  Okay, that's even easier.  It will be a base offense level of 30.

UNIDENTIFIED SPEAKER:  I can make it even easier.  I have it.

THE COURT:  Okay.

MS. NEWMAN:  Yeah.

MR. GJELAJ:  Again, just for purposes of the record, it would be a four-level increase under 2A3.1(b)(1).  And then, again, depending upon the age of the victim, I guess we're not --

THE COURT:  What's the next -- what is 84?  Let's go through this so that it's clearer.  What's paragraph --

MR. GJELAJ:  84 is the incident offense was committed by means set forth under 2241(a), and that's a four-level increase under 2A3.1(b)(1).

143

THE COURT:  And 85?

MR. GJELAJ:  And then 85 is the -- that does not apply at all, right.

THE COURT:  And 86?

MR. GJELAJ:  86 is an adjustment for all.  That does not apply, an adjustment for obstruction of justice.  And, again, if Your Honor wants me to make a finding with respect to the vulnerable victim with respect to this particular --

THE COURT:  Well, we passed that already.  The Government's not pressing.

MR. GJELAJ:  For Jane Doe 5, okay.  And then the adjusted offense level under 88 would be a 30 -- a 34.

MS. MERKL:  We agree with that, Your Honor.  And the difference between Jane Doe 5 and Jane Doe 3 is that Jane Doe 5 was a little bit older than Jane Doe 3, and so she had -- the subsection is "had not obtained 16."  She was at least 16 when this happened, possibly 17 now.  She's looking for her --

THE COURT:  So the adjusted offense level is 34?

MR. GJELAJ:  That's correct.

MS. NEWMAN:  So Paragraph 88 becomes 34?

MR. GJELAJ:  That's correct.

MS. NEWMAN:  Okay.  So that leaves last but not least, Jane Doe #7.  And looking at probation that they did the cross-reference, so we -- I assume the Court is noting my objections, my similar objections.  It would be they've done

144

the cross-reference from 2G1.1 to 2A3.1 and come with a base offense level of 30.  That's Paragraph 89.  Again, my objections.  Specific offense, the same, the use of force and threats.  That's Paragraph 90 so that we're at plus 4. They've added the vulnerable victim, Paragraph 91, and as I understand the Court's ruling, that would be omitted.  And so the adjusted offense level, Paragraph 94, would be 34.

MS. MERKL:  We concur, Your Honor.

MS. NEWMAN:  Okay.  So if we go to the alien smuggling and transportation, this is what we agreed on.

MS. MERKL:  Uh-huh.

MS. NEWMAN:  Okay.  The No. 3, the defense and the Government agree with alien smuggling and transportation that the adjusted offense level is 15 and not -- we disagree then with the PSR Paragraph 97 and 98.

THE COURT:  I'm sorry.  What is a 15?  95?

MS. NEWMAN:  Okay.  That would be if you look at the PSR Paragraph 95.

THE COURT:  Yeah.  That should be a 15, is that what you --

MS. NEWMAN:  Okay.  Base offense level is 12.

THE COURT:  Right.

MS. NEWMAN:  Specific offense level is plus 3.

THE COURT:  Right.

MS. NEWMAN:  We -- the Government and I agree that

145

the specific offense characteristic of plus 4 should not apply.

THE COURT:  Okay.

MS. NEWMAN:  The specific offense characteristic on Paragraph 98 of plus 4 should not apply.  And 99, Paragraph 99 specific offense characteristics of plus 2 should not apply.  Therefore, the adjusted offense level becomes 15.  That's Paragraph 103.

MS. MERKL:  Your Honor, I would just note that the Government sets forth in our sentencing submission at Page 26 to 29 the differences between our calculation as to the alien smuggling and transportation conspiracy and the probation department's interpretation of those guidelines.  And we concur with the defense because we did not include it in our Plea Agreement and that was our error.

I think that the probation department has good arguments for the guidelines interpretation that they utilized here, but at the end of the day, they don't end up actually becoming relevant to the defendants in this case because of the way of the -- the way the multiple counts analysis works.

THE COURT:  Okay.

MS. MERKL:  So the Government is not contesting the level 15 estimated in the Plea Agreement, although we do think probation has a good argument and I've learned something and we'll correct it in the future.

146

MS. NEWMAN:  Okay.  So we'll be here again at a later date.  I'll argue with that.

Money laundering conspiracy, all right, so that is -- wait, money laundering conspiracy is Paragraph 104.  The Government has it at level 34.  I'm not sure we disagree.  You know what?  Now I have to go find mine.  I'm sorry.

[Pause in proceedings.]

MS. NEWMAN:  And we agree that it's level 34.  And that's level -- that's --

MS. SULLIVAN:  Paragraph 104?

MS. NEWMAN:  Yes.  Well, probation has it as level 36.  The Government and I have it as level 34.

THE COURT:  Okay.

MS. NEWMAN:  And I look to the Government for the discrepancy how we got to a different amount.  I think I have --

MS. MERKL:  We got to a different amount, Your Honor, because the probation department applied some of the underlying enhancements to the base offense level for the trafficking in order to arrive at the corresponding basically money laundering.  And so I don't think probation necessarily did it incorrectly, but we just had arrived at it through slightly different estimates.

THE COURT:  Okay.

MS. SULLIVAN:  So you agree that Paragraph 104 is 34

147

now?

MS. NEWMAN:  That's --

MS. MERKL:  That's what we estimated in our Plea Agreement, and we will stick by that plea.

MS. NEWMAN:  So that would be 104 and 108, the adjusted offense level becomes 34.

Okay.  Which brings us to the multiple count which we -- I have to adjust my multiple count.  But I think the Government agrees that some of the multiple counts in the Plea Agreement was incorrect.

MS. MERKL:  Well, Your Honor, the multiple counts analysis is of course affected by the, you know --

THE COURT:  I think --

MS. MERKL:  -- slight adjustments.

THE COURT:  -- I think Mark is doing it right now.

MS. MERKL:  Right.  They're doing it right now, but it's of course affected by the slight adjustments to the offense level.

MS. MERKL:  No, I understand that.

MS. NEWMAN:  Yes.  That's why --

[Pause in proceedings.]

MR. GJELAJ:  Are they ready, Judge?

THE COURT:  Yeah.

MR. GJELAJ:  Okay.  So multiple count adjustment for Racketeering Act 8 and Count 17, there's an adjusted offense

148

level of 42;   Racketeering Act 10A, and this is Jane Doe 8, an adjusted offense level of 34; Racketeering Act 5 Jane Doe 3, adjusted offense level of 36; Racketeering Act 7A Jane Doe 5 is an adjusted offense level of 34; Racketeering Act 9 Jane Doe 7 is an adjusted offense level of 34; Racketeering Act 1-5(d) and 8(c), is that the alien smuggling --

MS. NEWMAN:   Yeah, uh-huh.

MR. GJELAJ:   -- that is an adjusted offense level of 15.   And the money laundering is a adjusted offense level of 34.

MS. NEWMAN:   Your Honor, before we get to it, there was an important argument that I forgot to advance and it was advanced in my sentencing memo.

THE COURT:   Well, let's let him --

MS. NEWMAN:   Because it would affect the guidelines.

THE COURT:   Go on.

MS. NEWMAN:   Very quickly, I indicated that I believe on Jane Doe 3, 5, and 7 based on his -- the limited involvement, that a minor role adjustment for those three Jane Does is absolutely appropriate, that his scope was extremely limited, he didn't have money, he didn't control them.   He didn't get money from them, he didn't control them, and that, therefore, his involvement should warrant in each of those a minor role adjustment, which would affect -- you know, I'm not able to --

149

MR. GJELAJ:  If --

MS. NEWMAN:  So I would correct --

MR. GJELAJ:  Well, let me just --

MS. NEWMAN:  Yeah, you can.

MR. GJELAJ:  -- first address the law on it.  So role adjustment is made with respect to the entire enterprise. It's not limited to a victim or a predicate act.  Within the enterprise, he would have to be a minor participant for it to apply, and then it would apply to every one of the counts.

MS. NEWMAN:  Well --

MS. MERKL:  Your Honor?

MS. NEWMAN:  -- if I may?  I disagree in this context because while normally I would agree, but here we're making him responsible under Ruggiero, right?

MR. GJELAJ:  Right.

MS. NEWMAN:  And he is getting the offense conduct of all the defendants whether -- and the Government was arguing this substantively which clearly that should have been for 3, 5, and 7 only, right, should be a minor role.  So when we're looking as to -- since we're counting the guidelines separately as opposed to let's say a drug conspiracy -- I understand what you're saying -- then we should look to his role as to each of those Jane Does.  That's where we disagree. I understand the difference.

MR. GJELAJ:  And I'm not disagreeing that this is a

150

fairness argument or an equity argument of some kind. But the case law, and I think the case is Evazi [Ph.] --

MS. MERKL: Evazi, yeah.

MR. GJELAJ: Yeah, which basically establishes that you're looking to the count of conviction, you're looking within the enterprise and what is his role within the enterprise. You just don't parse out predicate acts, which we did for a very long time up until Evazi came out and it established that you have to look at the entire enterprise, not just the predicate acts.

MS. NEWMAN: And since I'm not familiar with that case or haven't memorized it --

THE COURT: I'm not going to sentence him today, so you can go look at it.

MR. GJELAJ: Well, yeah. I can certainly give you the cite.

MS. NEWMAN: Thank you, Your Honor. I'll look at that case.

MR. GJELAJ: I don't know it off the top of my head, but I can certainly get it for you.

MS. NEWMAN: It would be unfair to make argument.

THE COURT: Okay. So where are we now? What other --

MR. GJELAJ: So units. We have a total of -- well, the first count Racketeering Act 8 which is Jane Doe 6 gets

151

one unit, Jane Doe 8 which is Racketeering Act 10A gets a .5, Racketeering Act 5A which is Jane Doe 3 gets a .5, Racketeering Act 7A which is Jane Doe 5 gets a .5, Racketeering Act 9A Jane Doe 7 gets a .5, Racketeering Act 1-5(d) and 8C which is the alien smuggling gets no units given the disparity between the highest which is a level 42 and the alien smuggling which is a level 15, and the money laundering, which I think may also have been an issue --

MS. NEWMAN:   Right.

MR. GJELAJ:   -- that gets -- based on the guideline I think it gets grouped with the underlying criminal activity. So that does not get any units either.

THE COURT:   So could you tell me on the first three, I missed it.

MR. GJELAJ:   Sure.   The first three is a base -- an adjusted offense level of 42 that gets one unit.

THE COURT:   Right.   That's what I have.

MR. GJELAJ:   Second one is an adjusted offense level of 34 gets a .5.

THE COURT:   Okay.

MR. GJELAJ:   And then the next one 3 is a adjusted offense level of 36 and that is likewise a .5.

THE COURT:   Okay.

MR. GJELAJ:   That should total, although I didn't take this position for math, I think that should total 4.

152

MS. NEWMAN:   Three.

MR. GJELAJ:   Three, I'm sorry.

MS. NEWMAN:   Three.

MR. GJELAJ:   That's right.  I told you.  And that translates into an increase in the offense level of three levels.  Now when you take the greater of the adjusted offense levels, that's the 42.  That's to Jane Doe 6.  So you take the highest of the adjusted offense levels, that's a 42, you add three levels under the grouping rules, you come out with a combined adjusted offense level of 45.  You subtract three for acceptance of responsibility, subtract two for the global.  You should be an offense level 40 and a criminal history category of 1, which should be 292 to 365.

[Pause in proceedings.]

THE COURT:   All right.  There's a woman who wants to make a victim impact statement.

MS. MERKL:   That's correct, Your Honor.  Jane Doe #6 is in the witness room.  He'll go get her.

[Pause in proceedings.]

MS. MERKL:   Your Honor, Jane Doe 6 has entered the courtroom to make her victim impact statement with the assistance of a court-certified Spanish interpreter.

THE CLERK:   Who is still under oath.

MS. MERKL:   Marsha Gottler [Ph.].

JANE DOE #6:   Thank you for allowing me to come here

153

and for allowing me to express what I have been feeling during all of those years. I was convinced to come here because of my son who also suffered. He is now 12 years old. I also lost a baby and my integrity as a woman because of this person, because of this person during two years, roughly two years four months and two weeks.

I know that he should not be free to continue causing more harm to more women. And I'm here to ask that he get the maximum sentence because he does not have God's forgiveness for having done what he did to me. I believe he knows who I am now, and it doesn't matter to me. It doesn't matter to me because all of the damage that he did to me before he's paying for now and will pay for.

In the time that I was with him, he raped me. He raped me anally. He snatched my child from my arms in order to bring me here and prostitute me to the exclusive or sole benefit of himself and his family.

He would give me quotas of how much to bring him, and if I didn't meet them, then he was abusive to me. I did not speak with my son or my parents.

THE INTERPRETER: One day he brought me here -- and interpreter's correction.

JANE DOE #6: One time he brought me here to New York to Queens and he beat me the day before I was going to the Mexican consulate to get my passport. He did that because

154

he said no one was supposed to know that I was anywhere else or that I was here specifically.

When he brought me here, I was maybe two or three months pregnant. And he decided to go to Mexico on October 7th, 2008 to bring back more women. But before he left, he beat me in my belly to make me lose my baby. He did not take me to the hospital. He left me bleeding from a hemorrhage. And even so, he still wanted me to keep on working and giving him money because he needed to keep up with his other family members who were driving new cars and had new houses.

While I was here, my son was being abused in Mexico. He was threatened with a gun. He talks to me and tells me about this. He also suffered. He says he was left to go hungry. And if he did not behave himself, he would be left inside of a dark room for days without anything to eat and they would beat him. He has been in treatment for more or less three years in Mexico because of blood clots that he got in his head from the blows.

I don't think he should go free. And I am still in fear for my parents' freedom because he knows where they live. He asked me for money so he could buy himself a car and even so he could get things for his house in his town. And I was suffering here. I was giving him all my money, didn't have enough to eat, and finally ended up with nowhere to live. I suffered from anxiety.

155

I don't think that I will ever -- that all of the scars that I have will ever heal.  I hope that by speaking here I will have brought to a close the cycle as I have hoped to do for many years.  The only thing I wanted to know is what he did with the baby.  And I hope he pays for all of it.  I can't go on.

THE COURT:  Do you want to take a seat and catch your breath?

JANE DOE #6:  No.  When he was drunk, he used to force me to go into the bathroom to have him urinate.  He would have me grab on to his penis and have him urinate.  And he would force me to have relations while he had other women there, and he would force me to.  He would force me to swallow his semen.

He says I was a drug addict.  I was not a drug addict.  I smoked marijuana when I was a teenager and he knows about it, but I was not even with him yet.  I didn't -- I never smoked marijuana or used cocaine when I was with him. He made me change my name in order to send messages to Mexico.

One time he dropped me off or left me at my house where I had my apartment and --

THE INTERPRETER:  The interpreter needs to get clarification.

[Pause in proceedings.]

JANE DOE #6:  He left me with AKA Elsitanico Desnudo

156

[Ph.].  Elsitanico is Saul. And he wanted to rape me.  And not just him, also AKA El Chino approached me.  In order to tell me I should stop working for Felix and work for him, he tried to force me.

All I want is for you to give him the highest possible sentence because he's a manipulator.  And even though he's old, I know he's still going to try to keep doing more harm to more women.  And he deserves to be here.  I can't anymore.  I can't say anything else.

[Pause in proceedings.]

THE COURT:  Thank you.  I'm not going to sentence him tonight as I told you.

MS. MERKL:  I understand, Your Honor.

MS. NEWMAN:  And we are -- we'll be adjourned -- will Paula reach out?

THE COURT:  Paula is coming in to tell me.

THE CLERK:  What am I telling you?

MS. MERKL:  When we resume.

MS. NEWMAN:  Telling all of us.  We're waiting for you to tell us.

THE COURT:  When am I adjourning this sentence to?

THE CLERK:  All the other co-defendants are on tomorrow starting at eleven.

[Pause in proceedings.]

THE CLERK:  Eleven a.m., Counsel, tomorrow.

157

MS. NEWMAN:  With a letter from you.

THE CLERK:  Absolutely.  I'll going to mail you one tomorrow.  Will you appear in this case?

MS. NEWMAN:  I'm not.  I have a co-defendant meeting that I in my office that I arranged.

THE CLERK:  That's fine.

MS. NEWMAN:  I'm going to make it earlier.  I had it made at 10:00.  I'm going to ask them to come at 9:30, and I'll be here at eleven.

THE CLERK:  At eleven.

MS. NEWMAN:  You know I'm never late, so.

THE CLERK:  You're never late.

MS. NEWMAN:  You know I get nervous.

THE CLERK:  Guys, I'm sorry, you have to go.  He's coming back at 11:00 tomorrow.  Okay.  Everybody's coming back?  Everybody's coming in tomorrow at 11:00.

THE CLERK:  Yes.  So thank you very much.

(Proceedings concluded at 7:40 p.m.)

                    *  *  *  *  *

158

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

Shari Riemer, CET-805

Dated:   April 5, 2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                                   :
UNITED STATES OF AMERICA,          :
                                   :   15-CR-00348 (ERK)
           v.                      :
                                   :   January 4, 2019
FELIX ROJAS,                       :   Brooklyn, New York
                                   :
              Defendant.           :
                                   :
------------------------------X


TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:          TARYN MERKL, ESQ. ESQ.
                             MARGARET ELIZABETH LEE, ESQ.
                             U.S. Attorney's Office
                             Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York  11201

                             BENJAMIN J. HAWK, ESQ.
                             U.S. Department of Justice
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530


For the Defendant:           DONNA R. NEWMAN, ESQ.
                             Law Office of Donna R. Newman
                             20 Vesey Street
                             Suite 400
                             New York, New York 10007


Court Transcriber:           MARY GRECO
                             TypeWrite Word Processing Service
                             211 N. Milton Road
                             Saratoga Springs, New York 12866


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

(Proceedings began at 11:31 a.m.)

THE CLERK:  <u>United States v. Felix Rojas</u>.  Your appearances, counsel.

MS. MERKL:  Taryn Merkl and Maggie Lee for the United States.  Good morning, Your Honor.

MS. NEWMAN:  Good morning, Your Honor.  Donna R. Newman on behalf of Felix Rojas who's standing next to me and with the aid of a Spanish interpreter.

THE CLERK:  Probation?

MS. SULLIVAN:  Patricia Sullivan.  Good morning, Your Honor.

MS. BETTS:  Mary Ann Betts for the Probation Department.

MR. GJELAJ:  Mark Gjelaj, United States Probation.

[Pause in proceedings.]

THE COURT:  Okay.

MS. NEWMAN:  Thank you, Your Honor.  We left off yesterday was that I was asking for a two point role reduction for mitigation and thanks to Probation and their giving me the site to the case which name I cannot pronounce and that's the -- and they were right, there was only one case that is with that name, Evojo [Ph.]?

MS. MERKL:  Ivizai [Ph.].

MS. NEWMAN:  Ivizai.  I was able to say that I withdraw that application because the law in the Second

3

Circuit is clear that it is the role extends to the entire RICO involvement.  However, as I will go through my request for variance, I will bring it up again.  I will point out, however, that the Supreme Court hasn't ruled on it.  It is only in the, to my knowledge, 2nd, 7th, and 11th.  So while I'm not arguing for it, in the event some miracle happens that the Supreme Court somehow disagrees with it, I will reserve my objection and that's it for that, the role reduction.

So that brings us to I believe, because we did the calculations with the restitution and TSR does not advise as to restitution, I disagree with the Government and respectfully ask for additional time to submit a brief because in fact the Government is absolutely wrong because they're asking for joint and several restitution and we know that the Supreme Court in <u>Honeycutt</u> said that it cannot be joint and several.  So looking at the Government's basis for restitution which I believe is speculative, I would want to submit a -- promise a small brief on the issue of restitution, but we can finish sentencing and just reserve that part of the sentencing and amended judgment.

THE COURT:  Many of these people afford to make restitution?

MS. NEWMAN:  No.

MS. MERKL:  No, Your Honor, but restitution is mandatory under 5093 as to the sex trafficking count and there

4

is -- it is mandatory.

MS. NEWMAN: And I agree that it is mandatory. I don't disagree. But I do -- because it's legal, it would be wrong to be joint and several. And therefore, I don't believe we have to come back for a hearing. I just think we should submit briefing as to the amount because the amount that they have I would say is very speculative and should not be a basis to award restitution. And I believe you have 90 days to submit a restitution decision and then we --

THE COURT: And restitution to who?

MS. MERKL: Your Honor, it's laid out in the Government's brief.

THE COURT: Oh, okay.

MS. MERKL: Our estimate as to the earnings of each victim. The Second Circuit has repeatedly affirmed judgments where the approach was taken that was taken in the Moneta [Ph.] case where the restitution is based on the lost earnings of the workers. And so the Government's estimate is based on victim by victim, how much each is owed.

THE COURT: No, but that's what I meant. You were going to give me both the amount and --

MS. MERKL: Yes. Right.

THE COURT: -- to whom. Okay.

MS. NEWMAN: Right. And so I want to look into that. I understand there basis. It's just that I'm saying

5

that the calculation is in error and that it can't be joint and several.

So that brings us to my arguments for variance unless the Court wants to --

THE COURT:  I didn't want to go over anything.

MS. NEWMAN:  No.  And we meant -- I think we can all agree, again another agreement, we don't want to either.  So I --

THE COURT:  I should say one thing about -- I'm not changing anything --

MS. NEWMAN:  Right, right.

THE COURT:  -- and I don't want to resume an argument on this vulnerability aside from the reason that I gave for rejecting the Probation Department's teetering.  It seems to me that particularly with the person that we're dealing with with respect to Rojas -- I forget whether it was 6.

MS. MERKL:  Yes.

THE COURT:  This was it seems to me vulnerable under the -- on the Probation's theory, another reason to reject it is that they're vulnerable presumably to inducement.  But she was coerced.  I mean there's no -- it seems to me that under their theory that's another reason why that theory doesn't work.

MS. MERKL:  Your Honor, most respectfully, there is

always an element of consent in coercion.  That's the nature of the course of conduct.  And the question I would have is how -- does the vulnerability make a person more susceptible to being coerced?  Make them more likely and more manipulable and subject to coercion.

THE COURT:  I'm not --

MS. MERKL:  So I would respectfully disagree that that is -- takes people similarly situated to [indiscernible] out of the box altogether.  That's --

MS. NEWMAN:  I think I was going to say something similar but I have my objections.  I won't go over them at all.

THE COURT:  Okay.

MS. NEWMAN:  Thank you very much.  So we're moving on to variance.  And it's important for the Court to know that in arguing for variance and arguing the guidelines it was not our aim to deflect responsibility in any way but rather with respect to the variance our arguments are really to keep an eye on the ball which is to consider all 3553(a) factors. It's also important I think to emphasize that we are not saying here by any stretch this is not a serious offense. What we are saying, however, what is enough is enough is enough?  And our position is that 15 years, the mandatory minimum, is sufficient here in light of all the factors that I will now discuss.  Because in fact the Court must consider the

7

individual in sentencing not only as compared to others, not only his specific offense conduct, but who he is, his background, and the other factors that 3553(a) identifies. After all, Your Honor, one of the factors is punishment. You know, punishment for Mr. Rojas may not be punishment for somebody else. What I mean is 15 years for him in a foreign jail is not a walk in the park. It is extremely difficult. His family can't visit him because of money. They live in Mexico. And so 15 years we're saying is just punishment for Mr. Rojas. He's not a monster although the Government would like -- or I think they are suggesting he is. He's a human being who's complex like we all are. And we can't look at just the events conduct. We have to take the whole person. They I understand have dealt with the victim but they have not dealt with Mr. Rojas. They have not heard him speak with remorse. They haven't seen him sob about his remorse and his inability to be with his family or how he's so shameful for what he has done. They weren't there when he talked about his background. They don't see him for what he really is. They only see one aspect of this case. And with all due respect to Probation, I don't know their recommendation and we don't have any documents other than all the affidavits which they said they relied on which we do have --

THE COURT: Their recommendation, I don't keep things secret, but their recommendation is not relevant

8

because it wasn't based on, when they gave it to me it was not based on what guidelines now are.  So --

MS. NEWMAN:  Well, I also would say that in weighing whatever their recommendation, whatever it is, they have likewise not considered all the information that I've given to the Court and they didn't review when they gathered all this information for the presentence report they didn't have the sentencing memo, they didn't have the documents I attached. For example, with respect to Tenancingo the background or the document from Sonja Rendon-Herrera that was -- I say they're Family Court but it's a municipal court that was submitted there in 2010 with respect to Jane Doe #6's child.  So there are also --

THE COURT:  Why don't you refresh my recollection about that?

MS. NEWMAN:  Excuse me?

THE COURT:  Can you refresh my recollection about that last --

MS. NEWMAN:  Yes.  That was Exhibit D to client sentencing memo and that was when she appeared before the DIF which is the Municipal System for the Integral Development of Family.  That's why I'm saying it's similar to our Family Court and it was given on August 3, 2010 and it was informing the Court that she had been given custody to care for Jane Doe #6's infant child, son, on December 27, 2007 and that she had

9

taken care of him.  And then on February -- and had been receiving money for that care on a somewhat regular basis. And that on February 20, 2010 was the last day that she had received money for the care from Jane Doe #6 and that she didn't have money to continue caring for the child and that reason she requested the agency to look for the relatives of the child so that they could take custody of the child.  And it's my understanding that they then soon thereafter were contacted and came and took custody of Jane Doe #6's son.  And then I had also submitted the report of Carmen Espinal who spoke with Sonja Rendon-Herrera and confirmed what had occurred, that the child was seen by a doctor, was fine, that she had reported this so that they could find the right relatives for the custody.  So they didn't have some of the -- they didn't have my client's letter to the Court or the letters from his relatives, his daughters.  So their perspective, all I'm trying to say is their perspective of that recommendation of what should be done whether it was within the guidelines or outside the guidelines has to be seen and given that weight.  And just like the Government's recommendation must be seen as limited by what they didn't consider.

I want to -- the general deterrent -- I mean it is something I understand the Court has to consider.  But when we step back and really think about his general deterrence that

10

is given lengthy sentences something that has proven statistically to help deter criminals?  And there is academic research over academic research over academic research that says no.  It's just not proven to be effective.  And I just think that common sense says that before somebody commits a crime they don't go oh well because they don't know about, you know, what is at stake or the consequences.  And certainly, general deterrence is effective through a sentence of 15 years because that's an awful long time for anybody to be in jail and that certainly gives the message to people in Mexico which is, I assume who we are reaching and if in fact any general deterrence would be in fact general deterrence.  So it wouldn't matter, my point is, whether it was 15 years, 20 years, or 22 years, or 25 years, the same message would be filtered down to Mexico.  The impact of the guideline analysis and the multiple enhancements I think is a basis for a variance.

As we discussed at length yesterday, Mr. Rojas is being held responsible for the actions of others.  That would be Jane Doe 3, 5, and 7 is what I'm talking about.  And under the guidelines it punishes him the same as though he were -- had in fact prostituted these women.  And he didn't.  It holds him responsible for the fact that two were minors and there's nothing to my understanding that we can look at that says he absolutely knew they were minors except that the Government's

11

position which they stated yesterday well one of them, I think it was Jane Doe #3, they use the word harbored.  I said stayed overnight as a guest.  In any event because he was able to see her.  With all due respect, I think that's a ridiculous statement.  You can't tell an age by looking at somebody.  And I hope that's true, Your Honor.  That's all I can say for my own sake.  Thank you.  The guidelines do not take into account the unfairness of sentencing someone based on a preponderance rather than beyond a reasonable doubt.  And I understand the system.  I'm not here to argue the system.  But I am arguing that that is a basis for variance.  The guidelines don't take into account that we had a clear agreement here that really was a Pimentel letter.  It did allow us to argue guidelines, I agree.  But it essentially was a Pimentel letter.  And that although his allocution of which he said was, and accepted, was narrow, his involvement to Jane Doe #6 and Jane Doe #8 and was narrow as to the amount of years, that was useless.  The Plea Agreement was just a useless piece of paper.  It's nothing more.  It's certainly not the kind of contract that the word agreement anticipates.

There is also the concept that the guidelines don't take into account the duplicative enhancement specifically as to Jane Doe #6 which really drives the guidelines in this case.  The enhancements here do equate to the tail that wags the dog.

12

THE COURT:  What do you say is duplicative?

MS. NEWMAN:  Excuse me?

THE COURT:  What do you say is duplicative?

MS. NEWMAN:  Well in the sense that, for example, we start at level 30, right, and the Court said before automatically gets because of the nature of the offense we're at 34.  Then we added two points for additional -- excuse me, four points for permanent injury.

MS. MERKL:  Two.

MS. NEWMAN:  Two?  Was it two?  I'm sorry, I wasn't sure.  I put this down wrong and I thought it was wrong. Thank you.

THE COURT:  Serious.

MS. MERKL:  Serious.  Not permanent.  Serious.

THE COURT:  That's what I just said.

MS. MERKL:  Yes.  Two points for serious, four points for permanent.  You were advocating for two.

MS. NEWMAN:  Right.  Well, it's not advocating.  In fact the Court found two.  It was serious injury in which I argued against.  But in any event, you can see how they're stacking.  Then we had two for vulnerable victim and the abduction in Mexico which was four.  So all together, if my math is correct, it's 12 points which is almost half of the original base of 30.  And when we realize that if we had used 2G1.1 or 2G1.3 in the case of the minors, we would be at a

13

base offense 24.

MS. MERKL:  Your Honor, I most respectfully disagree with that.  We're re-arguing the guidelines here.  If he had been convicted under 1591(b) the base offense level is 34.  Period.  Full stop.  He was convicted under 1591(g)(1) as to Jane Doe 6.

MS. NEWMAN:  I'm not talking about Jane -- what I am saying --

MS. MERKL:  All of the enhancements you just described pertain to Jane Doe 6.

MS. NEWMAN:  I understand that.  I am asking for a variance.  I did say that we started with offense level 30 and if the Court recalls, I didn't argue that that was incorrect.  I argued it with respect to the other Jane Doe.  I did not argue that.  But what I am saying, and this is very clear, that -- and I had said previously we are talking about 12 points in enhancements.

MS. MERKL:  Only as to the one victim, Your Honor.  I just want to be very clear about that.  She's mixing apples and oranges.  She's saying 12 points are being added on --

MS. NEWMAN:  Excuse me --

MS. MERKL:  -- but it's level 24 in the alternative.  That is just not accurate.

MS. NEWMAN:  I am -- so we are clear, with respect to Jane Doe #6 which drives the guidelines in this case

14

without a question, it is the highest, correct.  But that's --

MS. MERKL:  But it would never be a level 24.  That is where you're mixing apples and oranges most respectfully.

MS. NEWMAN:  I am not mixing apples and oranges when I say the enhancements are 12 points.  That's what the Court found and --

MS. MERKL:  I concur with that.

MS. NEWMAN:  Good.  So now we can move on.

MS. MERKL:  Level 24 was never on the table for Jane Doe 6.  That is not correct.

MS. NEWMAN:  May I continue now?

THE COURT:  Go ahead.

MS. NEWMAN:  Thank you very much, Your Honor.  So what I was also saying when you look at Jane Doe 3, 5, and 7 which we had said which was used as a cross-reference after the Government incorrectly said that we look at 2G1.1 or 2G1.3 and we ignore the word convicted, that in fact the Court found we use the cross reference and all I'm trying to demonstrate is that not for the cross reference.  In other words, if you don't find that he threatened, which is what I argued, it would be level 24.  I'm just talking about the disparity in the guidelines and how the guidelines don't take into account the individual.  And in this case it's clear they didn't take that into account.

Now, so we have guidelines that result in 12 points

15

enhancement, that drive the guideline.  We have a calculation under cross reference that also drives up the guidelines in those cases 3, 5, and 7 and held too responsible for actions of others which the Court found.  All I'm saying is a variance.

With respect to minor role, which as I indicated the Second Circuit says it has to be the entire enterprise you look at role, but it is a basis for a variance where you look at his limited involvement with 3, 5, and 7.  And I think that that is a viable basis for a variance in this case.  If he were to have just pled guilty for what he -- if the guidelines were calculated on just what he pled guilty to which 6 and 8, we would be with the two points of the three, total base offense level of 38 which is 235 to 293 which is a 20-year range.  But we say that is even too high but we can see how what I'm trying to show that the guidelines for the other Jane Does has increased what he is facing under the guidelines. Indeed, since we're looking for a sentence of 180 months, if he were level 38, a variance would only be a three level reduction or an additional four-year reduction.

As the Court is well aware, the guidelines don't take into account other individual factors which 3553(a) says we must consider, background.  As the Court is aware from my Exhibit A and what was stated by Dr. Simone Gordon which would respect to the [indiscernible] culture gives us some window

16

into the way Mr. Rojas viewed, until he came to the United States and understood more about it, women. I don't think it's right. He doesn't think it's right now. But we can't look at him in a vacuum. We can't impose upon him our background. We can't -- we're not missionaries here. Whether we agree with that culture is not relevant. It is only relevant of how it influenced his thinking and his decision-making. This is not a case where we're saying -- we're not saying that gee, he was old enough to make his own decisions. Of course he was. We all are. But we are all nonetheless a product of our background. That's who we are and we make decisions accordingly. And I ask the Court to consider that and not to condemn his background but to give some understanding and some weight on how this influenced his decision making. In short, he had a different upbringing than we did. We should also consider his upbringing with respect to his own familiar situation. He was the product of an illegitimacy. But worse yet, worse yet, his father refused to recognize them. That's particularly bad in Mexico where he couldn't even continue with his schooling unless his father would recognize him. So is having only one name and the fact that the small town in which he grew up in knew that his mom had slept with an authority in the municipal court so that her other son could be released from prison didn't bode well for him and he was constantly tormented by this, he was rejected

17

somewhat by his mother and by his other relatives.  He did not have an easy upbringing.

We should also consider that when he was initially arrested in Mexico on October 15, 2015 --

THE DEFENDANT:  November.  November 15th.

MS. NEWMAN:  I'm sorry, Your Honor.  November 15, 2015.  Which would be five months and eight days.  He was tortured.  There were electric shocks given to him.  He was what we would consider water boarding.  He was brutally attacked and assaulted on a constant basis.  He was not once but numerous times had electric shock put to his private parts and water boarded numerous times.  This is a basis for a non-guideline sentence.  I supplied the Court with some sites but I'm sure the Court is aware of them.  And he stayed there for the five months and eight days.  And in addition --

THE COURT:  Was it five months or seven months?  I thought it was seven months.

MS. NEWMAN:  Well, is my math --

THE DEFENDANT:  Seven.

MS. NEWMAN:  Seven months.  Okay.  And that credit for the time that he was in Mexico, the BOP will not credit him.  The presentence report has starting when he comes to the United States on Page 1 it says 6/23/2016.

THE COURT:  I discussed that earlier with Probation and they say that the Bureau of Prisons will automatically

18

credit him for that time.

MS. NEWMAN:  How will they know that if it's not in the presentence report?

MR. GJELAJ:  If I may, Your Honor?

MS. NEWMAN:  Yes, please.

MR. GJELAJ:  I was unaware that the arrest date we have on Page 1 indicates the day that he was actually indicted.  We'll amend it before it goes to the BOP.  We'll take into consideration the date that his arrest was in Mexico and then the BOP will credit it.  They'll rely on our presentence report to begin his time.

MS. NEWMAN:  All right.  So that was my concern. Thank you.  That was my concern.  But nonetheless, there is an ICE detainer and so we know what happens.  Once he finishes his term of incarceration he then serves more when he's detained waiting to be removed.  How long that can be could be three months, it could be four months, it could be five months.  And we don't know.  We don't know.  I would ask the Government if they had any of his documents that they release it to me and I would send it to his family in Mexico and then when he is ready to be released they might be able to get those documents to him and that would ease his detention.  If not, it takes even longer.

In addition, we know that he will not have the same availability of programs while being incarcerated and he

19

doesn't get to a halfway house.  And so he served longer.  If somebody similarly situated would have been released to a halfway house in six months, he will remain in custody six months.

The guidelines don't consider his age.  He is 48 years old.  And that is a factor to consider and it is a reason for variance for several reasons one of which just the cost involved in incarcerating somebody and holding them and holding them as they age.  We know that the cost goes up and we know that he's going to be removed to Mexico.

Recidivism, specific deterrent is a factor.  But here we suggest it is not a factor because in fact not only is he 48 but he stopped participating in this offensive conduct. He drove a taxi when he came back to Mexico in 2011.  And there is another concern.  And I have to step lightly but I'm compelled to mention it.  I understand and I don't in any way take anything from Jane Doe #6 and what she went through, but there's certain inconsistencies that have to be pointed out. One is Sonja Rendon-Herrera's statement or certified statement to the Court in Tenancingo which says that the -- she was holding the child and the money stopped and she had to go look for somebody to take the child.  Right?  So it seems just common sense or an inference if this was so important to this woman she could have called her parents and had the police come with the parents and take the child.  She knew where she

20

was or the police could find the child.  But the fact that more important what we have here perhaps is the fact that rather than when she stopped sending the money, the child wasn't harmed.  A doctor examined the child.  The child wasn't harmed at all.  Rather they were -- Ms. Herrera's looking to give custody to whoever is the rightful relative because Jane Doe #6 wasn't communicating, had stopped calling, had stopped communicating with Ms. Herrera.  So I'm mentioning this in terms of recidivism.  All that time that he was still in Mexico from 2011 he never went to her home.  So concerns about him doing this to more women or going to a home, I just feel belied by the other documentation that's present and that goes to the fact that at 48, the fact that he didn't do this when he got back in 2011, never came back to the United States indicates that as to specific deterrence that he's not at risk of recidivism.

If the Court is not going to give weight to Ms. Herrera's statement, to the certified statement to the municipal system which I think is important here, then I would request an opportunity to put her on videoconferencing.  It just never occurred to me that the Court wouldn't take credence in this weight into this document.  I'm not saying it controls all the decisions but it does talk about where the child was, the care that the child was given, and the fact that it was in Ms. Herrera's custody and it was given to her

21

by Jane Doe #6.  I just say that with respect to recidivism. That's all.

So I guess, you know, there's two sides of every story and how you look at it.  We don't contest that Jane Doe #6 was a victim here.  And all we are saying is that looking at it, all the factors that he doesn't present a risk and certainly after 15 years in jail he wouldn't present a risk. What else do we know about him that we learned?  He cares about his children.  You've received letters from his sister and his daughters.  His daughters are professionals.  They talk very highly of their father and the sacrifices they have made, he's made for them, The fact that he supported his mom throughout her life.  Nobody lived in high fashion.  They were very, very poor.  Mr. Rojas did not have a fancy car, he did not have a fancy house.  He drove a taxi.  And that's what he did for the majority of his life and in Mexico, he drove a taxi.  So other than the few years he was in the United States which I think adds up to little over two years he drove a taxi and that's how he supported -- and the children talk about the charity, that even though they had so little growing up, very little food, he gave to the church.

Rehabilitation, you have a very heartfelt letter from Mr. Rojas that he had help drafting but nonetheless it was his thoughts.  And he says to the Court that I saw what I was doing as normal because in my country they do not see it

22

as a serious crime.  Not saying they don't see it as wrong or that it's not a crime, just nobody's ever arrested for it or very rarely.  I shouldn't say nobody, right?  But very rarely. But this is the important part, Your Honor.  Now I realize the serious harm I was causing.  That is why at this moment I manifest my repentance for this incomprehensible act.  I ask for forgiveness to the victims, my family, and society for causing so much pain and suffering.  He is somebody who was a drunk, he did things that were very, very wrong and he is extremely sorry for what he did.  This is not somebody who's standing before you and is saying it was right because in Tenancingo we accept it.  That's not what he's saying.

THE COURT:  What you're saying.

MS. NEWMAN:  I am saying, no, I am saying that that was what he was led to believe but that's not what he believes at all and that he has learned and he understands very much that what he did was wrong.  What we cannot, what I said, is discount how we develop our thoughts about whatever we do in our character.  That is not -- he is not excusing it, he is not blaming that.  He is just trying to give this Court an understanding of who he is and where he got to this and now where he is.  That person is not the person, absolutely not the person, who was involved in this criminal activity.  And it's this letter and his conduct in jail that I think also explains that and is evident.  We have supplied the Court with

23

a work performance rating that is very, very high.  He works extra hours.  He has had no problems at the MDC which in my experience these days is unusual.  He has certificates from MDC in anger management.  He even took the GED, the math part.  He's trying desperately to learn English and to understand English, and he's taken the American Bible Academy, he has four certificates from that.  So he's not at all saying what he did was right, he's not deflecting the blame to say it's because I came from Tenancingo.  It's just so the Court has an understanding of who he is and how he has changed.

And I want to just speak a little bit about parity.  Unlike -- I had mentioned parity in my sentencing memo and I think it's important here because I know the Court considers it.  I found that it's a particularly important factor for the Court.  I know the Government is going to stress it.  But I'd like to bring to the Court's attention what the Government has said about others in this case.  So recognizing that Mr. Rojas did not live in a fancy house, didn't have fancy cars, he wasn't making all this money that they allege or at least no evidence of it, I also want to -- and the Government has said that he has really -- he's the worst of the worst, he's this monster, but when they speak about Odilon Martinez-Rojas they likewise speak in the same terms and there he helped co-defendants with at least five other defendants -- five other Jane Does.  We helped three.  And that his conduct with

24

respect to Jane Does 1, 4, and 9, that he was -- had abusive conduct and that his conduct was not a mere aberration.  I am just reading from the Government's sentencing memo.  I'm looking on Page 51 of their sentencing memo.  And they go in on how he also caused a miscarriage and that he raped a virgin.  I am not asking the Court in any way to punish Mr. Odilon more than Mr. Rojas but I am saying that in considering these various defendants one has to consider that also those in the same case had lesser guidelines than the Government initially wanted for Mr. Rojas.  The same thing would hold true for Severiano Martinez-Rojas.  And also did some acts that were abusive and was involved in more Jane Does.

So I think when we consider parity in a way we look at the whole case, Mr. Rojas unquestionably did a serious crime.  He's 48 years old.  He has shown to this Court that he is full of remorse, that he has made attempts to rehabilitate himself and recognizes the wrongfulness of his conduct and he wants the victims to understand that, that he doesn't -- there's no need for specific deterrence.  I understand general deterrence is a factor although I question whether in fact it does anything.  He will serve longer than his American counterpart, US citizen counterparts, because of the ICE detainer and because of his status here.  He was tortured in Mexico.  And the guidelines I believe should be looked at and that a variance based on the enhancements and the fact that

25

we've included Jane Does 3, 5, and 7 in that guideline should be considered. I thank the Court. If the Court has any further questions? I know my client would like to say a few words but we can wait.

THE COURT: I don't have any questions but assuming I don't downwardly depart and I give a sentence within the guideline range, I assume all your arguments would be the same as to what the sentence should be.

MS. NEWMAN: I'm sorry? If you gave a non-guideline sentence? I --

THE COURT: If I gave a guideline sentence. If I did not downwardly depart. The guidelines are 292 to 365. So if I didn't depart --

MS. NEWMAN: Right. If you didn't go below. Well, I understand. Well, naturally I would ask for the lowest range but I --

THE COURT: No, but I assume all of your arguments would be the same, right? So I'm just --

MS. NEWMAN: Yes. But except that I think that the argument for a variance is more compelling than a lowest guideline when we have a first offender. Generally we give the lowest ends of the guidelines. We have a first offender and that the guidelines are so exorbitant here where it's very clear from the congressional intent, the legislative history, is we start high. And yet we've added and added and added.

26

That's what's driving them up. So that's why I think it's more compelling for a variance. A variance to represent that even -- let me mention -- I didn't mention this. When Probation did their analysis and we recognize that there were some problems with that analysis, but nonetheless, it was less than where we are now. And so that's also consideration. I mean at 48, why is 25 years necessary? What message does it send to anybody that 20 years isn't? And if all these years that they had been getting the sentences, and some of them where they've been less for more victims, some of them admittedly more, but the more, did it stop anybody? Is that the message? The message should be through people who, for example, served 15 years that's so hard for them and they come back in their 60s and say what are you doing? Look what it's done to me. Or do we have him die in jail and then what? To cost us more money when he's only going to send the body back to Mexico? To me it's just, I'm sorry, doesn't make sense. To me what makes sense is to give him a sentence that is serious. 15 years is serious, 18 years is serious. Who would say 18 years isn't serious? Why does it have to be 25? It's 25 or close to 25 because of the guidelines and that's the only reason. And that's why I say a variance here is the proper course and to recognize that his change and to recognize who he was generally, a good father and somebody who was a hard worker and had a horrible upbringing.

27

THE COURT:  Do you wish to speak?

THE DEFENDANT:  Yes, Your Honor.  I've had some really terrible experiences from the moment I was arrested and that has pushed me to change my way of being, of thinking, and of acting.  And it's precisely for this reason that I ask forgiveness of the victims, unfortunately.  I feel sorry.  I'm doing everything possible here in prison to change my ways.  In spite of the fact that there aren't many activities, I've tried to find a way of being a good person.  I asked forgiveness of the Government of the United States for having broken the law.  That's all.  Thank you.

MS. MERKL:  Thank you, Your Honor.  Your Honor, I'm going to start by just pointing out Ms. Newman ended on talking about how the guidelines were driving the sentence up and up and up and up and up.  And it is clear that the guidelines in this case are high, but it is the Government's submission that the guidelines in this case are high because the defendant's conduct was terrible and he needs to be fully held accountable for his crimes.  If the defendant had been -- if you're looking at the guidelines the way that Ms. Newman is, it's important to take into consideration the fact that there are five victims here that this defendant was involved in.  As to Jane Doe 6 alone, the calculation would have resulted in a sentence of 360 to life.  As to Jane Doe 8 alone, the guidelines would have resulted in a sentence of 151

28

to 188 months.  As to Jane Doe 3 alone, the guidelines would have amounted to 188 to 225 months.  As to Jane Does 5 and 7 alone, the guidelines would have each amounted to 151 to 188 months.  The grouping of the multiple counts analysis in this case, Your Honor, is actually giving the defendant a tremendous benefit.  The three points that were added at the end of the calculation yesterday subsumed all of that other conduct for which he would have been subjected to a 15-year mandatory minimum had he gone to trial and these additional potential sentencing exposures and he been convicted of any one of those girls alone.  So those three points, Your Honor, are entirely wiped away by the acceptance of responsibility and the global points that the Government awarded in this case to spare the victims the shame and indignity of having to testify at trial.  That was the basis for the global.  And the global takes into substantial consideration a reduction in this case.  Because the guidelines are high and they're driven to be very high, two points at these upper levels of the ranges is a tremendous amount of time.  Those two points should be considered by Your Honor as a substantial variance that has already been taken into consideration.  No further variance is appropriate here.  This defendant kidnapped a young woman with her 10-month-old baby and forced her into sexual servitude for a lengthy period of time in fear of her child being harmed.  Ms. Newman has talked much about this

29

affidavit from Sonja Rendon-Herrera as if that affidavit in some way undermines Jane Doe 6's account or causes there to be some lack of concern about recidivism here.  Your Honor, I would just point out Jane Doe 6, the affidavit pertaining to Jane Doe 6's child was sworn to by a co-conspirator in this case in a municipal office Tenancingo, Mexico which is the very epicenter of this trafficking epidemic that arises out of that city.  Ms. Newman's own factual recitation and her own sentencing submission underscore that Tenancingo has problems. Her own sentencing submission talks about the fact that the defendant is a product of a bribe situation in the Tenancingo court system.  Tenancingo is a very dangerous place.  The notion that Ms. Jane Doe 6 could have called the police and had her children rescued, Your Honor, is laughable on its face.  The agents who are in the courtroom and I have traveled to Mexico on numerous occasions in these cases.  Even the federal agents don't go to Tenancingo.  They're not permitted to do so without military and heavy police presence from the local authorities because it is that dangerous.  So blaming the victim for not being able to extract her child from that situation and placing undue reliance on an inherently unreliable document, Your Honor, should not be considered. This affidavit from Sonja Rendon-Herrera Herrera if it proves anything proves that Jane Doe 6's child was being held by the trafficking network and forcing her to work.

30

So Your Honor, other than the very fact of that situation, the nuances and subtleties of that affidavit, Your Honor, should not be given any credit. There's no corroboration for the claim that this child was inspected by a doctor. There's no corroboration for anything that Sonja Rendon-Herrera says other than the fact that he has acknowledged and Jane Doe 6 has advised that that is one of the women who was responsible for taking care of the child when she was being forced to work.

The other thing that is lacking in corroboration is the claim of torture. None of the other defendants in this case are claiming that. There's been no evidence to suggest that it's true. There's been no medical documentation of any kind to suggest that that's true. It comes out of nowhere unique to this defendant when we have five defendants that were extradited at the same time. That in and of itself is extremely suspect. Why Mr. Rojas? There's no explanation of that. There's no substantiation of that claim. And in the Government's view it should not be given any credit whatsoever.

In her discussion, Ms. Newman argued that the Plea Agreement in this case --

THE COURT: Weren't they all held in the same place?

MS. MERKL: Your Honor, I believe they were all held in the same place.

31

AGENT:   [Inaudible].

MS. MERKL:   I'm sorry?

AGENT:   [Inaudible].

MS. MERKL:   So the supervisory case agent in the rear of the courtroom just stated that they were held in the same place pending extradition but might have been separated in prior points when they were being arrest processed.   Is that a fair summary?   So --

MS. NEWMAN:   I'm talking about the arrest initially. I was speaking about the initial arrest.

MS. MERKL:   Well, Your Honor, the Government cannot disprove this allegation but there's no corroboration for the claim.   And it's strikingly absent from every other defendant in this case when all of the defendants were arrested by the same vetted Interpol group that works with the Mexican Federal Police as part of a coordinated operation with the Mexican Marines.   So I don't understand why Mr. Rojas -- and there's been no substantiation for that claim.

Ms. Newman spent a long time arguing that the Plea Agreement in this case was irrelevant and that it essentially amounts to a Pimentel letter where the Government's obligation, as the Court knows, is to give the defendant our estimate of the scenario that he may face upon pleading guilty.   And the Government's estimate, we do our best to be accurate.   Of course we had some discrepancies with the

32

Probation Department.  That's inevitable.  But at the end of the day our Plea Agreement absolutely had weight.  Five levels off, Your Honor, is an extremely substantial amount variance given how high the guidelines were in this case.  Without those five -- without the two levels for the global, Your Honor, we would be back in the range of 360 to life which is where we were throughout the plea negotiations for this defendant and for some of the other defendants.  And as a result of our lengthy and protracted negotiations we agreed to spare the victims the necessity of going through trial and reduce and give the offer.  To suggest that the Plea Agreement is somehow irrelevant in this case is ridiculous, frankly.  I mean no further variance from the guidelines is warranted. And the Government's view is that this defendant should be sentenced to the highest of the guidelines level found by the Court yesterday.  His conduct was terrible.  Jane Doe 6 is clearly still suffering the effects of that conduct as are all of the Jane Does in these cases.  These are wounds that can't really ever be healed.  Being trafficked, being held in captivity, losing a baby, all of the horrors that the Jane Does in these cases face is modern day slavery and it is a terrible, terrible thing to have to see when these victims explain what's going on, what happened to them.  And we can't look the other way, Your Honor.  15 years is totally insufficient.

33

THE COURT:   I'm not downwardly departing so we don't have to talk about 15 years.

MS. MERKL:   Thank you, Your Honor.   And Ms. Newman questioned whether or not deterrence is a factor in these cases and I can't speak generally of course to the broader academic question of whether deterrence works for certain types of crimes.   But what we can tell you, Your Honor, is anecdotally we're hearing from sources on the street, including sources in Mexico, that these prosecutions are making an impact in terms of whether or not Tenancingo based sex trafficking organizations are bringing their girls to the United States because they know that Homeland Security investigation into these cases in New York and the US Attorney's Office for the Eastern District of New York have been doing these cases for over a decade and they know that we reach into Mexico and we extradite people and we bring them to court to face the consequences of their actions.   So I can't speak about deterrence in general but we do have a sense that in these kinds of cases the message is getting through to Tenancingo and to the traffickers of Mexico that we are here and we are paying attention and we are hearing the victims and we are investigating the cases sufficiently so that we can prove these cases beyond a reasonable doubt in court and we're not backing down.

All of that being said, Your Honor, it's the

34

Government's position that Mr. Rojas deserves to be sentenced to the high end of the guidelines found by the Court yesterday and the fact that the Government took similar positions us to the defendants and the other plea agreements is because we're bound by the plea.  Of course we took the position that they should be sentenced within the guidelines estimate in the Plea Agreement.  That's our obligation because these defendants pled guilty.  It is not our view as to what's an appropriate sentence necessarily in each and every case.  They are just -- Mr. Rojas's conduct is certainly comparable to Odilon if not significantly worse given the violence that he inflicted upon Jane Doe 6 even though Odilon Martinez-Rojas had slightly more victims, involved with slightly more victims.  And I would note that Mr. Odilon Martinez-Rojas has already been sentenced to 262 months for his involvement with three women.  In this case he's looking at involvement with seven.  So we are asking for a sentence higher than 262 as to Mr. Odilon Martinez-Rojas as set forth in our agreement, as set forth in the agreement and as set forth in the sentencing submission.  We would ask for an even higher sentence --

THE COURT:  I don't want to get into Odilon Martinez but he was also --

MS. MERKL:  -- as to this defendant.

THE COURT:  Nobody got a role adjustment but it seemed to me that he was also, aside from the fact -- he was

35

also directing younger people and in that sense his role was somewhat more significant than this defendant.

MS. MERKL:  Your Honor, I don't necessarily agree with that notion.  In the context of the RICO here we did not ascribe role adjustments but there's little question and the evidence shows that Felix Rojas was involved in helping Jovan Rendon-Reyes who was a younger person in the organization to facilitate the transportation of those girls here.  If we had assigned roles to the RICO we likely would have moved for a two level of what adjustment, if not three, for Felix.  We did not do that here.  And Forja [Ph.], the Government and the Probation Department assigned roles.  That case pled out after jury selection.  That's the determination that they made based on the evidence that was available to them and those defendants' relationship with Arturo Rojas Coyoto [Ph.].  But you know, we did not include that in our Plea Agreement here. We are not advocating it now.

MS. NEWMAN:  Your Honor, I just have a few comments. It is laughable to use the Government's statement to say that Mr. Rojas has not submitted documentation of torture in Mexico.

THE COURT:  No, the argument is that it's not corroborated.

MS. NEWMAN:  Well, I can't --

THE COURT:  That there are other -- his co-

36

defendants who were --

MS. NEWMAN:  But they were not --

THE COURT:  -- similarly incarcerated --

MS. NEWMAN:  Well, I don't know about his co-defendants.  I don't know what happened to them.  I don't know what guards were in charge of them.  I don't know that.  But corroboration?  Did you really expect that we would bring in a police report that the prison guards were torturing people?  I mean that's absurd.  And the fact that the others -- I don't know that they weren't tortured.  I don't know what they told their attorneys.  I don't know what relationship they had with their attorneys and I'm not saying that they were or they weren't.  I don't know.  This is what I know.  And there is nothing before this Court that suggests that he's not being truthful.  And talk about corroboration, that the Government questioned her statement, Ms. Herrera's statement, then I would request that we stop this hearing and that we have a video conferencing.  I submitted a document from another court.  Never would I assume --

THE COURT:  Well, suppose it's true.

MS. NEWMAN:  Excuse me?

THE COURT:  Suppose I accept it.  So what?

MS. NEWMAN:  That's all I'm saying.  They're saying it can't be accepted.  I ask the Court to give it the weight it deserves.

37

THE COURT:   What if I do accept it?   Where does that --

MS. NEWMAN:   All it shows is, as I said, is that -- and I did not undermine Jane Doe's testimony victim statement which was not sworn to, but I don't care, I did not undermine it, I wouldn't dare undermine it, and I have said that, and he had said apologize to the victim.   So that's a mischaracterization.   Tenancingo, she blames Mr. Rojas for living and being born in Tenancingo.   She blamed him and said he should be punished more because his mother was involved somebody and he's illegitimate.

MS. MERKL:   Your Honor, I'm sorry --

MS. NEWMAN:   Excuse me.

MS. MERKL:   -- that is so --

MS. NEWMAN:   Excuse me.

MS. MERKL:   That is such a mischaracterization of what I said that I feel compelled to object.   I did not bring up anything about Tenancingo in our sentencing papers.   It is Ms. Newman who brought up Tenancingo in our sentencing papers. And I in no way at any point in my comments suggested that the defendant should in any way be sentenced due to his natural origin or his city of origin.   That is just an absolutely untrue statement, Ms. Newman.

MS. NEWMAN:   It's not untrue as to the way you characterized just now.   In my papers I submitted that so the

38

Court could have a background and an understanding of my client.  And that is certainly something the Court must consider.  We all should agree on that.  So that's why it was submitted.  She wants to -- the Government wants now to use that and say she submitted don't you see what a horrible place they grew up in?  Don't you see how horrible he is because that's what the inference is.  Well, I disagree.

THE COURT:  I don't understand.  I don't read anything in the Probation report that reflects everything that #6 said.

MS. NEWMAN:  I agree.

THE COURT:  So you know, I'm essentially dealing with the presentence report's description of what happened.

MS. NEWMAN:  And I would ask that the five levels off, we do get three for acceptance of responsibility as we plead to the indictment, so that's not a gift.  So the two levels, Your Honor, again the Government keeps talking about conviction, conviction, conviction.  The Court -- we are not talking about conviction of [inaudible] Jane Doe 6 and Jane Doe 8.  The rest is part of [inaudible] and that's what [inaudible], right?  That's what I'm arguing for the variance was that it was just by a preponderance.  That's simple. That's all I was saying.  It was not that difficult.

In addition, I absolutely object to the Government's constant reference to plea negotiations.  It should not be any

39

consideration to the Court and I know the Court knows that well.

So Mr. Rojas did not direct anybody. There's no evidence of any in the presentence report. The fact that he lent somebody money is not a direction. That's their directing him for money. Right? But there's no role adjustment here. And there's no evidence that he directed anyone in any of the affidavits or the presentence report which is the factual basis that we're going on.

So for all the reasons again, I understand the Court's already advised that it's not granting a variance, but I do believe that a variance is warranted here and that any sentence in the 20-year range is just far too much for a 48-year old man who does not represent a danger to the United States for sure, and that's what we're talking about and Mexico, where they seem to be so concerned about their well being. Thank you. Unless the Court has any other questions.

MS. MERKL: Your Honor, once again, I just want to reiterate there's absolutely nothing in my comments that was meant to imply any additional punishment due to this defendant's country of origin. I was speaking about deterrence and I was speaking about limited areas. In no way was I suggesting anything other than direct responses to Ms. Newman's argument.

With all that said, Your Honor, based on everything

40

in this case, the presentence report, the Government's sentencing submission, victim impact statement, the affidavit which was sworn -- Ms. Newman just characterized Jane Doe 6's statement as un-sworn while the Court in fact has her affidavit which describes her efforts to take care of her child, the Government respectfully submits that a sentence at the high end of the range found yesterday is entirely appropriate for this defendant and we request a sentence of 365 months.

MS. NEWMAN:  Excuse me, Your Honor, I just want to ask my client if he needs me to say anything else for a moment.  Thank you very much.

[Pause in proceedings.]

MS. NEWMAN:  Thank you, Your Honor.

THE COURT:  I'm somewhat concerned about your argument that I should give a top of the guideline range because of the three points that he got for simply for pleading guilty and the additional two points for a global.  I think he deserves a guideline sentence but I'm not sure -- I'm troubled by the notion that the factors that went into the guideline calculation, that I should go to the top of the guideline calculation because those were somehow illegitimate factors.

MS. MERKL:  Your Honor, the Government is in no way implying that within the range you should sentence at 365

41

because of the fact that he got the global points.  The Government's --

THE COURT:  And the --

MS. MERKL:  And the acceptance of responsibility. The Government's argument --

THE COURT:  Which were three, which was --

MS. MERKL:  I'm sorry?

THE COURT:  Which were three points.

MS. MERKL:  Three points for acceptance and two points for the global.  The Government's argument that he should be sentenced to the top end of the range is based on his offense conduct.  The abduction of Jane Doe, the extreme violence inflicted upon her, the lifetime scars that she and Jane Doe 8 and the other Jane Does will have to bear, and this defendant's long, you know, and involved role in this trafficking organization.  The evidence we went over yesterday in calculating the guidelines established that he was involved with this organization for at least six years between 2006 and his alleged departure from the organization in 2011.  As we all know, the law of conspiracy is that the conspiracy continues until somebody affirmatively withdraws or the objects of the conspiracy have terminated.  We have no evidence that he actually withdrew from this family conspiracy to exploit women and girls.  Our position is that he was involved in this organization for a very long time, it was due

42

to the structure of this family network that were able to victimize as many women as they did.  He actively facilitated and participated in that activity including the exploitation of two minors, each of whom, Your Honor, is accounted for by half a guidelines level in the ultimate multiple count analysis.  It's the way that the multiple count analysis works that causes the Government to believe that a high sentence within the guidelines range is appropriate.  Each of the discount that he got for each of these Jane Does is very substantial because of his egregious conduct towards Jane Doe 6.  He got between a half a -- he got a half a point for each of the additional victims, Your Honor.  And that is frankly in the Government's view entirely insufficient to account for the seriousness of his criminal conduct and the need for punishment and deterrence.

MS. NEWMAN:  Your Honor, I must add, because I did not, it's multiple count analysis?  That's the guidelines.  It's the guidelines no matter what.  So the multiple count is what they signed in for by having this, the Ruggiero count.  That's what it says.  That's the law.  So I don't find that that's a reason to give a upward, the upward range.  That's the law.  His conduct is not any more egregious than anybody else.  And in fact, three of the individuals, what I constantly argue, three -- it was so limited, limited.  2006, what's their evidence of his total involvement?  What have

43

they presented?  That he lent money.  That's it.  There is no other evidence.  None.  And that goes to the other Jane Doe.  So on the contrary, there is nothing to suggest that with respect to yes, the guidelines place him in that level, yes the guidelines as the Court found make him responsible, but when we're talking about a variance, we're talking about whoa reality check.  What really happened here?  He lent money.  That's what it says.  That's what he did.  That's all I'm saying.

THE COURT:  Forgetting about -- not forgetting about, but putting aside the manner in which this guideline was achieved, his conduct was particularly with respect to 3 and the other one was, what was it, 6?

MS. MERKL:  6 and 8.

THE COURT:  6 and 8.  Was really outrageous.  And the one thing you haven't alluded to in the 3553(a) factors is the seriousness of the offense.  I mean this is pretty outrageous behavior, conduct rather --

MS. NEWMAN:  Your Honor, I want to just --

THE COURT:  -- in fact.  Go ahead.  And that's one thing you haven't alluded to.  I'm not saying I'm giving him the top of the guidelines.  I just want to be sure that --

MS. NEWMAN:  And I don't think I've addressed 8.  And I think that 8 is something I should have addressed, and I think Your Honor's right.  And the reason is there was a child

44

who he cared for --

THE CLERK:   [Inaudible].

MS. NEWMAN:   Oh.   There is a child who he cared for who lived with him who he returned to the mother at her request.   She had the child brought to him and then returned on his request.   They purposely had the child born in the United States.   That's with respect to 8.   This child who he cared for and had a bond with he hasn't seen and has been kept from him.   His also.   The Government concludes that.   It's still his child and he still loves her.   But they have not allowed her to see him.   So there's also this -- what I'm trying to say, yes, and I have not said his offense conduct is not serious.   It was serious, Your Honor.   Of course it's serious.   That's why the guideline starts at level 30.   Right? For both of them.   But for 8 it's 34 which was the 30 plus the 4 that automatically comes.   That's what it was.   So I understand the Court's concern.   And yes, and that's what he's so ashamed of of course.   But there's more to sentencing than just punishment and that's what I guess I'm saying.   It's taking everything into account.

MS. MERKL:   Your Honor, I would also note that he beat Jane Doe 8 multiple times and sent her child to Mexico. I'd also note that he hit and beat Jane Doe 8 multiple times and sent the child to Mexico so she could earn more money.

MS. NEWMAN:   I don't know that.   We don't have that

45

in the affidavit.

MS. MERKL:  It is in the extradition paperwork, Your Honor, and it is also in the April 5, 2019PSR at Paragraph 28.

MS. NEWMAN:  I do know that he did return the child upon her request and that it was arranged through the godparent, I think godmother, that she meet him at the border and she return.  So as I say, there's two sides of every story.  But the fact of the matter is he had -- the child was born in the United States purposely.  Why do you do that if you don't care about the child?  It was an attempt on both of them that they be born in the United States.  And then she had the child brought back to Mexico and then he returned the child.  But what I was also talking about more to the point [inaudible] the child and I had submitted photographs of him with the child.  It's a normal thing.  They talk about how it's hurtful for the mother.  It's hurtful for my client not to see his child.  It's not one-sided.  Yes, it was a [inaudible].

MS. MERKL:  The conduct of Jane Doe 8 was not as violent as the conduct with Jane Doe 6 because of the lack of -- the forced abortion with the violence in the abortion.  But the conduct with Jane Doe 8, Your Honor, is substantially similar in that the defendant again took a child away from the mother to send the child back to Mexico to cause the woman to work.  And so the conduct --

46

MS. NEWMAN:  I disagree with that.

MS. MERKL:  Excuse me.  The conduct here, Your Honor, has to Jane Doe 8 should not be overlooked and was very serious.  Jane Doe 6 wants to come to sentencing to make the victim impact statement so in some ways she has sort of taken more of the spotlight than Jane Doe 8 has been given time for. But the idea that Jane Doe 8 was just purely a loving relationship with this child and bringing the child to the US is not Jane Doe 8's understanding and were not the coercive placed upon Jane Doe 8 to continue to work shortly after giving birth to a child.

MS. NEWMAN:  Your Honor, that [inaudible] level 34. That's why we found level 34 because we all agreed that there were threats, physical threats and physical force to make them be prostitutes.  That's clear in every single case.

MS. MERKL:  And Your Honor, that level 34 --

MS. NEWMAN:  And that that's level 34 and that's what's in consideration.  That's what we're saying.  That's how we got to level 34.  Nobody's saying that this -- we never said that Jane Doe 8 is not a victim.  We didn't say that.  He apologized.  Never.  But you can't deny that this is a child that he loved.  Say no, he's a monster.  He's not a monster. They don't see the whole person.  They see only one aspect and we look at the whole person.  That's what I'm saying.

MS. MERKL:  Your Honor, I would just again note

47

because of the disparity in the guideline calculation between Jane Doe 6 and Jane Doe 8 in the final analysis his conduct towards Jane Doe 8 earns him half of a level within the guidelines which is again the Government's reason for proposing a sentence at the top end of the range.

THE COURT:   I know.   But all of these -- it seems to me that one should take an overall view of his conduct rather than this micro view of the half a point here and a point there.   And I think --

MS. MERKL:   Agreed, Your Honor.

THE COURT:   I'm going to sentence the defendant to the custody of the Attorney General for a period of 300 months or 25 years and a period of five years supervised release with the condition that if the defendant is removed he not reenter the United States illegally.   He shall cooperate with and abide by all instructions of the Immigration Authority.   That the defendant shall comply with any potential restitution orders and that upon request the defendant shall provide the Probation Department with full disclosure of his financial records including commingled income, expenses, assets, and liabilities to include income tax returns with the exception of the financial accounts reported and noted within the presentence report.   The defendant is prohibited from maintaining or opening any additional and/or joint checking, savings, or other financial accounts for either personal or

48

business purposes without knowledge and approval of the Probation Department.  The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and information and expenses.  The defendant shall cooperate in the signing of any necessary authorizations to release information forms pertaining to the US Probation Department access and his or her information and records. Well, I don't know how significant this is but the defendant shall comply with any applicable state and federal and/or federal tax offender registration requirements as instructed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student.  That's the Probation Department's boilerplate which since he's going to be deported I don't think is relevant here but I pose it as a condition.  And I also impose a $200 special assessment.

MS. NEWMAN:  And I'm sorry, did you address the fine?

THE COURT:  As I said, I think -- pardon me?

MS. NEWMAN:  The fine?

THE COURT:  I'm not imposing a fine.

MS. NEWMAN:  I'm sorry.  Thank you.

THE COURT:  I don't think he can afford to pay a fine.

49

MS. MERKL:   We have no evidence that he could afford to pay.

THE COURT:   I think the sentence that I've imposed basically, we've gone over this, reflects I think the extreme seriousness of the offense as well as the other factors set out in Section 3553(a).   That's it.

MS. MERKL:   Your Honor, restitution?

THE COURT:   Oh, well I thought we agreed that --

THE CLERK:   There will be a supplemental submission for that.

THE COURT:   Yes, we're going to order restitution in an amount that you are going to -- you're going to provide me with.

MS. MERKL:   Your Honor, just to be clear, it is in our sentencing submission but we will respond to whatever Ms. Newman indicates.

THE COURT:   I'm sorry, I wasn't --

MS. MERKL:   We just wanted to make the record complete.

THE COURT:   -- I wasn't focusing on restitution.

MS. MERKL:   No, I understand.

THE CLERK:   Judge, it will read that the restitution has been reserved and I'll issue an amended J&C after that.

MS. MERKL:   Very good.   I just wanted to make the record complete as to the Court's sentencing.

50

THE COURT:  Yes.  Okay.

MS. MERKL:  Oh, Your Honor, the deadline for submission as to restitution?

THE COURT:  Somebody said something about 90 days but I don't --

MS. NEWMAN:  It has to be done --

MS. MERKL:  It has to be done in 90 days.

MS. NEWMAN:  -- by 90 days.  [Inaudible] 60 days.

MS. MERKL:  Your Honor, 60 days is pushing up against the deadline if the Government is expected to respond so is it possible it happens within two weeks or 30 days --

MS. NEWMAN:  No.

MS. MERKL:  -- and we will respond?

MS. NEWMAN:  No.  I'm sorry, Your Honor, because I had something else pending.  I would like at least 45 days.  It's not going to be a very lengthy submission and I don't expect the Government's submission.  They said they're going to rely on their papers already submitted.

MS. MERKL:  But we may need to respond.  I mean we don't know what her papers will say.

THE CLERK:  45 days, Judge?

THE COURT:  I'm going to give her the 45 days.

THE CLERK:  45 days.

MS. NEWMAN:  Thank you.  I appreciate it, Your Honor.

51

THE CLERK:   The Government will let me know if they need additional time to respond to that.

MS. MERKL:   Thank you.

THE CLERK:   Judge, that sentence was on each count to run concurrently?

THE COURT:   It's one sentence.

MR. GJELAJ:   So both counts.

THE COURT:   Hm?

MR. GJELAJ:   To run concurrent, right, on both counts.

MS. NEWMAN:   Yes.

THE COURT:   Oh, yes.

THE CLERK:   Disposition of any remaining counts for the underlying indictment, counsel?

MS. MERKL:   The Government would move to dismiss any open underlying counts, Your Honor, and the underlying indictment.   He was --

THE COURT:   Dismissed.

THE CLERK:   Has the defendant waived his right to appeal in the Plea Agreement?

MS. MERKL:   Yes, at a sentence of coincidentally 300 months.

MS. NEWMAN:   [Inaudible].   Yes.

THE CLERK:   Thank you very much, counsel.

MS. NEWMAN:   Okay.   Just for the record, I will

Case 19-2664, Document 21, 09/10/2019, 2651417, Page324 of 333

52

advise the defendant of his right to appeal although it's been waived.  I will try my best to explain that [inaudible].  Thank you.

THE CLERK:  Thank you.

(Proceedings concluded at 1:00 p.m.)

* * * * * *

53

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

*Mary Greco*
_____
Mary Greco

Dated:   April 5, 2019

# EXHIBIT 4
**(Judgment)**

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| FELIX ROJAS | ) Case Number:  15CR348 |
| | ) USM Number:  81210-053 |
| | ) DONNA NEWMAN |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1, 17 OF SPSDG INDICTMENT

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1961(1) | RACKETEERING | 11/30/2015 | 1 |
| 18:1591(a)(1) | SEX TRAFFICKING | 2/28/2014 | 17 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   RMG   ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/4/2019
Date of Imposition of Judgment

S/Edward R. Korman
Signature of Judge

EDWARD R. KORMAN, USDJ
Name and Title of Judge

8/15/19
Date

AO 245B (Rev. 11/16)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ____2____ of ____7____

DEFENDANT:  FELIX ROJAS
CASE NUMBER:  15CR348

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

THREE HUNDRED (300) MONTHS.

☐  The court makes the following recommendations to the Bureau of Prisons:

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:  FELIX ROJAS
CASE NUMBER:  15CR348

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :     FIVE YEARS.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
     ☐ The above drug testing condition is suspended, based on the court's determination that you
        pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Case 1:15-cr-00348-ERK   Document 168   Filed 08/16/19   Page 4 of 7 PageID #: 2028

AO 245B (Rev. 11/16)     Judgment in a Criminal Case
                         Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT: FELIX ROJAS
CASE NUMBER: 15CR348

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

Case 1:15-cr-00348-ERK   Document 168   Filed 08/16/19   Page 5 of 7 PageID #: 2029

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
                       Sheet 3B — Supervised Release

Judgment—Page  5  of  7

DEFENDANT:  FELIX ROJAS
CASE NUMBER:  15CR348

## ADDITIONAL SUPERVISED RELEASE TERMS

- If removed, defendant may not re-enter the United States illegally;
- The defendant shall cooperate with and abide by all instructions of immigration authorities;
- The defendant shall comply with any potential restitution and forfeiture orders;
- Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of his/her financial dealings and shall provide truthful monthly statements of his/her income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his/her financial information and records.
-The defendant shall comply with any applicable state and/or federal sex offender registration requirements, as instructed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student;

Case 1:15-cr-00348-ERK   Document 168   Filed 08/16/19   Page 6 of 7 PageID #: 2030

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page 6 of 7 |
|---|---|

DEFENDANT: FELIX ROJAS
CASE NUMBER: 15CR348

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ | $ 367,500.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Jane Doe 3 | $21,000.00 | $21,000.00 | |
| Jane Doe 5 | $29,400.00 | $29,400.00 | |
| Jane Doe 6 | $102,900.00 | $102,900.00 | |
| Jane Doe 7 | $58,800.00 | $58,800.00 | |
| Jane Doe 8 | $155,400.00 | $155,400.00 | |
| TOTALS | $ 367,500.00 | $ 367,500.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the     ☐ fine     ☐ restitution.

☐ the interest requirement for the     ☐ fine     ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

DEFENDANT:  FELIX ROJAS

CASE NUMBER:  15CR348

Judgment—Page ___7___ of ___7___

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

Joint ans several with the other defendants convicted with trafficking each Jane Doe.